**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SAMUEL COHEN, TABATA KELLNER, JOANNA MICIUS, TAMAR PACHT, LANA RITTERMAN-MCANDREW, FAITH SHEIBER, and YULIYA STEIN,**<br><br>*Plaintiffs,*<br><br>-against-<br><br>**THE CITY OF NEW YORK, DEPARTMENT OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK, and SYE-EUN AHN,**<br><br>*Defendants.* | Civil Action No. ____________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Samuel Cohen, Tabata Kellner, Joanna Micius, Tamar Pacht, Lana Ritterman-McAndrew, Faith Sheiber, and Yuliya Stein (collectively, "Plaintiffs"), by and through their undersigned counsel, the National Jewish Advocacy Center, Inc., for their Complaint against Defendants the City of New York (the "City"), the Department of Health and Mental Hygiene of the City of New York ("DOHMH" or the "Department"), and Sye-Eun Ahn ("Ahn") (together, "Defendants"), allege as follows:

## I. NATURE OF THE CASE

1. This is an action by seven employees of the New York City Department of Health and Mental Hygiene (DOHMH) to redress discrimination on the basis of religion, creed, ethnicity, ancestry, and national origin in the terms, conditions, and privileges of their employment, and a hostile work environment directed at Jews who identify with the Jewish people's historic connection to the Land of Israel and the State of Israel, and those who affiliate with and support

such Jews. Three Plaintiffs are among the leaders of HINENU, a Jewish employee group at DOHMH.

2. DOHMH operates an Employee Resource Group (ERG) program that confers official recognition, an agency e-mail account, a SharePoint page, a place on the agency's ERG calendar, and a $5,000 annual budget on employee groups that "share common identities or backgrounds." DOHMH has recognized six ERGs.

3. Since July 2025, DOHMH has twice refused to recognize a Jewish ERG on the stated ground that Jewish identity is "religious" and that "ERG identity cannot be based on religious groups." The written denial so ruled although HINENU's application and charter stated, repeatedly and expressly, that the group is organized around the shared peoplehood, ancestry, ethnic heritage, culture, and history of the Jewish people, that it "will not engage in political advocacy, religious worship, or religious instruction," and that it "is not organized to advance, oppose, or practice any religion."

4. DOHMH, by contrast, recognized an ERG defined by the shared regional ancestry and heritage of the "indigenous peoples of Southwest Asia and North Africa" — a group that, by its charter's own account, encompasses multiple religious identities — and sponsors City training teaching its staff that bias against Muslims is a form of "racism" and that Muslims are a "racialized" group.

5. On December 16, 2025, days after two gunmen murdered Jews gathered for a Hanukkah celebration at Bondi Beach in Sydney, Australia, HINENU sent from its agency e-mail account, to the approximately eighty-five DOHMH employees on its mailing list, a Hanukkah message mourning the victims and quoting a New York rabbi's public statement that "anti-Zionism kills Jews," and convened an online support space for grieving Jewish employees. The next day,

within hours of HINENU's "Urgent Requests" e-mail to senior leadership, DOHMH's EEO Director ordered HINENU to "desist" from using its agency e-mail account.

6. DOHMH then opened an EEO investigation of eight leaders of HINENU, including three Plaintiffs, for "racial and religious discrimination," on a complaint by fourteen co-workers, most of whom, upon information and belief, had neither received the e-mail nor attended the event, and several of whom had organized the Department's own anti-Israel programming.

7. Over a nearly four-month investigation, DOHMH's investigators interrogated HINENU leaders about their beliefs concerning Zionism, Israel, and the meaning of the slogan "globalize the intifada," pressed them to concede that quoting a rabbi's condemnation of that slogan was "inflammatory," "political," and "triggering," and suggested that Jews who fear those who chant "globalize the intifada" thereby express hostility to Arabs and Muslims.

8. On June 24, 2026, DOHMH closed the case, stating that it was "unable to make findings" because it could not adopt "a definitive interpretation of terms and slogans such as 'anti-Zionism' and 'globalize the intifada.'" Sixteen days later, Defendant Sye-Eun Ahn — the same EEO Director who had issued the "desist" order and had been assigned to investigate the HINENU Plaintiffs — denied HINENU's ERG application with a single sentence.

9. These acts occurred as part of an environment at DOHMH, prevailing since October 7, 2023, hostile to Jews, embodied primarily in severe and pervasive messaging of animus toward the State of Israel and support for its enemies. The State of Israel is the world's only Jewish state and home to approximately half of the world's Jews, but represents only about 0.12% of the world's population.[1] Israel is the only foreign nation that has been the subject of sustained and

---

[1] Israel Central Bureau of Statistics, Media Release No. 117/2026, *Israel's Independence Day 2026* (Apr. 19, 2026) (population of 10.244 million), https://www.cbs.gov.il/he/mediarelease/DocLib/2026/117/11_26_117e.pdf; U.S.

dedicated programming and messaging issued by and at DOHMH, none of it pertinent to DOHMH business.

10. Since October 2023, DOHMH's leadership and its official "Equity" offices have carried on a sustained pattern of hostile programming and messaging on Israel, Gaza, and Palestine, through official agency channels. In substance, DOHMH determined — as a matter of agency policy — that Israel was committing "genocide," accompanied by expressions of support for Israel's enemies, without reasonable adjudication of the facts, and without legitimate connection to the agency's public health mission.

11. That policy was reflected in at least the following: a Deputy Commissioner (DC)'s division-wide message describing the "settler colonial establishment of Israel" and "ongoing apartheid"; the Acting Commissioner's Monday message on the "war in Gaza," citing casualty figures attributed to "Gaza's Ministry of Health" (*i.e.*, Hamas); an agency-recorded training series in which a participant described the October 7, 2023 massacre committed by Hamas (the October 7 massacre) as "the counter-terrorist acts of an indigenous peoples" and "armed resistance" that "oppressed groups have every right to use," without recorded objection; an International Holocaust Remembrance Day (IHRD) message that ignored Jewish employees' comments on the draft requesting omission of antisemitic statements hostile to the Jewish state, such as a passage instructing staff to "confront genocide in the present, in Gaza"; and a February 3, 2026 agency-organized, agency-promoted hybrid workshop at DOHMH headquarters (the February 3 event), convened by DOHMH's Division Equity Liaisons (DELs), with anti-Israel propaganda, held by a

---

Census Bureau, *World Population Day: July 11, 2026* (International Database projection of 8.2 billion in July 2026), https://www.census.gov/newsroom/stories/world-population-day.html.

working group that the DOHMH host told more than 100 attendees was "developed in response to the ongoing genocide in Palestine."

12. Anti-Israel posters, flyers, and slogans — including maps of "Palestine" that erase Israel and union flyers accusing Israel of "genocide" — are displayed at workstations and on public walls at DOHMH's headquarters, in violation of written agency rules. Upon information and belief, DOHMH has enforced its rule on the use of agency e-mail accounts against no group other than HINENU.

13. Since January 2026, that pattern has been encouraged by the official policy and public statements of the City's chief executive, who on his first day in office revoked the City's adoption of the leading definition of antisemitism and the City's order barring agency boycotts of, and mayoral pension trustees' divestment from, Israel; told a rally that "[t]he monsters that we are up against, they take many different forms" before denouncing a pro-Israel advocacy organization; in July 2026 used the Mayor's Office to broadcast, as "objective facts," the accusation that the Prime Minister of Israel is "the architect of a horrific genocide" and to announce that his administration had examined whether the City could arrest him; and on October 7, 2026, the third anniversary of the massacre, issued an official City statement that did not mention Jews but accused Israel of an "ongoing genocide in Gaza" funded by American "tax dollars." That accusation is the same one DOHMH's leadership and equity infrastructure had pressed on its staff. The Mayor's statements and policy decisions are pleaded as evidence of the purpose behind City policy toward Jews who identify with Israel, and of the City's endorsement of DOHMH's conduct, as set out in paragraphs 151–164 and 168–191 and the Ninth Claim for Relief.

14. When Jewish employees complained — about a 2025 anti-Israel event on agency premises, about the February 3 event before it occurred, and about the agency's silence after the

Bondi Beach massacre — DOHMH ignored or dismissed those complaints and investigated the complainants.

15. DOHMH's May 2026 staff antisemitism training — a repeat of a December 2024 session, again paired with a training on anti-Muslim bias — omitted any discussion of Zionism, mentioned Israel only in a population statistic, did not address the Jewish people's ancestral connection to the Land of Israel, and, while cataloguing various conquests of that land, omitted the seventh-century Islamic conquest. The presenters also disabled the chat and left unanswered Plaintiff Pacht's question, "What is driving anti-Jewish hate and discrimination today?"

16. Defendants' conduct constitutes intentional discrimination on the basis of race, ethnicity, shared ancestry, and national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"); discrimination on the basis of creed, religion, race, national origin, and ethnicity in the terms, conditions, and privileges of employment, and the maintenance of a hostile work environment, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL"); retaliation in violation of the NYSHRL and NYCHRL; and denial of the equal protection of the laws, and abridgment of the freedom of speech, the freedom of association, and the right to petition for redress of grievances, in violation of the First and Fourteenth Amendments, actionable under 42 U.S.C. § 1983.

17. Plaintiffs seek declaratory and injunctive relief, including an order directing Defendants to recognize HINENU as an ERG on the same terms as every other recognized ERG, and to expunge EEO Case No. 161370 from Plaintiffs' records, along with compensatory damages, punitive damages against Defendant Ahn, and attorneys' fees and costs.

## II. PARTIES

### A. PLAINTIFFS

18. Plaintiffs are, and at all relevant times were, employees of DOHMH working at or from its Gotham Center headquarters at 42-09 28th Street, Long Island City, New York (Gotham), or other DOHMH facilities in the City of New York. Six Plaintiffs — Plaintiffs Cohen, Kellner, Pacht, Ritterman-McAndrew, Sheiber, and Stein (the "Jewish Plaintiffs") — are Jewish by ancestry and ethnicity and are members of the Jewish people; these Plaintiffs also identify with the Jewish religious tradition, whether or not they are religiously observant.

19. For these six Plaintiffs, identification with the Jewish people's historic and ancestral connection to the Land of Israel, and support for the continued existence of the State of Israel as the national home of the Jewish people, are sincerely held components of their Jewish religious belief and ethnic identity.

20. Plaintiff Samuel Cohen is Director of eLearning in the Bureau of Workplace Development and Learning at Gotham. Mr. Cohen is Jewish, has a sincere and serious interest in Jewish culture and history, wishes to attend events of the proposed Jewish ERG, and is aggrieved by DOHMH's denial of that ERG.

21. Plaintiff Tabata Kellner is a Borough Nursing Director for the Office of School Health and works at 160 West 100th Street, New York, New York. Ms. Kellner is of Jewish ancestry, has a sincere and serious interest in Jewish culture and history, anticipated the creation of the ERG, was listed on HINENU's ERG application as an interested member, wishes to attend events of the proposed Jewish ERG, and is aggrieved by DOHMH's denial of that ERG.

22. Plaintiff Joanna Micius is a Public Health Adviser II in the Bureau of Hepatitis, HIV, and Sexually Transmitted Infections and works at Gotham. Ms. Micius is not Jewish. She has a sincere and serious interest in Jewish culture and history, wishes to attend events of the

proposed Jewish ERG, and is aggrieved by DOHMH's denial of that ERG. Ms. Micius associates with her Jewish colleagues and with HINENU, participates and wishes to participate in Jewish cultural activities and events at DOHMH, and has been injured by Defendants' discrimination against the Jewish employees and ERG with which she associates. She asserts her claims based on that association and in her own right as an employee denied the benefits of the proposed ERG.

23. Plaintiff Tamar Pacht is a Quality Assurance Analyst in the Bureau of Public Health Clinics, assigned to DOHMH's office at 30-30 47th Avenue, Long Island City, New York. Ms. Pacht is the founder of HINENU; drafted HINENU's Hanukkah message of December 16, 2025; submitted HINENU's June 30, 2026 ERG application as its designated Representative; received DOHMH's July 10, 2026 denial of that application; and would lead a recognized Jewish ERG. She objected in writing to the February 3 event before it occurred and has personally observed the workplace displays described in Part IV.G.4.

24. Plaintiff Lana Ritterman-McAndrew is a Crisis Programs Consultant in the Bureau of Children, Youth, Families, and Developmental Disabilities at Gotham. Ms. Ritterman-McAndrew is Jewish, has a sincere and serious interest in Jewish culture and history, wishes to attend events of the proposed Jewish ERG, and is aggrieved by DOHMH's denial of that ERG.

25. Plaintiff Faith Sheiber is Director of the Evaluation Standards Unit in the Bureau of Early Intervention at Gotham.

26. Plaintiff Yuliya Stein is a Borough Nursing Director, Region 6, in the Office of School Health, at 1780 Ocean Avenue, Brooklyn, New York. She participated in the July 16, 2025 meeting at which DOHMH first refused to permit a Jewish ERG; reported anti-Israel events on agency premises to DOHMH's EEO Director in 2025; and co-facilitated the December 18, 2025 support space.

27. Plaintiffs Pacht, Sheiber, and Stein (HINENU Plaintiffs) are all Jewish, members of HINENU's leadership committee, listed on HINENU's ERG application as interested members, involved in attempts to form the Jewish ERG, and subject to a retaliatory investigation by DOHMH. They were served with a Notice of Complaint in EEO Case No. 161370 on March 30, 2026, and interviewed under compulsion on April 16 and 17, 2026. They receive DOHMH's agency-wide communications and attend agency-wide meetings and events.

## B. DEFENDANTS

28. Defendant City of New York is a municipal corporation organized under the laws of the State of New York. DOHMH is an agency of the City. The City is Plaintiffs' employer within the meaning of the NYSHRL and the NYCHRL, and is a recipient of federal financial assistance supporting employment at DOHMH, within the meaning of Title VI.

29. Defendant Department of Health and Mental Hygiene of the City of New York is the City's public health agency, headquartered at 42-09 28th Street, Long Island City, New York 11101. Pursuant to Chapter 22, § 564 of the New York City Charter, the Department "may sue and be sued in and by the proper name of 'Department of Health and Mental Hygiene of the City of New York.'" DOHMH is therefore a proper defendant on each claim asserted against it, including the Ninth Claim for Relief under 42 U.S.C. § 1983. DOHMH receives federal financial assistance, including grants from the United States Centers for Disease Control and Prevention and the United States Department of Health and Human Services. According to public federal grant records, in federal fiscal year 2026, HHS is obligated to provide more than $200 million in federal financial

assistance for DOHMH, directly to the City or through DOHMH's fiscal agent, Public Health Solutions.[2]

30. Defendant Sye-Eun Ahn is, and at all relevant times was, EEO Director of DOHMH, and denied approval of the Jewish ERG and conducted a retaliatory investigation of the HINENU Plaintiffs.

31. At all relevant times, the officials whose conduct is described below — including Commissioner of Health (COH) Alister Martin; former Acting COH (ACOH) Michelle Morse (also former Chief Medical Officer (CMO) and former DC for the Center for Health Equity and Community Wellness ("CHECW")); former CHECW DC and former Chief Equity Officer Zahirah McNatt; former Chief of Staff Jenna Mandel-Ricci; Chief of Staff Jill Krauss; Director of the Office of Equal Employment Opportunity (EEO Director) Sye-Eun Ahn; Director of Employee Relations (ER Director) Juanita Saldivar; Deputy EEO Director June Bridgemohan; General Counsel Irene Mendez; and EEO investigators Jay Brodska and George Poubouridis — were employees and agents of Defendants acting within the scope of their employment and exercising managerial or supervisory authority delegated to them by Defendants.

---

[2]USAspending.gov, award and transaction records (retrieved Nov. 5, 2026), https://api.usaspending.gov/. Net HHS obligations dated October 1, 2025 through September 30, 2026: $193,136,995.61 under seventeen awards to the City of New York (UEI XKJ3F8WKV2L3) for DOHMH (Award Nos. H79SM089488, H8900015, NH23IP922705, NH25PS005177, NH25PS005226, NH25PS005265, NU50CK000517, NU51CK000368, NU51PS005167, NU52PS910258, NU58DP007511, NU62PS924775, NU62PS924835, NU62PS924871, NUE2EH001446, U50OH009739, and UT833949), and $33,506,553.00 under four awards to Public Health Solutions (UEI GSAHEHG8MNL7) for DOHMH (Award Nos. NE11OE000057, NU90TP922310, NU90TU000059, and U3REP240780), for a total of $226,643,548.61. *See* USAspending.gov, Recipient Profile, City of New York, UEI XKJ3F8WKV2L3 (alternate names include "NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE"), https://www.usaspending.gov/recipient/8a4a5698-e56e-f2ea-e551-884e4de0b514-C/latest; USAspending.gov, Award NE11OE000057 ("DOHMH WILL UTILIZE A FISCAL AGENT, PUBLIC HEALTH SOLUTIONS, TO RECEIVE, OBLIGATE AND LIQUIDATE GRANT FUNDS ON DOHMH'S BEHALF."), https://www.usaspending.gov/award/ASST_NON_NE11OE000057_075.

## III. JURISDICTION AND VENUE

32. This Court has original subject-matter jurisdiction over Plaintiffs' claims under Title VI and 42 U.S.C. § 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because those claims arise under the Constitution and laws of the United States.

33. This Court has supplemental jurisdiction over Plaintiffs' claims under the NYSHRL and the NYCHRL pursuant to 28 U.S.C. § 1367(a), because those claims arise from a common nucleus of operative facts with Plaintiffs' federal claims and form part of the same case or controversy.

34. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant City of New York resides in this District, where its seat of government is located, and all Defendants are residents of the State of New York. Upon information and belief, Defendant Ahn resides in the State of New York.

35. No notice of claim is required as a condition precedent to Plaintiffs' NYSHRL and NYCHRL claims against the City, and no administrative exhaustion is required before bringing claims under Title VI, § 1983, the NYSHRL, or the NYCHRL in this Court. Plaintiffs have not filed complaints concerning these matters with the New York State Division of Human Rights or the New York City Commission on Human Rights (CHR). Plaintiffs will serve a copy of this Complaint upon CHR and the Corporation Counsel, as provided in N.Y.C. Admin. Code § 8-502(c), upon filing.

36. All conduct complained of occurred within the three-year limitations period preceding the filing of this action, or is part of a continuing course of conduct the last act of which occurred within that period. All of the events alleged herein from October 2023 to the present are pleaded as part of a continuing violation and of a single, continuing hostile work environment of

which acts within the limitations period form a part, and as background evidence of Defendants' motive and knowledge.

## IV. STATEMENT OF FACTS

### A. JEWISH IDENTITY AND THE CONDUCT AT ISSUE

37. The Jewish people are an ethnoreligious people — a joinable tribal group sharing an identity rooted in common ancestry, history, culture, languages, traditions, and heritage, as well as religion — indigenous to the Land of Israel. Many Jews identify as Jewish regardless of their religious beliefs or observance. Jews are protected against discrimination on the basis of race, ancestry, ethnicity, and national origin, as well as religion and creed.

38. The Jewish people originated in the Land of Israel, where the ancient kingdoms of Israel and Judah and the First and Second Temples in Jerusalem stood. The Land of Israel is approximately coincident with the Roman province of Judea, for which the Jews are named. The modern State of Israel is situated within the Land of Israel. Over millennia, Jews were repeatedly conquered, exiled, and expelled from that land, and Jewish communities dispersed throughout the Middle East, North Africa, Europe, and beyond, while maintaining a continuous religious, cultural, and ancestral connection to, and presence in, the Land of Israel. Today, Israel is home to the largest Jewish community in the world — more than seven million Jews.

39. The Jewish people's connection to the Land of Israel is a constitutive element of Jewish religious practice and ethnic identity. For each Jewish Plaintiff, that connection and support for the State of Israel as the Jewish national home — that is, Zionism — are sincerely held components of their Jewish religious belief and ethnic identity, not a political opinion.

40. Because Jews are so widely identified with Israel, hostility toward Israel and toward "Zionists" is frequently directed at Jews as Jews: by demanding that Jews disavow their connection

to Israel or profess "antizionism" as a condition of acceptance; by portraying Israel as uniquely evil; by denying the Jewish people's history in and connection to the Land of Israel; by justifying or celebrating violence against Jews in Israel and worldwide; and, most relevant here, by denying the Jews' existence as a distinct ethnic or indigenous group and by treating Jewish grief at the murder of Jews as suspect or as hostility toward others.

41. Each act complained of below was directed at the Jewish Plaintiffs' identity and expression of that identity: a request to form a Jewish ERG; a Hanukkah message mourning Jews murdered at Bondi Beach; statements of fear made at a Jewish support space; and Jewish employees' requests that their employer acknowledge antisemitism as it acknowledges bias against other groups.

42. The agency made HINENU members' Bondi Beach statements the subject of a groundless investigation, which it closed without action. The EEO Office captioned that investigation "*McKenney, etc. v HINENU*," reflecting that it viewed HINENU's mere existence as offensive.

43. In that investigation, EEO investigators questioned the HINENU Plaintiffs and other Jewish employees about the meaning of the word "hinenu," as if the word itself were offensive and a subject of the complaint; demanded that a Jewish employee explain "why you don't believe Jewish is religious"; and interrogated the HINENU Plaintiffs about the formation of HINENU, a subject irrelevant to the complaint, which concerned specific statements about the Bondi Beach massacre.

44. The HINENU Plaintiffs objected at the time, complaining to the agency heads that the investigation was retaliatory and antisemitic. Upon information and belief, DOHMH and Defendant Ahn denied the ERG application in retaliation for Plaintiffs' statements criticizing the

February 3 event and other agency statements and actions, their statements concerning the Bondi Beach massacre, and their objections to the investigation of those statements. In addition, upon information and belief, the denial was motivated by discriminatory antisemitic animus that denies the ethnicity, ancestry, and peoplehood of the Jewish people, an essential part of Jewish identity recognized by law.

45. The events alleged took place in the context of rising antisemitic violence, much of it fueled by the same anti-Israel propaganda propounded by DOHMH. Anti-Jewish incidents in NYC and the United States have surged since the October 7 massacre. Jews have been murdered across the world in anti-Jewish attacks. In 2025, by the New York Police Department's (NYPD) own count, 330 of the 576 hate crimes recorded in the City, or 57 percent, targeted Jewish New Yorkers — against a Jewish population of roughly one New Yorker in ten.[3] In 2026, antisemitic hate crimes have risen: in the first nine months of the year, 245 of the 463 confirmed hate crimes in the City, or 52.9 percent, were anti-Jewish — an increase of 1.2 percent over the same period of 2025, as the Police Commissioner and the Mayor confirmed at the NYPD's quarterly crime briefing on October 6, 2026.[4]

---

[3] N.Y.C. Police Dep't, Press Release, *NYPD Announces Safest Year Ever for Gun Violence with Fewest Shooting Incidents and Shooting Victims in Recorded History* (Jan. 6, 2026), https://www.nyc.gov/site/nypd/news/PR001/nypd-safest-year-ever-gun-violence-fewest-shooting-incidents-shooting; Office of the Mayor, City of New York, Transcript: Mayor Mamdani and Commissioner Tisch Announces Safest Year Ever for Gun Violence with Fewest Shooting Incidents and Shooting Victims in Recorded History (Jan. 6, 2026), https://www.nyc.gov/mayors-office/news/2026/01/transcript--mayor-mamdani-and-commissioner-tisch-announces-safes; *see also* New York City Council, Press Release, *Speaker Julie Menin Unveils Five-Point Action Plan to Combat Antisemitism and Strengthen Community Safety* (Jan. 16, 2026), https://council.nyc.gov/press/2026/01/16/3060/ ("According to the NYPD, antisemitic incidents accounted for 57% of reported hate crimes in 2025, although only approximately 10% of New York City residents are Jewish.").

[4] N.Y.C. Police Dep't, Press Release, *NYPD Announces Fewest Shooting Incidents, Shooting Victims, and Murders in Recorded History for First Nine Months of 2026 and Third Quarter* (Oct. 6, 2026), https://www.nyc.gov/site/nypd/news/PR015/nypd-fewest-shooting-incidents-shooting-victims-murders-recorded-history-for ("More than half of the confirmed hate crimes year to date, or 52.9%, were anti-Jewish hate crimes … During the first nine months of this year, anti-Jewish hate crimes increased 1.2% (245 vs. 242)."); *see also* Office of the Mayor, City of New York, *Transcript: Mayor Mamdani Joins NYPD Commissioner Jessica S. Tisch For A Quarterly Crime Statistics Briefing* (Oct. 6, 2026), https://www.nyc.gov/mayors-office/news/2026/10/transcript--

**B. DOHMH'S ERG PROGRAM**

46. DOHMH maintains an ERG program governed by written "Employee Resource Group Guidelines" dated July 2025 (the "ERG Guidelines"). The ERG Guidelines define ERGs as "voluntary, employee-led groups that bring together personnel who share common identities or backgrounds, and their allies," and state that "ERGs [are] a vital component of our workplace infrastructure in that they connect members of the workforce with each other and enrich the workplace itself." The ERG Guidelines state that ERGs "are considered Agency initiatives" and that they "provide spaces to celebrate shared identities and backgrounds, creating a supportive workplace that values its employees and the communities they serve."

47. Recognition as an ERG is a privilege of employment at DOHMH that confers substantial benefits on the employees who share the ERG's identity. "Each ERG will be provided with 1) an agency email account, 2) a Sharepoint page, and 3) access to the joint ERG calendar." Each ERG is allocated $5,000 per fiscal year from agency funds. ERGs may use "Agency equipment, resources, and facilities for meetings and approved activities," during the workday; their charters are announced agency-wide; they receive an official certificate at their first event; and they "can serve as a platform for Agency personnel to advocate for internal work environment improvements relating to the ERG-focused backgrounds and identities." Employees who share an identity for which DOHMH has recognized an ERG thereby enjoy an officially sanctioned community, a channel to agency leadership, agency resources, and agency-wide visibility unavailable to employees without an ERG.

---

mayor-mamdani-joins-nypd-commissioner-jessica-s--tis (Commissioner Tisch: "So far this year, 53 percent of all confirmed hate crimes have targeted Jewish New Yorkers"; Mayor Mamdani: "Year to date, antisemitic hate crimes are up 1.2 percent").

48. For example, during Hispanic Heritage Month (September 15 to October 15, 2026), the SALUD ERG presented a series of events in DOHMH conference rooms at Gotham during the workday, including a "Muévete Latin Dance Class brought to us by Worksite Wellness," DOHMH's employee wellness program — the same program that did not act on HINENU's December 17, 2025 request that it "share agencywide HINENU's online event." Upon information and belief, SALUD's September 23, 2026 announcement of that event included a disclaimer that "it is not a NYC Department of Health event," notwithstanding the ERG Guidelines' statement that ERGs "are considered Agency initiatives."

49. The ERG Guidelines vest control of the ERG program in two officials: "The [ER Director] and the EEO Director oversee the ERGs … and are responsible for…[a]pproving ERG communications, events and activities, including the vetting of all speakers."

50. The ERG Guidelines provide that "ERGs must be open to all current personnel" and that "[p]articipation does not require sharing the unifying identity or characteristics of the ERG." Among "Restricted Activities," the ERG Guidelines state: "An ERG identity must not be based on outside affiliations (e.g. political parties, religious groups, sports organizations) or revolve around mere shared interests (e.g. running club, photography, music appreciation)." The ERG Guidelines further provide that "ERG events and activities should not assume or promote positions on issues where the Agency has not established an official stance (e.g. international conflicts)," and that ERGs "cannot engage in discriminatory behavior," including "excluding individuals, explicitly or implicitly, from discussions or activities based on a protected category such as race, ethnicity, gender, sexual orientation, religion, age, disability, etc."

51. DOHMH's written Application Instructions provide that "ERG approval will be based on 1) the alignment of the ERG's mission and goals with the Agency's core values and

commitment to diversity and equal opportunity; 2) the specific employee population the ERG will serve; 3) consideration of whether there is an existing ERG with similar mission and goals; and 4) level of demonstrated interest in the new ERG." They promise that "[i]f the application is denied, upon the Representative's request, a meeting will be scheduled with the [EEO Director] and [ER Director] to discuss the reasons for the denial and possible next steps." The Instructions identify no further avenue of review or appeal.

52. Before October 2024, there were five recognized ERGs, which DOHMH's own guidance identified as AANHPI, ACHIEVE, DREAM, LGBTQ+, and SALUD; that guidance stated that "Agency leadership is currently exploring how existing ERGs can be further supported, as well as the need for additional ERGs." Upon information and belief, DOHMH thereafter recognized a sixth ERG, the Southwest Asian and North African ERG ("ASWATNA"), on a charter dated on or about October 3, 2024. None of the six recognized ERGs is a Jewish ERG.

53. ASWATNA's charter defines the group's identity in ethnic and ancestral terms: "ASWATNA's mission is to celebrate the rich and diverse heritage of the indigenous peoples of Southwest Asia and North Africa [] in NYC," and explains that "SWANA is a term for the South West Asian/ North African [] region in place of Middle Eastern, Near Eastern, Arab World or Islamic World which centers Europe/the West and fails to acknowledge the ethno-diversity of the region (e.g., Berber, Kurds) and other religious identities beyond Islam." ASWATNA's charter's "Prohibitions" section states that "no ERG may be organized for the purpose of advancing or opposing any religion or religious viewpoint nor may ERG engage in religious or worship activity," and that "an ERG designed around political activity … will not be approved."

## C. DOHMH REFUSES A JEWISH ERG IN JULY 2025

54. In or about June and July 2025, Plaintiff Stein and three other Jewish employees asked DOHMH to permit a Jewish ERG, noting that the Department had other ERGs but no Jewish one. They met with EEO Director Ahn and ER Director Saldivar on July 16, 2025. A follow-up meeting on August 28, 2025 was also attended by Chief Equity Officer McNatt, DC of Administration Friesen, and Chief of Staff Mandel-Ricci. On June 25, 2025, Plaintiff Stein asked Chief Equity Officer McNatt why the agency had failed to acknowledge Jewish American Heritage Month. On July 9, 2025, Chief Equity Officer McNatt responded that the agency would send an IHRD message instead. In the same month in which DOHMH did not acknowledge Jewish American Heritage Month, it acknowledged Asian American Heritage Month. The July 9, 2025 reply stated that the agency "look[ed] forward to a Jewish Heritage Month message in future years." DOHMH sent no Jewish American Heritage Month message in May 2026.

55. Plaintiff Pacht separately wrote to ER Director Saldivar on July 3, 2025, asking about the process of starting an ERG and whether affinity groups could obtain "some sort of official status" for advertising their events. After a follow-up, Ms. Saldivar responded on August 4, 2025: "We are currently working on revising the guidelines. I believe they may be ready soon." Upon information and belief, her further inquiry of August 26, 2025 to Employee Relations received no substantive response.

56. DOHMH refused to permit a Jewish ERG. It told Plaintiff Stein and others that they could not have an ERG because the agency defined Jewish as a religion, despite the employees' protests that Jewish identity was an ethnicity. Jewish employees, including Plaintiffs, were told they could form an affinity group, without the financial and material support ERGs receive. Upon information and belief, DOHMH did not reduce its refusal to writing, identify any written policy defining Jews as a "religious group," or explain why the Jewish people were a "religious group"

rather than a people sharing a "common identit[y] or background." During a Teams meeting on July 16, 2025, Plaintiff Stein sent DOHMH's representatives, through the meeting chat, a link to a fact sheet of the Louis D. Brandeis Center for Human Rights Under Law titled "Jewish Employee Resource Groups," together with its statement that "[c]ourts protect Jewish ethnic or ancestral heritage in the workplace under both the Civil Rights Act of 1866 and Title VII of the Civil Rights Act of 1964"[5] and that "[d]enying Jewish employees an ERG where ERGs are offered to other ethnic groups is unlawful." A DOHMH representative at the meeting responded that the fact sheet concerned corporations and did not apply to a City agency.

57. In April 2025, a group calling itself "DOHMH Jews for Justice" (DJFJ), organized by DOHMH employees who were also officers of DC37 Local 3005 (one of several employee union locals at DOHMH), hosted a hybrid event in a Gotham conference room titled "Speaking Out for Justice in Palestine with Rabbi Andrue Kahn," described as "discussion of antisemitism, Palestine, and public health"; its flyer stated that the event was "not sponsored by DOHMH."

58. Plaintiff Stein e-mailed the EEO Office objecting to that event as an unsanctioned political event on agency premises. Defendant Ahn responded only that she would restrict groups that are not ERGs from using DOHMH's name. On or about June 10, 2025, Plaintiff Stein called Defendant Ahn and forwarded to her DJFJ's invitation to a June 18, 2025 "Bagel Lunch" at Gotham, and on June 11, 2025 she wrote to Defendant Ahn that DJFJ's use of DOHMH e-mail and meetings on DOHMH property "really creates hostile environment and brings political activity into the workplace." At least one of these organizers went on to participate in the Working Group described below and became a complainant against Plaintiff Stein.

---

[5] *See, e.g.*, *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (holding that Jews are a group falling in the category of "race" protected by the Civil Rights Act of 1866, 42 U.S.C. § 1982).

59. Having been told that they could form only an "unofficial" affinity group, Jewish employees formed HINENU as an affinity group in August 2025, recognizing a critical need for a space where Jewish employees and their allies could support each other, especially with the uptick in antisemitic hate crimes post-October 7, 2023. Upon information and belief, DOHMH then had no written rules governing affinity groups; its 2018 ERG Toolkit described them only as "inward-facing groups" that "often serve as social clubs," stating that "Affinity groups are also encouraged."

60. From its founding, HINENU defined itself in ethnic and ancestral, not religious, terms. HINENU's written FAQ, in force from at least December 11, 2025, provided: "Jewish heritage, not religion: For the purposes of HINENU, 'Jewish' refers to 'people who are ethnically and/or genetically Jewish,' not 'people who practice the Jewish religion.' Please refrain from shifting the focus of this group to religion." HINENU's FAQ also barred politics ("DOHMH employees are not permitted to organize groups based on political affiliation"), stated that HINENU "is not centered around" the Israeli–Palestinian conflict "because … DOHMH classifies this as a political issue," and declared "zero tolerance … for any form of discrimination, including … Antisemitism, … Islamophobia, [and] Racism." By December 2025, HINENU had approximately eighty-five DOHMH employees on its mailing list, the great majority at Gotham.

61. HINENU obtained an agency e-mail account authorized by DOHMH's DC of Administration Julie Friesen, whose Administration division includes the EEO Office and Human Resources. (DOHMH's organizational chart, however, shows the EEO Office reporting to the Commissioner.) HINENU used that account to organize its third event, a "Donuts & Dreidels" Hanukkah celebration in December 2025.

## D. HINENU'S RESPONSE TO THE BONDI BEACH MASSACRE AND DOHMH'S "DESIST" ORDER

62. On the first night of Hanukkah in December 2025, two terrorists attacked the Jewish community of Sydney, Australia, at its annual Hanukkah celebration at Bondi Beach, murdering at least fifteen people and wounding dozens.[6] Upon information and belief, DOHMH's leadership issued no agency-wide message about the massacre or anti-Jewish hate.

63. On December 16, 2025, HINENU sent "A Hanukkah Message from HINENU" from its agency account to the DOHMH employees on its mailing list. The message reported the massacre, invited "all DOHMH employees… to hold space for the victims of the Bondi Beach massacre and support each other in this time of grief and fear," and stated: "Antisemitism, like any other form of racism, is a global public health crisis. Jews are twice as likely as members of any other racial, ethnic, or sexual minority to be the victims of hate crimes."

64. The message then quoted three New York Jewish leaders and elected officials who had spoken at a public menorah lighting two days earlier, including Rabbi Chaim Steinmetz of Congregation Kehilath Jeshurun: "'Globalizing the intifada is not an unfortunate phrase, it's not something to be discouraged, globalizing the intifada is a call to murder… It's time for us to tell the truth that this anti-Zionism has led to the death of Jews in Boulder, in Washington D.C., in Leeds and in Sydney. It's time to say that anti-Zionism kills Jews.'"

---

[6] Commonwealth Director of Public Prosecutions, Prosecution of Naveed Akram, https://www.cdpp.gov.au/prosecution-naveed-akram (terrorist act, 15 counts of murder, 43 counts of attempted murder); Prime Minister Albanese, press conference transcript (Dec. 22, 2025) ("the ISIS-inspired terrorists"; Attorney-General Rowland: "a targeted, antisemitic terrorist attack on the first day of Chanukah"), https://pmtranscripts.pmc.gov.au/release/transcript-47120; Royal Commission on Antisemitism and Social Cohesion, Interim Report, at 4 (Apr. 30, 2026), https://asc.royalcommission.gov.au/system/files/2026-05/interim-report-ascrc.pdf ("Fifteen people were killed, another 40 were wounded"); NSW Police statement of alleged facts as reported by ABC News (Dec. 22, 2025) (video before an Islamic State flag in which the pair "make a number of statements regarding their motivation for the Bondi attack and condemning the acts of 'Zionists'"), https://www.abc.net.au/news/2025-12-22/nsw-sydney-bondi-terror-attack-naveed-akram-court-police-facts/106170286.

65. The Hanukkah message addressed violence against Jews and the ideology that the speakers it quoted identified as motivating that violence. It took no position on the Israeli–Palestinian conflict, on Israeli policy, or on any political question, and it was consistent with HINENU's FAQ. Two months earlier, as described in Part IV.F, ASWATNA had circulated from its agency e-mail account an invitation to a webinar premised on the accusation that Israel is committing genocide in Gaza, and no official instructed ASWATNA to desist.

66. On December 17, 2025, HINENU sent an e-mail titled "Urgent Requests From HINENU," marked high importance, to the ACOH, Chief of Staff Mandel-Ricci, Chief Equity Officer, ER Director, and EEO Director, with copies to thirteen other senior officials and to the e-mails of the six recognized ERGs. The e-mail repeated the Steinmetz quotation, stated that "[a]ntisemitism, like any other form of identity-based violence and bigotry, is a global public health crisis," and requested, by December 31, 2025, an agency-wide e-mail "dedicated solely to acknowledging antisemitism as global public health crisis" and a hybrid event with "a mental health professional well versed in antisemitism and Jewish trauma" for Jewish employees, and asked Worksite Wellness to "share agencywide HINENU's online event ASAP." It offered to meet with leadership. The requests asked DOHMH to treat antisemitism as it treats bias against other groups. Later that day, HINENU sent a notice from its agency account, "12/18 Virtual Events: Processing Emotions Post-Bondi Beach," repeating the invitation to the support space.

67. Within hours of receiving HINENU's "Urgent Requests," on December 17, 2025, the day before the support space, Defendant Ahn wrote to HINENU, copying the ER Director: "Sorry for my delay in noticing this, but can you please advise how you received an agency email? Who provided the authority? As of now, please desist from the use of this agency account." On its face, the order addressed only the Jewish group's use of an agency e-mail account, not the content

of its messages or the planned event. HINENU responded the same day that the account had been authorized by DC Friesen, and asked "what type of email address we are allowed to use for affinity group communications." No answer came.

68. Defendant Ahn's denial of agency e-mail to HINENU was discriminatory. At that time, DOHMH routinely granted recognized ERGs and affinity groups agency e-mail addresses. The Global Oppression Working Group later used agency e-mail to organize and promote its February 3, 2026 antizionist propaganda session, and agency officials use it for the frequent antizionist messaging alleged herein.

69. On December 18, 2025, HINENU held its support space on DOHMH's Microsoft Teams platform, co-facilitated by Plaintiff Stein and another HINENU leader and attended by approximately fifteen or sixteen employees. DOHMH not having responded to HINENU's request for a mental-health professional, the facilitators' outline described an informal "support and self-care meeting," not a therapy group, whose "purpose is to hold space for the victims of Bondi massacre and recognize how it affects us as Jewish people." Participants spoke of their fear; of armed guards now posted outside their synagogues and their children's religious schools; of being afraid to wear a yarmulke or to identify as Jewish in public; and of their gratitude toward the bystanders who had stopped the Bondi Beach shooter.

70. DOHMH's leadership answered HINENU's "Urgent Requests" on December 29, 2025 — 12 days later, after the December 18 event — in an e-mail from Chief of Staff Mandel-Ricci sent "after discussions with several leaders including Dr. Morse and Dr. McNatt." Leadership declined to send the requested agency-wide message, announcing instead that the Chief Equity Officer "is already planning an agency message for the month of January grounded in [IHRD]," which "may not directly address the Sydney attack." It did not arrange the requested

session with a mental-health professional, pointing Jewish employees instead to the Employee Assistance Program (EAP) generally. It ignored the third request.

71. No professionally facilitated session for Jewish employees took place until February 10, 2026, nearly two months after the massacre, and then only on Plaintiff Pacht's initiative. That session, facilitated through the EAP by a therapist from the City's Office of Labor Relations, was poorly advertised, and no one attended other than members of HINENU's leadership. A second session with the same facilitator, on April 13, 2026, also held on Plaintiff Pacht's initiative, drew more attendees, but many participants did not engage. Sarah McKenney, one of the complainants in EEO Case No. 161370, attended as a participant, kept her camera off, and communicated only briefly through the chat; several attendees were reluctant to participate because of her presence. One attendee stated that the session did not feel like a safe space and that the agency did not feel safe, and asked why the session was not restricted to Jewish attendees. Several attendees stated that they would not speak openly in a space where they did not know who everyone was. The facilitator repeatedly suggested that resuming HINENU's activities would be helpful. It was also stated that an ERG promoting Jewish employees' well-being would be more helpful than an emotional-support group.

72. A Worksite Wellness representative attended both sessions, and Plaintiff Pacht separately discussed the situation with that representative at length. No further sessions were held. On July 10, 2026, DOHMH denied HINENU's formal ERG application, described below, despite the feedback at the April 13 session that such a group would be helpful to Jewish employees.

73. In May 2024, DOHMH's Worksite Wellness program and its Race to Justice office "collaborated to provide" agency "Healing & Support Spaces" for staff, announced through the agency's "DOHMH Announcements" channel, including a May 30, 2024 session titled "Managing

and Coping in Times of Global and Political Stressors," "led by a licensed mental health professional from Decolonizing Therapy" and "open to all staff." Nineteen months later, DOHMH provided no mental-health professional for the support space HINENU convened after the Bondi Beach massacre, Worksite Wellness did not share HINENU's event, and DOHMH's EEO Office ordered HINENU to "desist" from using its agency e-mail account and then investigated the support space itself.

## E. HINENU'S FORMAL ERG APPLICATION AND DOHMH'S ONE-SENTENCE DENIAL

74. On June 30, 2026, Plaintiff Pacht, as HINENU's designated Representative, submitted to Defendant Ahn and the ER Director a completed application, on DOHMH's own template, for recognition of "HINENU: The Jewish ERG." The fourteen-page package comprised the Application Form, a Charter dated June 30, 2026, and a Proposed Meeting Schedule and Activities plan. It listed eighteen interested DOHMH employees, more than three times the minimum requirement of five, and noted that there were more.

75. The application described the group's identity in the same ethnic and ancestral terms DOHMH had accepted from ASWATNA. It stated: "The Jewish people are an indigenous group from the Southern Levant." It continued: "Jewish identity encompasses a shared peoplehood rooted in common ancestry, history, culture, languages, traditions, and heritage … . Many Jews identify as Jewish regardless of their religious beliefs or level of religious observance … . While Judaism is the religion historically associated with the Jewish people, Jewish identity also reflects a unique cultural, ethnic, and ancestral heritage."

76. The application disclaimed any religious purpose no fewer than five times:

(a) "HINENU will be a cultural, heritage, and affinity-based [ERG]. It will not engage in political advocacy, religious worship, or religious instruction."

(b) Its cultural programs "will not include religious worship, prayer services, or religious instruction."

(c) "HINENU is organized around the shared peoplehood, ancestry, ethnic heritage, culture, and history of the Jewish people (Yehudim) — a protected ethnic and national-origin identity, as well as a religious one — and not for the purpose of religious worship, observance, or the advancement of any religious doctrine. HINENU's holiday-related programming is cultural, educational, and commemorative in nature."

(d) "HINENU is not organized to advance, oppose, or practice any religion or religious viewpoint, and HINENU will not conduct religious worship, prayer, or services, or use Agency time, funds, facilities, or resources for religious ritual or observance."

(e) "HINENU will not proselytize or make political statements."

77. The Charter provided that membership "may not be limited based on … religion … or other protected category, even if one of these protected categories is part of the common interest or purpose of the ERG." It provided that HINENU's meetings would be "open to all Agency personnel," and that HINENU "will not discriminate against any member, or potential member, on the basis of their actual or perceived status in a protected class including … political or religious opinion or affiliation." HINENU's stated aims were to "[f]oster … an inclusive and safe environment for Jewish employees and their allies," to "[c]elebrate Jewish culture, identity, and heritage," to "[a]dvocate for workplace issues relevant to Jewish DOHMH employees and public health issues affecting Jewish New Yorkers," and to "[p]romote a work environment where Jewish voices and lived experiences are recognized without fear of discrimination … ."

78. HINENU's planned activities were cultural and educational: Jewish film, food, music, and literature; programs on the Ashkenazi, Sephardi, Mizrahi, Ethiopian, Bukharan, and

Persian Jewish communities; Mizrahi Heritage Month and Jewish American Heritage Month events; secular commemorations of Jewish holidays; and "educational presentations on recognizing and addressing anti-Jewish bias, discrimination, and stereotypes."

79. On July 10, 2026, Defendant Ahn denied the application. Her e-mail to Plaintiff Pacht, copying the ER Director, consisted of one sentence: "As stated in the ERG Guidelines, ERG identity cannot be based on religious groups." The denial addressed no provision of HINENU's application or Charter. It did not explain how a group that had repeatedly disclaimed religious worship, observance, instruction, and doctrine, and defined itself by peoplehood, ancestry, and ethnic heritage, was "based on" a "religious group[]." It applied none of the Instructions' four approval criteria. It did not explain why the Jewish people are a "religious group" when the "indigenous peoples of Southwest Asia and North Africa" are not. It did not mention the Representative's right to request a meeting "to discuss the reasons for the denial and possible next steps," and neither it nor DOHMH has identified any avenue of appeal.

80. The July 10, 2026 denial is DOHMH's final decision on HINENU's application. The ER Director, to whom Plaintiff Pacht addressed HINENU's June 30, 2026 application together with Defendant Ahn, and who was copied on the July 10, 2026 denial, did not object to the denial and, upon information and belief, agreed to it.

81. Nor did the denial apply the ERG Guidelines' restriction as written. That restriction addresses ERG identities "based on outside affiliations (e.g. political parties, religious groups, sports organizations)" — that is, affiliation with outside organizations, such as religious congregations or denominations. HINENU is not affiliated with any outside organization, religious or otherwise. DOHMH instead reinterpreted "religious groups" to mean any people whose shared identity has a religious dimension, and applied that reinterpretation to Jews alone.

82. DOHMH's 2018 Employee Resource Group Toolkit used a materially similar formulation, providing that "[g]roups based on jobs, outside affiliations (such as political parties or religious groups), sports organizations, etc. will not be considered." It also excluded "[g]roups which promote a religious, partisan or divisive agenda," and its sample ERG charter provided that "no ERG may be organized for the purpose of advancing or opposing any religion or religious viewpoint nor may ERG engage in religious or worship activity." HINENU's Charter likewise provided that HINENU "is not organized to advance, oppose, or practice any religion or religious viewpoint" and "will not conduct religious worship, prayer, or services."

83. Other New York government guidance lists religion among the types of ERGs. The New York State Department of Labor's guidance "Employee Resource Groups 101" lists "Religion" among the "[t]ypes of ERGs,"[7] and the 2024–2028 Accessibility Plan of the New York City Mayor's Office of Contract Services lists "Multi-faith" among its "[e]xample ERG focuses."[8]

84. The stated ground for the denial — that Jewish identity is "religious" and therefore ineligible — was pretextual. DOHMH knew, from each of the following, that Jewish identity is ethnic and ancestral as well as religious: the express terms of HINENU's application; DOHMH's own recognition of an ERG defined by the ancestry and heritage of the "indigenous peoples" of a region whose peoples include Muslims, Christians, Jews, and others; DOHMH's own public-health data practice, in which, upon information and belief, DOHMH's Bureau of Communicable Disease lists "Jewish" as an option under "ethnic or cultural group identification" in the demographic fields of its disease surveillance system and lists no religion there; DOHMH's own

---

[7] N.Y. State Dep't of Labor, *Employee Resource Groups 101* (P60 (8/22)), https://dol.ny.gov/system/files/documents/2022/08/p61.pdf.

[8] N.Y.C. Mayor's Office of Contract Services, *MOCS 5-Year Accessibility Plan 2024–2028*, app. C, at 25 (Mar. 20, 2024), https://www.nyc.gov/assets/mocs/downloads/About/MOCSFiveYearAccessibilityPlan.pdf.

convening of a standing "Haredi Health Coalition" of "health care professionals, CBO's, community members and DOHMH staff who work together to create innovative and culturally responsive solutions that address Orthodox Jewish community needs" — an agency work group organized around Jewish identity when the beneficiaries are outside the agency; and the City's own antisemitism training, delivered to DOHMH staff two months earlier, which defined antisemitism as occurring "when Jewish people are treated worse because of their religion, ethnicity, race, and culture." On August 25, 2025, in response to Plaintiff Pacht's inquiry about the refusal of a Jewish ERG, the Division of Disease Control's Director of Health Equity and Divisional Priorities wrote to her of "Jewish folks, which I agree are an ethnoreligious group."

85. The denial was issued by the same official, Defendant Ahn, who had attended the July 16, 2025 meeting at which DOHMH refused a Jewish ERG; who had ordered HINENU to "desist" from using its agency e-mail account on December 17, 2025; and who had been the assigned investigator in DOHMH's nearly four-month investigation of HINENU's leaders, described below, which the EEO Office had closed 16 days earlier.

## F. DOHMH'S DISPARATE TREATMENT OF COMPARABLE GROUPS

86. DOHMH's refusal to recognize a Jewish ERG, its revocation of HINENU's agency e-mail account, and its pausing of HINENU's activity stand in contrast to its treatment of every other identity group that, on the facts alleged herein, has sought recognition or operated at the Department.

87. *The Affinity Group pause.* On December 30, 2025, Chief of Staff Mandel-Ricci e-mailed HINENU pausing its activity and, purportedly, that of other affinity groups. The e-mail stated that "[o]ver the last few months, we have recognized however that there are inconsistencies in agency policy related to … Affinity Groups, and these inconsistencies need to be addressed.…

In the meantime, we are asking all current affinity groups, including this one, to pause activity until we are able to complete this policy review, which should be done within the first quarter of the year."

88. During the pause, three groups were permitted to hold events at DOHMH: the "Planetary and Climate Health Interest Group" (Climate Group), the "DOHMH Haitian Coalition Group" (Haitian Group), and the DELs' "Working Group on Global Oppression and Public Health" (DEL WG).

89. On January 29, 2026, HINENU sent an e-mail to Chief of Staff Mandel-Ricci, ACOH, Chief Equity Officer, EEO Director, DC of Administration Friesen, and the EEO Office seeking clarification on the affinity group pause, noting that three other groups that were neither ERGs nor officially endorsed were conducting activities during the pause, and that HINENU was "eager to host a Tu BiShvat event open to all." HINENU requested, among other things, "the definition of affinity group, interest group, coalition group, and working group" and a list of the groups asked to pause.

90. Chief of Staff Mandel-Ricci replied on February 3, 2026, thanking HINENU "for bringing to our attention these additional types of groups" but answering none of HINENU's requests for clarification. Less than an hour later, the DEL WG event described below took place.

91. On March 30, 2026, DOHMH announced, through its agency-wide "DOHMH Announcements" e-mail account, that "[t]he agency has developed new guidelines regarding employee-led activities and groups that operate outside of the formal Employee Resource Group (ERG) process," including "a new requirement for all existing groups to register no later than April 30, 2026." The new guidelines, issued by DOHMH's Bureau of Human Resources & Labor Relations (the "Non-ERG Guidelines"), provide that, "[o]ther than ERGs, Employee-Led Groups

do not: receive funding, get support from the Agency, e.g., with a SharePoint page or agency announcements, hold public facing events, or receive an Agency email address." They require that every event of such a group be "vetted and approved by HR Central/Labor Relations," after Deputy Commissioner approval and on at least thirty days' notice; limit workday activities to one hour during lunch; require a disclaimer that the event "is not a NYC Department of Health event"; and direct that such groups should not "assume/promote positions on issues where the Agency has not established an official stance (e.g., international conflicts)" or "host any event or meeting wherein other staff may reasonably feel offended based on the content of that event."

92. The Non-ERG Guidelines state that "[a]s of February 2026, there are six ERGs," none of them Jewish, and that "[m]anagers and supervisors have a responsibility to encourage and support participation in ERGs." Upon information and belief, the Non-ERG Guidelines replaced the pause on affinity-group activity: groups formerly treated as affinity groups may now operate only as registered "employee-led groups" on these terms. DOHMH never informed HINENU that the pause had ended.

93. *ASWATNA.* Although ASWATNA's shared regional ancestry and heritage, by its charter's own account, encompasses multiple religious identities, DOHMH did not deem that ERG "based on … religious groups."

94. *ASWATNA issues religious-observance guidance in the agency's voice.* Guidance on supporting colleagues observing Ramadan was circulated at DOHMH by a DEL in 2024. On February 18, 2026, it was sent to all DOHMH staff from the agency's official "DOHMH Announcements" account over the signature of the ASWATNA ERG, including guidance on requesting religious accommodation through the EEO Office. DOHMH thus permitted an ERG it had recognized on the basis of shared regional ancestry to issue religious-observance guidance in

the agency's own name, and five months later told a Jewish group that had disclaimed religious worship, observance, and instruction five times that its identity was "based on religious groups." Upon information and belief, no comparable guidance for Jewish observances has been circulated.

95. *DOHMH's 2026 roster of ERG co-chairs lists six ERGs — ACHIEVE, AANHPI, ASWATNA, DREAM, LGBTQ+, and SALUD — and no Jewish ERG.*

96. *Recognized ERGs use agency e-mail to address foreign conflicts and disasters.* On October 20, 2025, ASWATNA used its agency e-mail to circulate to DOHMH staff an invitation to a webinar titled "Understanding genocide through a public health lens: Perspectives from Gaza," whose description began: "As a growing number of human rights organizations and United Nations experts have argued that Israel is committing genocide in the Gaza Strip …."

97. Upon information and belief, no official ordered ASWATNA to "desist," and no inquiry, warning, or enforcement followed. On June 25, 2026, SALUD used its agency e-mail to send to its board members a message titled "Standing With Venezuela: Support and Solidarity in Challenging Times," acknowledging an earthquake in Venezuela and the distress of members with family there, and expressing "solidarity with our Venezuelan colleagues and community members." That message is materially indistinguishable from the Hanukkah message and support-space notice for which HINENU was ordered off its agency e-mail account.

98. *Unrecognized groups use agency channels freely.* DOHMH permits unrecognized employee groups to use agency Teams channels, bulletin boards, and conference rooms, and in some cases its managers promote them, without any "desist" instruction. The Climate Group — organized around a "mere shared interest[]," a category the ERG Guidelines exclude from ERG status — tables at DOHMH events, has presented to a Division of Disease Control (DDC) equity

team, and held its thirteenth numbered "Lunch and Learn" speaker event on July 13, 2026, having advertised it via common workspaces in late June 2026.

99. The Haitian Group advertised a "Haitian Independence Celebration… a celebration of Black liberation and immigrant empowerment," in a Gotham conference room on January 22, 2026, by a flyer posted in agency space that lacked the contact block DOHMH's signage rules require.

100. On July 15, 2026, an Assistant Commissioner in DDC circulated over agency e-mail an invitation to an "LGBTQIA+ Staff Community Space," described as "a confidential group open to all staff in Disease Control who identify as LGBTQIA+ and closed to allies," which "is centered around the Black Lives Matter movement's commitment to 'end white supremacy.'" That group is apparently closed by identity and anchored to an outside movement, and therefore could not have satisfied two of the ERG Guidelines' requirements, but it was promoted by management five days after DOHMH denied a Jewish group whose charter opened membership to all.

101. The DEL WG was an employee group organized around a position on an international conflict — a subject the ERG Guidelines forbid even recognized ERGs to address — with agency-wide promotion and a flyer posted on DOHMH bulletin boards.

102. DOHMH has organized identity-based affinity spaces for its staff, including, in DDC's Bureau of Hepatitis, HIV, and Sexually Transmitted Infections, "[r]egular staff affinity spaces for Black, Latinx, API, LGBTQIA+, and White staff," which DOHMH reported as a project under its Race to Justice goal to "Develop Mechanisms for Reporting Bias and Oppression." Upon information and belief, DOHMH has not organized a standing affinity or community space for Jewish staff.

103. *DOHMH treats Muslims as a protected ethnic and "racialized" group, but Jews as merely "religious."* In May 2026, DOHMH's leadership sponsored and hosted for its staff a pair of CHR trainings: "Understanding Jewish Experiences and Antisemitism" and "Understanding Muslim Experiences and Combating Anti-Muslim Bias."

104. Chief of Staff Krauss introduced sessions of both trainings on COH's behalf, stating that "[t]he commissioner is deeply committed to this work"; DOHMH's Assistant Commissioner for Human Resources and Labor Relations thanked the presenters for "providing these trainings"; and a DOHMH human-resources staff member stated that "this training is in alignment with the agency's race, justice … process" and requested the materials for posting on DOHMH's intranet.

105. The Muslim-experiences training taught DOHMH staff that the preferred term for anti-Muslim bias is "anti-Muslim racism"; that "anti-Muslim racism is fear, hatred, and prejudice against Muslims or those perceived to be Muslim"; that "racialization is the process of social [construct] of race by which people or groups are categorized as different and subjected to discrimination"; and that "the racialization of Muslims lumps these diverse cultures and ethnicities into one category and otherizes them."

106. The paired Jewish-experiences training, by contrast, told the same staff that "Jewish people don't generally identify as a racial group."

107. DOHMH has continued that practice. Upon information and belief, DOHMH's CHECW Division Action Team invited ASWATNA — described in the registration form as "the Employee Resource Group representing Indigenous Southwest Asian & North African (SWANA) staff" — to host a workshop titled "Introduction to Anti-Arab & Anti-Muslim Racism," held on October 29, 2026, via Teams and promoted as "open to ALL staff," covering "[c]ore definitions and terminology," "[c]ommon myths and stereotypes about Arab and Muslim communities," and

"[w]ays staff can interrupt harmful narratives and practices at work." Upon information and belief, no DOHMH division has sponsored a comparable workshop on antisemitism hosted by a Jewish employee group.

108. *The agency e-mail rule was enforced only against HINENU.* DOHMH's "Responding to External Events" guidance, issued in June 2024 and re-issued in October 2024, provides that "[u]se of agency email to communicate about non-work-related issues, including political activity, is prohibited," and that "[e]mployees are also prohibited from hanging signs or posters in Health Department office spaces that are not directly related to work activities."

109. Upon information and belief, the only enforcement of the agency e-mail rule against any employee group is the December 17, 2025 order to HINENU to "desist" from using its agency account. Upon information and belief, no comparable action was taken against ASWATNA's "genocide" webinar circulation; SALUD's Venezuela message; the agency-wide promotion of the February 3 event or its flyer posted on DOHMH bulletin boards; the "NYC City Workers for Palestine" rally flyer and pension-divestment flyer posted on DOHMH bulletin boards; or the anti-Israel posters displayed at DOHMH workstations described below. Recognized ERGs have also used their agency accounts for workplace and public-health advocacy without any "desist" instruction: on October 27, 2026, the LGBTQ+ ERG e-mailed from its agency account (LGBTQ@health.nyc.gov) a template letter for staff to send to agency officials opposing the disbanding of an epidemiology team, stating that the decision "directly opposes our agency's public health goals and antiracist stances."

## G. THE HOSTILE ENVIRONMENT FOR JEWISH EMPLOYEES WHO IDENTIFY WITH ISRAEL

110. The refusal to recognize a Jewish ERG and the investigation of HINENU's leaders occurred as part of a workplace environment in which DOHMH's leadership and official equity

infrastructure have, since October 2023, promoted through official agency channels a one-sided narrative condemning the State of Israel — as a "settler colonial" "apartheid" state committing "genocide" — while tolerating widespread anti-Israel expression by employees in agency space. Jewish employees who identify with Israel reasonably understood these communications as their employer's statement that their identity is a mark of complicity in "genocide," and that Jewish grief and fear are suspect.

***1. The February 3, 2026 "Global Oppression" Workshop***

111. DOHMH's official equity infrastructure, headed by its DC for CHECW and Chief Equity Officer, includes appointed DELs in each division, whose written duties include "[h]ost[ing] and organiz[ing] training sessions and events focused on equity and social justice." In 2025, the DELs formed a "Working Group on Global Oppression and Public Health" which, in its own words, "[d]eveloped in response to the ongoing genocide in Palestine."

112. DOHMH's DELs and its Division and Bureau Action Teams are components of DOHMH's "Race to Justice" initiative, its "internal transformation initiative for promoting antiracism and embedding racial equity and social justice in its policies, processes, programs," whose Management Team "works in close partnership with … Divisional Equity Liaisons (DELs), Division and Bureau Action Teams (RESJAT), workgroup members, and agency leadership." DOHMH's guidance for those action teams lists "Employee Resource Groups," alongside "Divisional and Bureau Action Teams," among the "[e]xamples of our efforts to organize" under the strategy it calls "Organize for Racial Equity," and DOHMH's 2026 equity staff list includes, beside its DELs, action-team members, and Race to Justice Management Team, the roster of ERG co-chairs described above. Upon information and belief, Race to Justice staff have had multiple meetings with ERGs for event planning, but they never met with HINENU for event planning and

never reached out to HINENU apart from the opportunity to comment on the draft IHRD message described below.

113. On December 11, 2025, Sarah McKenney, DOHMH's Director of Operations for the Rapid Response Team in DDC, writing from her DOHMH e-mail account under her official title, invited Dr. Weeam Hammoudeh — an Assistant Professor at Hunter College, a research affiliate of Birzeit University's Institute of Community and Public Health in the West Bank, and coordinator of the "Palestine Program for Health and Human Rights" at Harvard's FXB Center — stating that she had "followed up with my colleagues in the [DEL WG] at DOHMH and we'd love to invite you to speak."

114. On January 26, 2026, a DEL sent an agency-wide e-mail, "On behalf of the [DEL WG]: join us for a discussion with Dr. Weeam Hammoudeh," announcing a hybrid event on February 3, 2026, "on zoom and in person at Gotham," titled "Challenges of advancing public health in an occupied territory: Social and political determinants of health in Palestine," and inviting recipients to "share within your divisions and teams."

115. Ms. McKenney forwarded the announcement to additional staff the same morning: "The event is open to all DOHMH staff so please forward to anyone who might like to attend!" The event flyer was posted on DOHMH bulletin boards, beside routine agency postings, and circulated near the elevator banks at Gotham. It carried a disclaimer that "[t]he views and opinions expressed do not reflect official DOHMH policy or position"; the event was nonetheless organized by DOHMH's DELs, announced and hosted by DOHMH, and promoted by a Director-level manager. More than fifty people registered within a day.

116. Plaintiffs Pacht and Stein and other employees objected in advance. On January 22, 2026, Plaintiff Pacht sent the EEO Office a photograph of the flyer and asked how a "working

group" differs from an affinity group — that is, why it could operate when HINENU could not. On January 29, 2026, she wrote to the EEO Office: "I thought groups were not allowed to talk about politics. This event is going to be all about politics. Why is this event being allowed? Is this an official agency event? … If this event were about any other country, I would be objecting just the same. … It's very upsetting to me."

117. The EEO Office never answered Plaintiff Pacht; the only reply she eventually received, from Chief of Staff Mandel-Ricci, did not address her concerns. On January 30, 2026, Plaintiff Stein wrote to the EEO Office that the event "appears to be discussing politics," that "[a]s a Jewish employee, I once again, feel that my workplace allows hostile and partisan discussions in the workplace," and that "[a]ntisemitism in New York is at the historic high levels."

118. The workshop, scheduled for 2:00 to 3:30 PM, went forward on February 3, 2026, at DOHMH headquarters and online, with "over 100 folks" online, plus those in the room. The DOHMH host opened by describing the DEL WG as "a cross-divisional effort led by…the DELs, as well as action team members from [DDC]," which "developed in response to the ongoing genocide in Palestine."

119. The presentation treated the accusation that Israel is committing "genocide" as established fact; described the founding of Israel as "ongoing settler colonialism" through a four-map "shrinking Palestine" graphic; described Israel as "a colonial regime" that "doesn't actually have borders" and maintains a "tiered system" of rights in which "Jewish Israelis … have sort of like full political and social rights" and Palestinians are second-class; presented statistics sourced to the Institute for Palestine Studies; embedded a Jewish Voice for Peace social-media post alleging that Israel had "tortured … to death" a Palestinian physician; and concluded with a "Takeaway Points" slide asserting "war crimes, potential evidence for genocide."

120. The propaganda session was entirely hostile to the Jewish state. It did not address the contested nature of claims about Palestinian historical displacement, or mention that Arabs within Israel have the right to vote, attend university, and serve in the judiciary, military, and Knesset. The event did not mention the October 7 massacre, Hamas, or the Israeli hostages or victims.

121. In the question period, DOHMH staff were told of Palestine-solidarity organizations they could join or donate to; that the "mainstream" two-state framework is "very harmful for us to be perpetuating as public health practitioners in the sense of how it ignores settler colonialism"; that "the journalism that we get here is very biased"; and to "push back around the framing that takes for granted that this is a controversial issue. Because it isn't."

122. The next day, the New York Post (NY Post) reported that DOHMH employees had created a "working group" accusing Israel of genocide; quoted a Jewish DOHMH employee as saying that the politicization was "causing a rift among employees and sapping morale" and that colleagues "never mention antisemitism when it comes to confronting oppression because they do not consider white Jews as victims"; and identified Ms. McKenney as an organizer who introduced the speaker.

123. Council Member Lynn Schulman, Chair of the City Council's Committee on Health, stated that she was "deeply troubled" that DOHMH employees had launched a working group "focused on foreign political issues—during work hours and using city resources," that "[h]osting a meeting that promotes inflammatory accusations while ignoring antisemitism entirely only deepens division and alienates Jewish employees and residents," and that, having "spoken

with the DOHMH about this incident," she was "very glad to learn an investigation is underway."[9] The Speaker of the City Council called for "[a] thorough investigation into the use of taxpayer resources."[10] U.S. Representative Elise Stefanik called for an investigation into antisemitism at DOHMH by the U.S. Department of Health and Human Services, which has obligated more than $170 million to DOHMH in each federal fiscal year since 2022, and more than $1 billion in all.[11]

124. Although DOHMH apparently told Council Member Schulman that "an investigation is underway," no result of any investigation, and no discipline or corrective action, has been disclosed to staff or the public, and upon information and belief none occurred. DOHMH issued no statement, correction, or disavowal; did not respond to press requests for comment; and did not mention the event in ACOH's ensuing weekly staff messages.

---

[9] N.Y.C. Council, *Statement by Council Member Lynn Schulman on the Department of Health and Mental Hygiene Workers' Gloal [sic] Oppression Working Group* (Feb. 4, 2026), https://council.nyc.gov/lynn-schulman/2026/02/04/statement-by-council-member-lynn-schulman-on-the-department-of-health-and-mental-hygiene-workers-gloal-oppression-working-group/.

[10] Carl Campanile, Hannah Fierick & David Propper, *Mamdani health department 'global oppression working group' should be probed over use of taxpayer funds: NYC Council speaker*, N.Y. Post (Feb. 5, 2026), https://nypost.com/2026/02/05/us-news/zohran-mamdani-health-dept-global-oppression-working-group-should-be-probed-over-use-of-taxpayer-funds-nyc-council-speaker/; *see also* Will Bredderman, Anti-Israel 'working group' in NYC health agency sparks backlash, Jewish Insider (Feb. 5, 2026), https://jewishinsider.com/2026/02/new-york-city-health-department-working-group-menin-schulman/.

[11] Letter from Rep. Elise M. Stefanik to Hon. Robert F. Kennedy, Jr., Sec'y, U.S. Dep't of Health & Human Servs. (Feb. 10, 2026), https://stefanik.house.gov/_cache/files/f/b/fb007678-9e10-4510-82d4-73818b87614e/65332E035E323B57C26FB19F8CE468764CC2377AD4D05B4E1539082A5F60FE13.stefanik-letter-to-hhs-re-nyc-doh-s-alleged-taxpayer-funded-political-meeting-that-accused-israel-of-genocide.pdf; Press Release, Rep. Elise Stefanik, *Stefanik Urges Federal Investigation into NYC Department of Health's Alleged Taxpayer-Funded 'Working Group' that Accused Israel of 'Genocide'* (Feb. 11, 2026), https://stefanik.house.gov/2026/2/stefanik-urges-federal-investigation-into-nyc-department-of-health-s-alleged-taxpayer-funded-working-group-that-accused-israel-of-genocide; *see also* USAspending.gov, Recipient Profile, City of New York, UEI XKJ3F8WKV2L3 (alternate names include "NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE"), https://www.usaspending.gov/recipient/8a4a5698-e56e-f2ea-e551-884e4de0b514-C/latest (HHS obligations to UEI XKJ3F8WKV2L3 by federal fiscal year: FY2022, $219,063,494.87; FY2023, $229,804,570.25; FY2024, $199,928,604.73; FY2025, $174,728,263.04; FY2026, $183,714,172.18; total, $1,007,239,105.07) (last visited Oct. 12, 2026).

### 2. *Messages from Senior Leadership Concerning Israel and "Genocide"*

125. In the days after the October 7 massacre, DOHMH's then-COH, Ashwin Vasan, issued agency-wide messages that "condemn[ed] terrorism" and, in one Agency Digest, condemned "the atrocities committed by Hamas."

126. On October 24, 2023, then-DC for CHECW and CMO Dr. Morse sent her division's "October Monthly Message," which stated: "We must continue to unequivocally denounce the use of terror and violence against civilians while acknowledging the settler colonial establishment of Israel in 1948 and ongoing apartheid enforced by the Israeli government against Palestinians of all religions. As [CHECW] we are called to stand for relief from suffering, humanization of the oppressed, and a cease fire."

127. On October 30, 2023, Dr. Vasan directed all staff that "as employees of the City of New York we must refrain from expressing personal views through official channels, in our official roles, or using official assets." This directive contradicted Dr. Morse's message of six days before, and was never thereafter applied to discourage anti-Israel messaging through official channels.

128. On May 10, 2024, Dr. Morse invited her division's staff to an all-staff meeting to "hear from Dr. Bram Wispelwey, co-director of the Palestine Program for Health and Human Rights, a joint program between [Harvard and Birzeit University]…on Settler Colonialism and Public Health."

129. On September 8, 2025, Dr. Morse, then ACOH, devoted a portion of her agency-wide "Monday Message" to "the war in Gaza," stating that "it weighs heavily on me," reciting that "[a]ccording to Gaza's Ministry of Health, more than 2,000 Palestinians have been killed and another 13,500 have been wounded while seeking aid," that "we are watching public health infrastructure be targeted in war," and that "[a]s public health practitioners, we must acknowledge

that this is wrong." The message did not mention the Israeli hostages, Hamas, or the October 7 massacre.

130. In the sixty-eight weekly "Monday Messages" ACOH sent to staff between October 2024 and February 2026, the sole passage addressing antisemitism, in the September 22, 2025 message, notes that "[w]e recognize discrimination in any form as a public health threat, including antisemitism."

131. On January 7, 2026, DOHMH's Chief Equity Officer hosted a "Fireside Chat" titled "War, Peace, and Public Health" to explore "the profound impact of armed conflict on global health systems and the role of public health in fostering justice and peace." Upon information and belief, the host pressed the invited academic speakers to declare an ongoing "genocide" in Gaza; when they declined, the Chief Equity Officer declared it herself; and questions submitted by attendees that departed from that narrative were passed over.

132. On January 14, 2026, HINENU leaders were given two days to comment on a draft agency-wide IHRD e-mail. The draft, for example, linked vaccine hesitancy in Hasidic and Haredi communities in Brooklyn to institutional distrust due to the Holocaust (a simplistic connection reflecting little understanding of those communities) and implied that the Holocaust's lesson for the agency is to provide culturally appropriate resources to NYC communities.

133. The draft also stated that "[r]emembering the Holocaust is about… confronting and ending genocide, rejecting all forms of hate… and reminding us that public health has a role in the prevention of such atrocities." HINENU objected to universalizing the lessons of the Holocaust, "especially on IHRD. The main driver of the Holocaust was specifically antisemitism. Antisemitism does not function like other forms of bigotry, and to universalize the Holocaust camouflages the unique nature of antisemitism."

134. Disregarding HINENU's feedback, on January 27, 2026, the Chief Equity Officer sent an agency-wide IHRD e-mail that doubled down on universalizing the Holocaust: "[IHRD] also calls us to acknowledge how and why the Holocaust was allowed to happen – thus requiring that we confront genocide in the present, in Gaza, Myanmar, Sudan, and beyond. Jewish organizers in NYC have chanted the phrase, 'Never again for anyone. Never again is now,' to help us connect past and present, and build solidarity across oppressed communities." This was the e-mail DOHMH substituted for an acknowledgment of the Bondi Beach massacre: a message that used DOHMH's sole annual Holocaust acknowledgment to accuse Israel of present-day "genocide."

135. Three days later, DOHMH's Agency Digest amplified this message, reminding staff of "the devastating consequences of dehumanization—not only in history, but in the present-day realities facing communities in Gaza, Sudan, Myanmar, and beyond," without mentioning Jews.

136. DOHMH's message used the agency's sole annual Holocaust acknowledgment to equate the conduct of the Jewish state with the crime committed against the Jewish people, an inversion that the IHRA definition's contemporary examples, quoted in Part IV.G.7, identify as a manifestation of antisemitism, and it substituted that accusation for the acknowledgment of antisemitism that Jewish employees had requested after the Bondi Beach massacre.

### *3. Additional DOHMH Programming Concerning Israel, Palestinians, and Gaza*

137. DOHMH's official equity infrastructure has carried sustained programming on Israel and Palestine through agency channels since at least 2023, including:

(a) A weekly EAP support group, beginning October 25, 2023, for staff affected by "the war in Israel and Palestine."

(b) The listing, on the events calendar of DOHMH's Bureau of Hepatitis, HIV, and Sexually Transmitted Infections intranet, of a March 28, 2024 webinar titled "Safeguarding Health in Gaza and The West Bank," described as focusing "on the ongoing attacks on healthcare and critical civilian infrastructure in Gaza and the West Bank …," and of an April 16, 2024 webinar titled "Gaza: A perspective on children in war zones," addressing "the effect of the current war on Gaza's children."

(c) A three-part "Decolonizing Public Health" training series in March, April, and May 2024, hosted, recorded, and archived by CHECW for an audience of roughly sixty staff per session. According to the recordings, in the March 2024 session a participant who identified herself as involved in the agency's Indigenous Peoples' Day work, explaining why she had posted COH Vasan's October 2023 e-mails into the session chat, described the October 7 massacre as "the counter-terrorist acts of an indigenous peoples in the middle east," criticized COH for "condemning" it, and defended "the actions of resistance of armed resistance that … oppressed groups have every right to use in their defense." No participant is recorded objecting; the facilitator responded, "Thank you for lifting that … whose humanity is worth a statement?"

(d) In the April 30, 2024 session, the facilitator framed the discussion around "active genocide happening in the world," a participant described campus encampments as "quite literally liberated zones" and urged colleagues to practice "solidarity in action," and the facilitator answered, "Well, amen." In the May 31, 2024 session, a credited presenter referred to "the genocide of the Palestinian people" and noted a protest that weekend, and the facilitator read aloud, and thanked, a participant's comment analogizing "how deep Israeli investment is in our economy and politics" to the defense of American slavery. Across three hours and forty-

seven minutes of these official recordings, the words “Jew,” “Jewish,” “antisemitism,” “Hamas,” and “hostage” do not appear.

(e) A May 8, 2024 Environmental Health equity-team proposal to organize a discussion of “student protests and the Palestinian genocide.” In May 2024, DOHMH equity officials — including the then-Senior Director of Race to Justice; three other members of DOHMH’s Race to Justice office and a CHECW Lead Trainer, all four of whom now serve on its Race to Justice Management Team; the Director and Acting Deputy Director of Racial Equity and Social Justice Initiatives in DDC; and Tala Mansi and Paola Villegas, later complainants against Plaintiffs — signed, as “equity staff” and “equity leaders at DOHMH,” a letter to DOHMH’s Cabinet calling on leadership to “denounce 1) the ongoing public health crisis and genocide in Gaza; and 2) police brutality against scores of students, faculty and allies across NYC exercising their civil liberties to advocate for the human rights of Palestinians,” to “[a]dvocate to have New York City Employees’ Retirement System divest from all Israeli bonds,” and declaring that “[w]e cannot truly call ourselves an agency that advocates for health and racial equity if we are silent on the ongoing apartheid and settler colonial occupation of Palestine.”

(f) A June 6, 2024 Division Action Team record refers to a “Letter from DELs to Cabinet” concerning “the destruction of the public health infrastructure in Palestine.” The Cabinet replied that, although its guidance on responding to external events had been “in development prior to your letter, your communication motivated the release of this guidance document at this time.”

(g) A later 2024 draft letter to the Cabinet by DOHMH equity staff, whose list of signatories includes Ms. Mansi, Sara Atlas, Musarrat Rahman, Ms. Villegas, Grace Mackson, and Ms.

McKenney, all later complainants against Plaintiffs, states as one of its concerns: "Cease conflating anti-Zionism and anti-Semitism." Upon information and belief, the letter was finalized and sent to the Cabinet.

(h) The promotion, on the same Bureau intranet calendar, of a March 12, 2025 webinar titled "Attacks on Children in Gaza: Injuries, Trauma, and Survival," co-sponsored by the Palestine Program for Health and Human Rights and Birzeit University.

(i) The April 10, 2025 "Speaking Out for Justice in Palestine with Rabbi Andrue Kahn" event at Gotham, whose organizers are officers of DC37 Local 3005 and later complainants against Plaintiffs.

(j) A DDC Health Equity Action Team announcement, at its August 6, 2025 meeting, of a session on "Public health and Gaza/Palestine Genocide," listed among the team's "Invites/Reminders" immediately after "RTJ Core Workshop sign up."

138. On March 5, 2024, DOHMH's Race to Justice Health Equity Practice and Systems Manager e-mailed approximately 260 members of DOHMH's equity action teams a resource on "Anti-Palestinian Racism," which Ms. Mansi, a Senior Advisor for Racial Equity & Social Justice Programming, endorsed by reply-all.

139. Apart from the December 2024 and May 2026 CHR antisemitism trainings, DOHMH's equity apparatus programmed no event on antisemitism, the October 7 massacre, the Israeli hostages, or the surge of antisemitic violence against Jewish New Yorkers. DOHMH's flagship equity instrument, the 2024 "Race to Justice" All-Staff Survey, contains no occurrence of the words "religion," "Jewish," or "antisemitism" in forty-six pages.

### *4. Anti-Israel Expression in the Workplace and DOHMH's Refusal to Act on Complaints*

140. Anti-Israel and antizionist displays are numerous in the public areas and workstations of Gotham, in violation of DOHMH's written rule that "[e]mployees are also prohibited from hanging signs or posters in Health Department office spaces that are not directly related to work activities." These displays include, at identified workstations and on public walls:

(a) rally posters and cards for "Shut It Down for Palestine" at three locations, each bearing a map of "Palestine" that encompasses the entire State of Israel, one of them on a public wall, dated May 1, 2024, and still displayed in July 2026;

(b) three flyers of DC37 Local 3005 promoting "Divestment from Israel," one at a workstation and two on a public wall, asserting that Israel is committing "genocide";

(c) cards reading "End the Genocide, Free Palestine" and "May every star in the universe protect Palestine. Global Solidarity / End the Genocide";

(d) a flyer reading "Nie Wieder Ist Jetzt!" ("Never Again Is Now!" in German), turning the vow made after the Holocaust against the Jewish state;

(e) and a copy of a book on "US Labor, Zionism, and the Struggle for Palestine," displayed at a workstation and describing "Zionist settler colonialism."

141. One DOHMH employee has worn earrings reading "From the River to the Sea" in the office, a slogan that calls for the elimination of the State of Israel. On or about December 13, 2023, a flyer for a "NYC City Workers for Palestine — Speakout & Rally," declaring that its organizers "stand firmly with the people of Gaza undergoing a genocide at the hands of the Israeli occupation" and demanding "withdrawal of all U.S. aid to Israeli war crimes, and a liberated Palestine," was pinned to a DOHMH bulletin board. A flyer demanding that the City "DIVEST OUR PENSIONS FROM ISRAEL," asserting that City workers' retirement savings "are being

used to fund apartheid and genocide in Palestine," was likewise posted in DOHMH space. Upon information and belief, DOHMH took no action concerning these items.

142. DC37 Local 3005 represents Plaintiffs Kellner and Pacht and numerous DOHMH workers. DOHMH permitted the local's divestment flyers, which accuse Israel of "genocide," to remain posted at a workstation and on public walls at Gotham, in violation of the agency's written signage rule, and took no action concerning them.

143. Jewish employees complained repeatedly about the antisemitic activity at DOHMH, and the agency took no effective action. Plaintiff Stein reported the April 2025 DJFJ event and related events to the EEO Director several times. HINENU's December 17, 2025 "Urgent Requests" to senior leadership drew a "desist" order within hours and, 12 days later, a refusal. Plaintiff Pacht's January 22 and 29, 2026 e-mails to the EEO Office objecting to the February 3 event were never substantively answered by the EEO Office, except, upon information and belief, by retaliation.

144. Upon information and belief, as reported by the NY Post, another DOHMH employee described the atmosphere as "less than safe at times," and the Jewish Community Relations Council stated that the February 3 event "made staff feel unsafe and unwelcome."

### 5. *DOHMH's Antisemitism Training Erases Jewish Peoplehood from Jewish Identity*

145. In May 2026, while its EEO investigation of HINENU's leaders was pending, DOHMH hosted two sessions of a CHR training, "Understanding Jewish Experiences and Antisemitism" (on or about May 7 and 12, 2026), paired, as in December 2024, with a training on "Understanding Muslim Experiences and Combating Anti-Muslim Bias" (on or about May 19 and 21, 2026). DOHMH's Chief of Staff Krauss and its Assistant Commissioner for Human Resources

and Labor Relations introduced the sessions; CHR's Director of Trainings stated that the sessions were "scheduled because [DOHMH] … did request it."

146. The antisemitism training omitted the elements of Jewish identity that DOHMH's own conduct had placed at issue. In an hour-and-a-half presentation on Jewish history and antisemitism, the presenters did not mention Zionism or antizionism. They mentioned the State of Israel once, in a population statistic, and did not describe Jewish history in the Land of Israel. They referred only in passing to Jewish "origins in Judea, in Israel," and did not discuss the Jewish people's shared ancestry, the ancient kingdoms of Israel and Judah, Jerusalem as the Jewish people's ancestral capital, or Jewish traditions, commandments, prayers, and scriptures emphasizing the Jewish people's ties to the Land. They focused instead on the diversity of Jewish "ethnic identities" and on religion.

147. In recounting the conquests and expulsions that drove Jews from their land, the training omitted the seventh-century Islamic conquest of the Land of Israel, and did not otherwise address Jewish history under Islamic rule. The only historical episode of Muslim–Jewish relations the presenters discussed was the wartime rescue of Jews by Albanian Muslims.

148. The presenters' teaching that "Jewish people don't generally identify as a racial group" restated the premise on which DOHMH had refused a Jewish ERG: that Jews are a religious group rather than a people.

149. The sessions were conducted with "mics and chat … disabled" and a moderated question panel. A question posted by Plaintiff Pacht — "What is driving anti-Jewish hate and discrimination today?" — was not read or answered. Another attendee noted that "one of the questions was deleted."

150. When Plaintiff Pacht met with CHR's training staff on June 4, 2026 to raise these omissions and the hostile environment at DOHMH, CHR's Director of Trainings stated that, as to Zionism and antizionism, "our laws don't cover political ideology." Upon information and belief, that statement reflects the City's position that hostility directed at Zionism and Zionists falls outside the City's antidiscrimination law.

### ***6. The City's Policy of Hostility to Zionism, Israelis, and Jews Who Identify with Israel***

151. Under the New York City Charter, the Mayor is the chief executive officer of the City, and, together with the City Council, holds general policymaking authority; DOHMH is a mayoral agency whose COH is appointed by the Mayor. The February 3 event, EEO investigation of the HINENU Plaintiffs from February through June 2026, and July 10, 2026 refusal to recognize a Jewish ERG all occurred under Mayor Zohran Mamdani.

152. On October 8, 2023, the day after Hamas-led terrorists murdered approximately 1,200 people in Israel and took 251 hostages, Mamdani issued a public statement mourning "the hundreds of people killed across Israel and Palestine in the last 36 hours," asserting that the Israeli Prime Minister's "declaration of war" would "undoubtedly lead to more violence and suffering," and stating that "[t]he path toward a just and lasting peace can only begin by ending the occupation and dismantling apartheid." Upon information and belief, the statement did not condemn Hamas.[12]

[12] Robert Pozarycki, Queens *socialist lawmaker denounces Mideast violence but slams Israeli government following Hamas attack*, amNY (Oct. 8, 2023) (reporting on Mamdani's statement posted on X following the October 7 attacks and stating that he responded "without denouncing Hamas"), https://www.amny.com/new-york/queens-socialist-lawmaker-slams-israel-hamas/; Gabe Friedman & Shira Li Bartov, *What Zohran Mamdani has actually said about Jews, Israel and antisemitism*, Jewish Telegraphic Agency (July 1, 2025, updated Nov. 5, 2025), https://www.jta.org/2025/07/01/politics/what-zohran-mamdani-has-actually-said-about-jews-and-israel ("Friedman & Bartov"); Zohran Mamdani (@ZohranKMamdani), X (Oct. 8, 2023), https://x.com/ZohranKMamdani/status/1711093032907321525 (statement image) ("I mourn the hundreds of people killed across Israel and Palestine in the last 36 hours"; Hamas is not named).

153. As early as October 13, 2023 — six days after the October 7 attack, and two weeks before the IDF announced on October 27, 2023 that its ground forces were expanding their activity in Gaza — Mamdani posted that "[w]e are on the brink of a genocide of Palestinians in Gaza right now," and, after his arrest that day at a protest outside a United States Senator's Brooklyn home, told NY1: "We are looking at imminent genocide."[13] On October 20, 2023 — still a week before the IDF announced its expanded ground operations — Mamdani spoke at a rally sponsored by the New York City chapter of the Democratic Socialists of America (NYC-DSA) and other organizations, where he accused Israel of genocide in Gaza; an NYC-DSA press release that day quotes him as stating: "We are witnessing a genocide and humanitarian crisis in Gaza." Video of the demonstration shows him using a megaphone to lead the crowd, phrase by phrase, in a call-and-response chant: "Senator Gillibrand, you are complicit in the genocide."[14]

154. As a candidate for Mayor, in December 2024 he pledged that "[a]s mayor, New York City would arrest Benjamin Netanyahu," and he repeated that pledge through 2025.[15] On or

---

[13] Zohran Mamdani (@ZohranKMamdani), X (Oct. 13, 2023), https://x.com/ZohranKMamdani/status/1712913626682491284; Ron Lee, *Two Queens assemblymembers charged with disorderly conduct after protesting*, NY1 (Oct. 14, 2023), https://ny1.com/nyc/all-boroughs/news/2023/10/15/two-queens-assemblymembers-charged-with-disorderly-conduct-after-protesting; *see also* Becky Sullivan & Daniel Estrin, *Israel says it's 'expanding' ground activities in Gaza as internet blackout takes hold*, NPR (Oct. 27, 2023), https://www.npr.org/2023/10/27/1209084199/israel-military-expanding-operations-gaza-hamas-communications-internet.

[14] Press Release, New York City Democratic Socialists of America, *New Yorkers Demand Ceasefire in Gaza*! (Oct. 20, 2023), https://socialists.nyc/press/new-yorkers-demand-ceasefire-in-gaza (headed "For Immediate Release: October 20, 2023"; stating that New Yorkers "rallied in Manhattan to condemn the Israeli government's ongoing bombardment in Gaza," that "[t]he rally was sponsored by the New York City Democratic Socialists of America" and fifteen other organizations, that "[a]ttendees heard from" speakers including "Assembly Member Zohran K. Mamdani"; attributing the quoted statement to Mamdani); Elliot Lewis, NYC for Palestine, October 20 2023, The Call (Oct. 22, 2023), https://socialistcall.com/news/nyc-for-palestine-october-20-2023/; MAZE (@mazemoore), X (Nov. 2, 2025, 12:33 PM), https://x.com/mazemoore/status/1985037438893371516 (95-second video labeled "OCTOBER 20, 2023"; the quoted chant is at approximately 0:58–1:09); Gerald Posner (@geraldposner), X (Oct. 7, 2026, 7:34 PM), https://x.com/geraldposner/status/2107977962515747215 (52-second video that appears to be an excerpt of the same footage, crediting @mazemoore; the quoted chant is at approximately 0:17–0:27).

[15] Friedman & Bartov, *supra note 12* (December interview with Mehdi Hasan; later repeated that position at B'nai Jeshurun); Rachel del Guidice, Flashback: NYC mayoral candidate Zohran Mamdani vowed to arrest Netanyahu if he visited the city, Fox News (June 25, 2025) (quoting Mamdani's interview with Zeteo), https://www.foxnews.com/media/flashback-nyc-mayoral-candidate-zohran-mamdani-vowed-arrest-netanyahu-he-

about May 22, 2025, at a forum hosted by UJA-Federation of New York, he reaffirmed his support for the movement to boycott, divest from, and sanction Israel (BDS), and, asked whether Israel has a right to exist as a Jewish state, answered that "Israel has a right to exist, and it has a right to exist also with equal rights for all"; at a televised primary debate on June 4, 2025, asked again, he answered, "As a state with equal rights."[16]

155. On or about June 17, 2025, asked on a podcast about the slogan "globalize the intifada," he declined to condemn it and stated that "the very word has been used by the Holocaust Museum when translating the Warsaw Ghetto Uprising into Arabic." The next day, the United States Holocaust Memorial Museum stated that "[e]xploiting the Museum and the Warsaw Ghetto Uprising to sanitize 'globalize the intifada' is outrageous."[17]

156. On October 7, 2025, the second anniversary of the attack, Mamdani, then the Democratic nominee, posted a statement that, after describing the attack as "a horrific war crime," asserted that "Prime Minister Netanyahu and the Israeli government launched a genocidal war"

---

visited-city; see also James Genn & Idan Kweller, *Mamdani reverses antisemitism order defining anti-Zionism as hate*, Jerusalem Post (Jan. 2, 2026), https://www.jpost.com/diaspora/antisemitism/article-882099 (reporting that Mamdani "has promised to arrest Prime Minister Benjamin Netanyahu should he set foot in New York").

[16] N.Y. Post, *NYC mayoral candidate Zohran Mamdani defends BDS support amid Israel controversy*, Fox News (May 23, 2025) (originally published in N.Y. Post) (reporting on a UJA-Federation of New York forum and quoting Mamdani as stating: "I believe Israel has a right to exist, and it has a right to exist also with equal rights for all"), https://www.foxnews.com/politics/nyc-mayoral-candidate-zohran-mamdani-defends-bds-support-amid-israel-controversy; Friedman & Bartov, supra note 12; Corey Walker, *Zohran Mamdani Refuses to Say Israel Has a Right to Exist 'As a Jewish State' During NYC Mayoral Debate*, Algemeiner (June 5, 2025) (debate of June 4, 2025), https://www.algemeiner.com/2025/06/05/zohran-mamdani-refuses-say-israel-has-right-exist-jewish-state-nyc-mayoral-debate/.

[17] Corey Walker, *US Holocaust Museum Slams Zohran Mamdani for Invoking Warsaw Ghetto Uprising to Justify 'Globalize the Intifada' Chant*, Algemeiner (June 18, 2025), https://www.algemeiner.com/2025/06/18/us-holocaust-museum-slams-zohran-mamdani-invoking-warsaw-ghetto-uprising-justify-globalize-intifada-chant; Luke Tress, *NYC mayoral candidate Mamdani compares Intifada to Warsaw Ghetto Uprising, drawing fire*, Times of Israel (June 18, 2025) (quoting the U.S. Holocaust Memorial Museum as calling the comparison "outrageous and especially offensive to survivors"), https://www.timesofisrael.com/nyc-mayoral-candidate-mamdani-compares-intifada-to-warsaw-ghetto-uprising-drawing-fire/; Tim Miller & Cameron Kasky, Zohran Mamdani: *FYPod Crossover*, The Bulwark Podcast (June 17, 2025), https://www.thebulwark.com/p/zohran-mamdani-fypod-crossover. Mamdani later said he would "discourage" use of the phrase (Friedman & Bartov, supra note 12).

and that "[o]ur government has been complicit through it all." Israel's Ministry of Foreign Affairs responded that "Mamdani has chosen to act as a mouthpiece for Hamas propaganda."[18]

157. On November 19, 2025, after demonstrators outside Park East Synagogue in Manhattan, during an event there by an organization assisting Jewish immigration to Israel, chanted, among other things, "Death to the IDF" and "globalize the intifada," the Mayor-elect's spokesperson stated that, while every New Yorker should be free to enter a house of worship without intimidation, such "sacred spaces" "should not be used to promote activities in violation of international law." Jewish communal leaders criticized that statement.[19]

158. Mamdani repeated the accusation throughout the 2025 campaign and as Mayor-elect. On October 13, 2025, as the hostages were released, he stated that "[w]e have watched as our tax dollars have funded a genocide."[20] At the first general-election debate on October 16, 2025, he stated: "I was horrified by the Israeli genocide of Palestinians."[21] On November 21, 2025, in the Oval Office, the Mayor-elect stated, as reported, that he had "spoken about the Israeli government committing genocide" and about "our government funding it."[22]

---

[18] Gloria Pazmino, *Mamdani's statement on October 7 attacks draws sharp rebuke from Israel*, CNN (Oct. 7, 2025), via KVIA, https://kvia.com/politics/cnn-us-politics/2025/10/07/zohran-mamdani-criticizes-hamas-israel-and-the-us-in-statement-marking-october-7-attack/; Zohran Mamdani (@ZohranKMamdani), X (Oct. 7, 2025), https://x.com/ZohranKMamdani/status/1975550702056538512; Israel Foreign Ministry (@IsraelMFA), X (Oct. 7, 2025), https://x.com/IsraelMFA/status/1975598416097857604.

[19] Eric Levenson, *Zohran Mamdani's handling of protest outside synagogue further worries NYC Jewish leaders*, CNN (Nov. 26, 2025) (quoting Mamdani spokesperson Dora Pekec), https://kvia.com/cnn-national/2025/11/26/zohran-mamdanis-handling-of-protest-outside-synagogue-further-worries-nyc-jewish-leaders/; Matthew Kassel, Mamdani: *Nefesh B'Nefesh event at New York synagogue promotes 'violation of international law,'* Jewish Insider (Nov. 20, 2025), https://jewishinsider.com/2025/11/mamdani-park-east-synagogue-protest/.

[20] Andrew Mark Miller, *Mamdani breaks silence on freed Israeli hostages in statement that doesn't mention Trump*, Fox News (Oct. 13, 2025), https://www.foxnews.com/politics/mamdani-breaks-silence-on-freed-israeli-hostages-in-statement-that-doesnt-mention-trump.

[21] Luke Tress, *Mamdani repeatedly accuses Israel of genocide in NYC mayoral debate*, Times of Israel (Oct. 17, 2025), https://www.timesofisrael.com/mamdani-repeatedly-accuses-israel-of-genocide-in-nyc-mayoral-debate/.

[22] Luke Tress & Jacob Magid, *Mamdani accuses US of funding genocide by Israel during warm meeting with Trump*, Times of Israel (liveblog) (Nov. 21, 2025), https://www.timesofisrael.com/liveblog_entry/mamdani-accuses-us-of-funding-genocide-by-israel-during-warm-meeting-with-trump/.

159. On his first day in office, the Mayor revoked every executive order that his predecessor had issued on or after September 26, 2024. These included Executive Order No. 52 of June 2025, recognizing the International Holocaust Remembrance Alliance working definition of antisemitism (IHRA definition) and its eleven contemporary examples, which City agencies "shall consider as appropriate" and were "encouraged to use" — whose contemporary examples include "denying the Jewish people their right to self-determination e.g., by claiming that the existence of a State of Israel is a racist endeavor" — and Executive Order No. 60 of December 2, 2025, which directed mayoral agency heads and contracting officers "to refrain from procurement practices … intended to carry out any policy that discriminates against the State of Israel, Israeli citizens based on their national origin, or individuals or entities based on their association with Israel," and directed the City's mayoral pension trustees "to oppose divestment from bonds and other assets made for the purpose of discriminating against the State of Israel."[23]

160. On April 22, 2026, at a hearing of the City Council's Taskforce to Combat Antisemitism, the Executive Director of the Mayor's Office to Combat Antisemitism, Phylisa Wisdom, confirmed that the City would use no codified definition of antisemitism, or of any other form of hate.

161. At the same hearing, asked whether a kosher restaurant vandalized with the words "Kill the Zionists" would be a hate crime, NYPD's Deputy Commissioner of Legal Matters,

[23] Exec. Order No. 1 (Jan. 1, 2026), *Prior Executive Orders*, § 1, https://www.nyc.gov/content/dam/nycgov/mayors-office/downloads/pdf/executive-orders/2026/eo1-prior-executive-orders.pdf; Exec. Order No. 52 (June 8, 2025), *Defining Antisemitism*, §§ 1–2, https://www.nyc.gov/content/dam/nycgov/mayors-office/downloads/pdf/executive-orders/2025/eo-52.pdf; Exec. Order No. 60 (Dec. 2, 2025), *Procurement and Investment Decisions Relating to Israel and Israeli Citizens*, §§ 1–2, https://www.nyc.gov/content/dam/nycgov/mayors-office/downloads/pdf/executive-orders/2025/eo-60.pdf; Office of the Mayor, City of New York, *Mayor Adams Signs Executive Order and Proposes Legislation to Codify Into Law International Holocaust Remembrance Alliance Definition of Antisemitism, Addressing Historic Rise in Anti-Jewish Hatred* (June 8, 2025), https://www.nyc.gov/mayors-office/news/2025/06/mayor-adams-signs-executive-order-proposes-legislation-codify-law-international (quoting "denying the Jewish people their right to self-determination e.g., by claiming that the existence of a State of Israel is a racist endeavor").

Michael Gerber, testified that "it's going to depend" on whether the vandalism could be proved to have been motivated by Jewish identity rather than purely political motives, whereas "Kill the Jews" on the same restaurant would be "a hate crime right there."[24]

162. The Mayor did not re-issue Executive Order No. 52 or No. 60, and has not adopted any definition of antisemitism.[25]

163. On February 4, 2026, the Mayor removed the executive director of the Mayor's Office to Combat Antisemitism, Moshe Davis, whom the prior Mayor had appointed in May 2025 as the Office's first executive director, and replaced him with Phylisa Wisdom, who, according to the Mayor's announcement, "most recently served as the executive director of the New York Jewish Agenda."[26] Upon information and belief, Ms. Wisdom had publicly opposed the IHRA definition, writing in September 2024: "I am calling upon every university to NOT adopt the IHRA definition but instead … adopt an approach that uses some of IHRA and @NexusProjectUS's definitions."[27]

164. Under Ms. Wisdom's leadership, New York Jewish Agenda had published a statement that "the Israeli government cannot continue the mass destruction of Gaza" (February

---

[24] N.Y.C. Council, Transcript of the Minutes of the Taskforce to Combat Antisemitism (Apr. 22, 2026), at 130–31, https://legistar.council.nyc.gov/View.ashx?M=F&ID=15482631&GUID=4B047444-F7AC-4C1B-AC45-DF406C638382.

[25] Exec. Order No. 1 (Jan. 1, 2026), supra note 23; Exec. Order No. 2 (Jan. 1, 2026), https://www.nyc.gov/mayors-office/news/2026/01/executive-order-02.

[26] Office of the Mayor, City of New York, *Mayor Mamdani Announces New Executive Director of Mayor's Office to Combat Antisemitism* (Feb. 4, 2026), https://www.nyc.gov/mayors-office/news/2026/02/mayor-mamdani-announces-new-executive-director-of-mayor-s-office. *See* Office of the Mayor, City of New York, Mayor Adams Creates New Mayor's Office to Combat Antisemitism (May 13, 2025), https://www.nyc.gov/mayors-office/news/2025/05/mayor-adams-creates-new-mayor-s-office-combat-antisemitism; Shiryn Ghermezian, *Ex-Head of NYC Office to Combat Antisemitism Discusses Being Abruptly Fired by Mamdani, Replaced With Israel Critic*, Algemeiner (Feb. 6, 2026), https://www.algemeiner.com/2026/02/06/ex-head-nyc-office-combat-antisemitism-discusses-abruptly-fired-mamdani-replaced-israel-critic/.

[27] Phylisa Wisdom (@phylisajoy), X (Sept. 15, 2024), https://x.com/phylisajoy/status/1835378968247091417 (quote-posting Rep. Ritchie Torres, https://x.com/RepRitchie/status/1835366506600730771).

20, 2024),[28] and joined a statement of Jewish organizations declaring that "this war is no longer justifiable" (August 14, 2025).[29]

### *7. The Federal Policy Guidance Against Antisemitism*

165. Federal policy directs every agency enforcing Title VI, including HHS, DOHMH's principal source of federal financial assistance, to consider the IHRA definition and examples. Executive Order 13899 provides that "[i]n enforcing Title VI, and identifying evidence of discrimination based on race, color, or national origin, all executive departments and agencies (agencies) charged with enforcing Title VI shall consider" the IHRA working definition and "the 'Contemporary Examples of Anti-Semitism' identified by the IHRA, to the extent that any examples might be useful as evidence of discriminatory intent."[30] Executive Order 14188 "reaffirms Executive Order 13899."[31]

166. On September 3, 2026, HHS's Office for Civil Rights issued a Dear Colleague Letter to recipients of HHS funding, stating that "[r]ecipients of HHS Federal financial assistance must administer their programs and activities without discrimination based on race, color, or national origin," that Executive Order 13899 directs agencies to consider the IHRA definition and examples, and that antisemitism "may … provide factual context and evidence of discriminatory

---

[28] *An Open Letter from Jewish Elected Officials Regarding the War in Gaza* (Feb. 20, 2024) (posted by Phylisa Wisdom), https://nyja.org/sign-ons-press-releases/an-open-letter-from-jewish-elected-officials-regarding-the-war-in-gaza/; see also N.Y. State Senate, *An Open Letter From Jewish Elected Officials Regarding The War In Gaza* (Feb. 20, 2024), https://www.nysenate.gov/newsroom/articles/2024/liz-krueger/open-letter-jewish-elected-officials-regarding-war-gaza.

[29] *Jewish Organizations Demand End To War, No Reoccupation of Gaza* (Aug. 14, 2025), https://nyja.org/sign-ons-press-releases/jewish-organizations-demand-end-to-war-no-reoccupation-of-gaza/; see J Street, *Jewish Organizations Demand End to War, No Reoccupation of Gaz*a (Aug. 14, 2025), https://jstreet.org/press-releases/jewish-orgs-demand-end-to-war-no-reoccupation-of-gaza/ (listing New York Jewish Agenda among nine signatory organizations).

[30] Exec. Order No. 13,899, *Combating Anti-Semitism*, § 2(a), 84 Fed. Reg. 68,779 (Dec. 16, 2019), https://www.federalregister.gov/documents/2019/12/16/2019-27217/combating-anti-semitism.

[31] Exec. Order No. 14,188, *Additional Measures To Combat Anti-Semitism*, § 1, 90 Fed. Reg. 8,847 (Feb. 3, 2025), https://www.federalregister.gov/documents/2025/02/03/2025-02230/additional-measures-to-combat-anti-semitism.

intent."[32] The City's revocation of the IHRA definition removed from the City's practice the very definition that federal policy directs HHS to consider in enforcing the Title VI obligations that DOHMH accepted as a condition of its federal funding.

> 167. The IHRA working definition, adopted by the IHRA Plenary on May 26, 2016, provides:
> Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.
>
> To guide IHRA in its work, the following examples may serve as illustrations: Manifestations might include the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for 'why things go wrong.' It is expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits. Contemporary examples of antisemitism in public life, the media, schools, the workplace, and in the religious sphere could, taking into account the overall context, include, but are not limited to:
> [1] Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion.
> [2] Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective — such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government or other societal institutions.
> [3] Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews.
> [4] Denying the fact, scope, mechanisms (e.g. gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust).
> [5] Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust.
> [6] Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.
> [7] Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

---

[32] *U.S. Dep't of Health & Human Servs., Office for Civil Rights, Dear Colleague Letter on Civil Rights Protections Against Antisemitic Discrimination* § I & n.1 (Sept. 3, 2026), https://www.hhs.gov/civil-rights/for-providers/ocr-dear-colleagues-letter-civil-rights-antisemitic-discrimination/index.html.

> [8] Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation.
> [9] Using the symbols and images associated with classic antisemitism (e.g., claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis.
> [10] Drawing comparisons of contemporary Israeli policy to that of the Nazis.
> [11] Holding Jews collectively responsible for actions of the state of Israel.[33]

The actions and statements of Mayor Mamdani and DOHMH alleged herein correspond to IHRA examples 2, 7, 8, 9, and 10.

168. On May 15, 2026, the Mayor's Office released, on the Mayor's official X account, a four-minute video, purporting to commemorate the "Nakba." The video's on-screen text stated that "Nakba is Arabic for 'catastrophe'" and that "[i]t refers to the expulsion and displacement of more than 700,000 Palestinians between 1947 and 1949 during the creation of the State of Israel and the year that followed."

169. The video alleges that Jewish military forces destroyed more than 400 Palestinian villages and cities, killed thousands of Palestinians, and carried out "dozens of massacres," and claims that the Nakba "continues to this day."[34] The video portrayed the creation of the State of Israel as a war of aggression against Palestinians, and attributed to Jewish forces destruction and killing that occurred in a war launched by Arab armies and militias after they rejected the United Nations Partition Plan.

---

[33] International Holocaust Remembrance Alliance, *IHRA Non-Legally Binding Working Definition of Antisemitism* (adopted May 26, 2016), https://holocaustremembrance.com/wp-content/uploads/2024/01/IHRA-non-legally-binding-working-definition-of-antisemitism-1.pdf; see also U.S. Dep't of State, *Defining Anti-Semitism,* https://2017-2021.state.gov/defining-anti-semitism/. The bracketed numbers have been added for ease of reference; the source presents the examples as bullet points.

[34] Mayor Zohran Kwame Mamdani (@NYCMayor), X (May 15, 2026, 5:40 PM ET), https://x.com/NYCMayor/status/2055402930677879076 ("Today marks Nakba Day, an annual day of remembrance to commemorate the expulsion of more than 700,000 Palestinians between 1947 and 1949 during the creation of the State of Israel and the year that followed.") (video, 4 min. 18 sec.).

170. The video fails to mention that the United Nations General Assembly had voted on November 29, 1947 to partition the British Mandate into Jewish and Arab states, or that the May 14, 1948 Declaration of Independence of the State of Israel accepted the Partition Plan, declared that Israel would ensure complete equality of social and political rights to all its inhabitants, and wished to live in peace with its Arab neighbors.

171. The video omitted that surrounding Arab states and many Palestinian Arab militias rejected the UN Partition Plan and launched a war to kill or expel the Jews and establish a single Arab-controlled state in the former Palestine mandate. Hamas and its allies continue that war to this day.[35] Nor did the video mention that hundreds of thousands of Jews were displaced from other Middle Eastern countries and fled to Israel in the same time period.[36]

172. On May 18, 2026, at an official City press conference, the Mayor stated that he "was proud to commemorate Nakba Day."[37] About two weeks after the video's release, the Mayor

---

[35] G.A. Res. 181 (II) (Nov. 29, 1947); U.S. Dep't of State, Office of the Historian, Creation of Israel, 1948, https://history.state.gov/milestones/1945-1952/creation-israel ("On November 29, 1947 the United Nations adopted Resolution 181 (also known as the Partition Resolution) that would divide Great Britain's former Palestinian mandate into Jewish and Arab states"; "Arab states threatened to attack almost as soon as the UN passed the partition resolution"); Declaration of the Establishment of the State of Israel (May 14, 1948), as reproduced by the Avalon Project, Yale Law School, https://avalon.law.yale.edu/20th_century/israel.asp ("THE STATE OF ISRAEL is prepared to cooperate with the agencies and representatives of the United Nations in implementing the resolution of the General Assembly of the 29th November, 1947"; "it will ensure complete equality of social and political rights to all its inhabitants irrespective of religion, race or sex"; "WE EXTEND our hand to all neighboring states and their peoples in an offer of peace and good neighborliness"); U.S. Dep't of State, Office of the Historian, The Arab-Israeli War of 1948, https://history.state.gov/milestones/1945-1952/arab-israeli-war ("The Arab-Israeli War of 1948 broke out when five Arab nations invaded territory in the former Palestinian mandate immediately following the announcement of the independence of the state of Israel on May 14, 1948.").

[36] Israel Central Bureau of Statistics, Immigration to Israel 2002–2006, Publication No. 1365 (June 2009), Table 2 at 34, and § 2.1.1, https://www.cbs.gov.il/he/publications/DocLib/2009/1365/pdf/e_print.pdf (immigrants in 1948–1951 whose last continent of residence was Asia: 237,352; Africa: 93,951; "Of the Asian immigrants, over half came from Iraq (52%), and the rest (44%) came from Yemen, Turkey, and Iran.").

[37] Office of the Mayor, City of New York, Transcript: Mayor Mamdani Announces the Peninsula in the Bronx as the Second Site for City's Public Grocery Stores (May 18, 2026), https://www.nyc.gov/mayors-office/news/2026/05/transcript--mayor-mamdani-announces-the-peninsula-in-the-bronx-a.html ("I was proud to commemorate Nakba Day, which is an annual day on May 15 that commemorates the expulsion of more than 700,000 Palestinians from 1947 to 1945 [sic] during the creation of the State of Israel and for the year that followed.").

announced that he would not attend the City's annual Israel Day Parade, stating, "I've made my views on the Israeli government abundantly clear," and, upon information and belief, became the first sitting Mayor of New York not to participate in the parade since 1964.[38]

173. Upon information and belief, the City has devoted official resources and official channels to the sustained condemnation of no foreign state other than Israel. The Mayor's statements and decisions described in this Part are pleaded as evidence of the purpose behind the City's policy toward Jews who identify with Israel, and of the posture that DOHMH's officials understood the City to endorse when they refused a Jewish ERG, investigated HINENU's leaders, and declined to interpret "anti-Zionism."

174. On June 18, 2026, the Mayor told an audience that "[t]he monsters that we are up against, they take many different forms," then denounced the American Israel Public Affairs Committee (AIPAC) — a lawful advocacy organization — as moving "millions in dark money to accomplish a single goal, to preserve their power so that they can turn us against one another." He did so as the chief executive of the city with the largest Jewish population outside Israel, and on the same day a federal grand jury indicted a man for allegedly plotting a mass shooting at one of AIPAC's offices.

175. AIPAC's political spending is lawful and a small fraction of U.S. political action committee spending: in calendar year 2025, federal political action committees reported

---

[38] Luke Tress, Mamdani posts Nakba Day video, saying the 'catastrophe' continues until today, Times of Israel (May 16, 2026) (video "produced by the mayor's office"; posted May 15, 2026; UJA-Federation criticism of omission of Jews expelled from Arab lands), https://www.timesofisrael.com/mamdani-posts-nakba-day-video-saying-the-catastrophe-continues-until-today/; Anthony Izaguirre, NYC Mayor Zohran Mamdani skips annual parade celebrating Israel, Associated Press (May 31, 2026, updated June 1, 2026) (originally titled "NYC Mayor Zohran Mamdani will skip annual parade celebrating Israel but pledges big police presence") (quoted; Nakba video released about two weeks earlier), via WTOP (June 1, 2026), https://wtop.com/national/2026/06/nyc-mayor-zohran-mamdani-will-skip-annual-parade-celebrating-israel-but-pledges-big-police-presence/; Mathilda Heller, NYC Mayor Zohran Mamdani to skip Israel Parade, first absence since 1964, Jerusalem Post (May 27, 2026), https://www.jpost.com/diaspora/article-897551. The video was posted on the official @NYCMayor account. See supra note 34.

disbursements of $3.4 billion, while AIPAC's political action committee reported disbursements of $28.2 million, about 0.8 percent of the total, or about 1.1 percent even including the United Democracy Project, a super PAC that, upon information and belief, is affiliated with AIPAC.[39] By singling out AIPAC in this way, the Mayor's statement targets Jewish money as uniquely illegitimate or corrupting.

176. On June 28, 2026, the Mayor was asked in a national television interview whether he supports Israel as a Jewish state. He answered: "I think any state that privileges one religion over the other is one that I can't tell you I support, whether it be Israel or Saudi Arabia or anywhere else." Asked earlier in the interview about a two-state solution, he had answered: "The way I see it is, equal rights for all people. And I think that that's the truth for Israel."[40] The IHRA definition revoked by the Mayor on January 1, 2026 identifies "denying the Jewish people their right to self-determination" as an example of antisemitism.

177. In July 2026, the Mayor told The New York Times that he was in "an active conversation" with the City's lawyers about whether he could order NYPD to seize Prime Minister Benjamin Netanyahu of Israel at the United Nations General Assembly in September 2026. On or about July 21, 2026, the Mayor's Office released a recorded video statement in which the Mayor

---

[39] Fed. Election Comm'n, Statistical Summary of 12-Month Campaign Activity of the 2025-2026 Election Cycle (Apr. 9, 2026), https://www.fec.gov/updates/statistical-summary-of-12-month-campaign-activity-of-the-2025-2026-election-cycle/ ("political action committees (PACs) raised $4.6 billion and spent $3.4 billion, according to campaign finance reports filed with the Federal Election Commission that cover activity from January 1, 2025 through December 31, 2025"); Fed. Election Comm'n, American Israel Public Affairs Committee Political Action Committee (C00797670), https://www.fec.gov/data/committee/C00797670/ (2025 disbursements $28,221,374.61); Fed. Election Comm'n, United Democracy Project (C00799031), https://www.fec.gov/data/committee/C00799031/ (2025 disbursements $9,101,949.70).

[40] ABC News, 'This Week' Transcript 6-28-26: New York City Mayor Zohran Mamdani, Sen. Mark Kelly & Sen. Todd Young (June 28, 2026) (interview by Jonathan Karl), https://abcnews.com/Politics/week-transcript-6-28-26-new-york-city/story?id=134279911; see also Kelly Hartog, Mamdani says 'I can't tell you I support' Israel as a Jewish state, Jewish Telegraphic Agency (June 29, 2026), https://www.jta.org/2026/06/29/united-states/mamdani-says-i-cant-tell-you-i-support-israel-as-a-jewish-state.

stated: "Benjamin Netanyahu is … the architect of a horrific genocide against the Palestinian people. He is responsible for the killing of more than 73,000 people . . .," and called Netanyahu a "war criminal," without citing evidence or valid authority for either accusation.

178. In the video, the Mayor portrayed Netanyahu as the sole cause of Palestinian death and suffering arising from the Gaza war, ignoring the role of Hamas and other terrorist groups that caused the conflict with their attack of October 7, 2023; the terrorists' daily violations of international law endangering Palestinian civilians; and their refusal to release hostages or surrender their arms. He also declared that "Benjamin Netanyahu is not welcome in New York City, nor is any other war criminal at large," acknowledged that "we do not have the independent legal authority to enforce this warrant," and called on the federal government "to join the ICC and execute this warrant."[41] Upon information and belief, Mamdani has never proposed to arrest any other person subject to an ICC arrest warrant, or any foreign leader other than Netanyahu.

179. As Mayor, he has made the same accusation at official City events. At a breakfast he hosted at Gracie Mansion on March 17, 2026, he spoke of the period in which "we've witnessed a genocide unfold before our eyes."[42] At a mayoral press conference on July 22, 2026, he stated that he could "look at Benjamin Netanyahu and see the way that he has orchestrated this genocide."[43]

---

[41] Mayor Zohran Kwame Mamdani (@NYCMayor), X (July 21, 2026, 8:00 PM ET), https://x.com/NYCMayor/status/2079718073058091261 ("Benjamin Netanyahu is a war criminal.") (video, 2 min. 9 sec.); see also Associated Press, Mamdani says New York City can't arrest Netanyahu but the federal government should (July 22, 2026), https://www.apr.org/politics-government/2026-07-22/mamdani-says-new-york-city-cant-arrest-netanyahu-but-the-federal-government-should.

[42] Office of the Mayor, City of New York, Transcript: Mayor Mamdani Hosts Breakfast to Celebrate Saint Patrick's Day (Mar. 17, 2026), https://www.nyc.gov/mayors-office/news/2026/03/transcript--mayor-mamdani-hosts-breakfast-to-celebrate-saint-pat.html; see Will Bredderman, Zohran Mamdani accuses Israel of genocide on St. Patrick's Day stage, Jewish Insider (Mar. 17, 2026), https://jewishinsider.com/2026/03/zohran-mamdani-st-patricks-day-israel-genocide/.

[43] Office of the Mayor, City of New York, Transcript: Mayor Mamdani Appoints Veteran City Leader Anthony Shorris as President and CEO of the Economic Development Corporation (July 22, 2026), https://www.nyc.gov/mayors-

180. On or about July 27, 2026, the Mayor stated that "what I shared were not even frankly personal assessments, they were objective facts." The Mayor thus stated, as fact and as the position of the City, an accusation that no court or tribunal has adjudicated.

181. The casualty figure of "more than 73,000" that the Mayor recited is, upon information and belief, the undifferentiated total published by the Ministry of Health in Gaza, which Hamas has controlled since 2007 and which does not distinguish combatants from civilians. Upon information and belief, the Mayor's Office used City resources to produce and distribute the video. The Mayor's accusation is the same one that appeared in the IHRD message sent to all DOHMH staff six months earlier, and that the February 3 event on DOHMH premises treated as established fact.

182. The Mayor repeated the accusation. On September 22, 2026, days before the Prime Minister of Israel was to address the United Nations General Assembly in the City, the Mayor, upon information and belief, told reporters that the Prime Minister "is the architect of horrific genocide against Palestinians." Upon information and belief, on or about October 1, 2026, he stated in a podcast interview that the United States "should join the ICC" and "should enforce its warrants for everyone," again calling the Prime Minister the "architect of a horrific genocide."[44]

---

office/news/2026/07/transcript-_mayor-mamdani-appoints-veteran-city-leader-anthony-s; see also Corey Walker, Mamdani Dodges Question on Whether He Considers Oct. 7 a 'Genocide'— Seems to [sic] Draws Equivalence Between Netanyahu and Hamas, Algemeiner (July 22, 2026), https://www.algemeiner.com/2026/07/22/mamdani-dodges-question-on-whether-he-considers-oct-7-a-genocide-draws-equivalence-between-netanyahu-and-hamas/.

[44] Michael Sinkewicz, Mamdani fires back at Netanyahu, calls Israeli leader 'architect of horrific genocide' ahead of UN visit, Fox News (Sept. 23, 2026) (remarks of Sept. 22, 2026), https://www.foxnews.com/politics/mamdani-fires-back-netanyahu-calls-israeli-leader-architect-horrific-genocide-ahead-un-visit; Charlotte Hazard, NYC Mayor Mamdani says US should join the ICC and enforce arrest warrant against Netanyahu, The National Desk (Oct. 2, 2026) (Theo Von interview), https://thenationaldesk.com/news/nation-world/nyc-mayor-says-us-should-join-the-icc-and-enforce-arrest-warrant-against-netanyahu-theo-von-new-york-city-genocide; see also Marcia Kramer, Mamdani says he doesn't plan to attend U.N. General Assembly protests during Netanyahu's visit, CBS N.Y. (Sept. 16, 2026), https://www.cbsnews.com/newyork/news/unga-benjamin-netanyahu-zohran-mamdani-protests/.

183. On October 7, 2026, the third anniversary of the Hamas-led massacre, the Mayor's Office published on the City's official website, nyc.gov, a "Statement From Mayor Zohran Kwame Mamdani on the Third Anniversary of October 7."[45] The Mayor posted the same statement the same morning on the City's official mayoral account on X, @NYCMayor.[46] The statement gave four sentences to the October 7 attack. It described the attack as "the horrific war crimes of October 7" but did not mention Jews.[47] The rest of the statement turned the anniversary into an indictment of the State of Israel. It declared that "[t]he suffering did not begin nor end that day" and that "[i]t instead continued through the Israeli government's devastating, ongoing genocide in Gaza." It asserted that "our tax dollars fund these war crimes." It also called on New Yorkers to "refuse to accept a world in which occupation and apartheid continue, where war crimes are met with impunity, and our federal government continues its complicity with every arms shipment."

184. The statement was issued in the Mayor's official capacity, under the City's name, through the City's official channels. Its assertions that Israel is committing "genocide," maintains "apartheid," and commits "war crimes" funded by American "tax dollars" were stated as fact. The statement thus repeated, as City policy, the same position the Mayor had described on or about July 27, 2026 as "objective facts."

---

[45] Office of the Mayor, City of New York, Statement From Mayor Zohran Kwame Mamdani on the Third Anniversary of October 7 (Oct. 7, 2026), https://www.nyc.gov/mayors-office/news/2026/10/statement-from-mayor-zohran-kwame-mamdani-on-the-third-anniversa; see also Mark Prussin & Robert Moses, Read NYC Mayor Zohran Mamdani's Full Statement on Oct. 7 Attacks, FOX 5 N.Y. (Oct. 7, 2026), https://www.fox5ny.com/news/mamdani-statement-oct-7-attacks-israel-hamas.

[46] Mayor Zohran Kwame Mamdani (@NYCMayor), X (Oct. 7, 2026, 8:40 AM EDT), https://x.com/NYCMayor/status/2107813239585120609; see Daniel Edelson & Itamar Eichner, Mamdani Marks Oct. 7 by Accusing Israel of Genocide, Ynetnews (Oct. 7, 2026), https://www.ynetnews.com/article/bkxvh7vsfg (reproducing screengrab credited "NYCMayor/X").

[47] Jonathan Greenblatt (@JGreenblattADL), X (Oct. 7, 2026), https://x.com/JGreenblattADL/status/2107828938659508440; see also Jesse Zanger & Ali Bauman, NYC Mayor Mamdani's Statement Marking 3 Years Since Oct. 7 Attacks Calls Out Israeli Government's "Ongoing Genocide," CBS N.Y. (Oct. 7, 2026), https://www.cbsnews.com/newyork/news/nyc-mayor-zohran-mamdanis-oct-7-statement/.

185. The statement drew immediate condemnation. Israel's Consul General in New York called it "a disgrace, shame, and insult to the memory of those who were murdered on October 7."[48] Israel's Ambassador to the United Nations called it an "attempt to hijack the anniversary of October 7 and turn it into yet another propaganda attack against Israel."[49] The national director of the Anti-Defamation League responded: "not once do you say 'Jews,'" and the Mayor was "weaponizing a day meant for mourning the worst massacre of Jews since the Holocaust."[50] Members of Congress from the Mayor's own party called the statement "reprehensible" and accused him of "desecrating the memory of murdered, innocent Jews."[51]

186. The Mayor did not retract or modify the statement. At an official City press conference in Bushwick, Brooklyn, on October 8, 2026, he was asked whether he had made "any missteps that inflamed tensions." He answered that "[t]here must be room to mourn the 74,000 Palestinians that the Israeli government has killed since." He also described a vigil he had attended as one that "ends with a shared vision for peace and for an end to the genocide."[52] Asked whether

---

[48] Zanger & Bauman, supra note 47 (quoting Consul General Ofir Akunis); Mayor Mamdani's Oct. 7 Anniversary Statement Draws Outrage from Jewish Leaders, ABC7 N.Y. (Oct. 7, 2026), https://abc7ny.com/post/nyc-mayor-mamdani-releases-new-statement-anniversary-oct-7-attacks-hamas-israel/19917350/.

[49] James Genn, Mamdani: Suffering Did Not Begin, End on October 7, Continued Throughout Israel's 'Gaza Genocide,' Jerusalem Post (Oct. 7, 2026), https://www.jpost.com/international/article-910939 (quoting Ambassador Danny Danon).

[50] Greenblatt, supra note 47; see also Zanger & Bauman, supra note 47.

[51] Anthony Izaguirre, Mamdani's Oct. 7 Commemoration Outrages Supporters and Critics of Israel, Associated Press (Oct. 8, 2026), available at https://www.nbcnewyork.com/news/local/mamdanis-oct-7-commemoration-outrages-supporters-and-critics-of-israel/6557210/ (quoting Rep. Dan Goldman); Joe Walsh, Mamdani Criticized by Fellow Democrats for Statement Mourning Oct. 7 Attacks While Condemning Israel, CBS News (Oct. 8, 2026), https://www.cbsnews.com/news/mamdani-criticized-by-democrats-oct-7-statement/ (quoting Rep. Debbie Wasserman Schultz).

[52] Office of the Mayor, City of New York, Transcript: Mayor Mamdani and Speaker Menin Cut Red Tape to Expedite Payments for Up to 800 Nonprofits (Oct. 8, 2026), https://www.nyc.gov/mayors-office/news/2026/10/transcript--mayor-mamdani-and-speaker-menin-cut-red-tape-to-expe; see also FOX 5 New York, Mamdani Answers Questions on Criticism of His Oct. 7 Statement, YouTube (Oct. 8, 2026), https://www.youtube.com/watch?v=9OJiaCHYkk4; Adam Daly, 'What I Signed Up For': A Cautious Mamdani Stands by Oct. 7 Response After Getting Backlash from Both Sides, amNY (Oct. 8, 2026), https://www.amny.com/politics/mamdani-stands-by-oct-7-response-backlash/; Joseph Strauss, Mamdani Says He Was 'Proud to Attend' Oct. 7 Vigil Where Protesters Called Him a 'Traitor,' Jewish

he would add or remove any line from his statement, the Mayor answered that October 7 was, for some, "a day that is continuing in the Israeli government's use of it as a justification for a genocide." He added: "I think that the statement, the attendance, the meeting, it all speaks to a reckoning with horror." Asked about protesters who had called him a "traitor," the Mayor again called the conflict "the genocide in Gaza" and stated: "As for those protesting me, I am the mayor of New York City, and this is what I signed up for."

187. At the same press conference, the Mayor was asked whether he would support a proposed permanent memorial in Brooklyn to the victims of October 7. He did not commit, stating that "our administration is reviewing it," that "there has to be engagement from the Parks Department," and that he would "have better thoughts" only after the review.[53] Upon information and belief, as of the filing of this Complaint, the City has taken no action to approve the proposed memorial.

188. In an interview with NY1 that aired on October 7, 2026, the Mayor stated, according to a City Hall transcript as reported, that Israel responded to the October 7 attack by "initiating a genocide of Palestinians in Gaza that has continued to this day."[54] He repeated the charge on October 8, 2026.[55]

---

Telegraphic Agency (Oct. 8, 2026), https://www.jta.org/2026/10/08/ny/mamdani-says-he-was-proud-to-attend-oct-7-vigil-where-protesters-called-him-a-traitor.

[53] Office of the Mayor, City of New York, Transcript (Oct. 8, 2026), supra note 52; see also sources cited supra note 52.

[54] Rebecca Szlechter, Mamdani Tells Interviewer a Lesson of Oct. 7 Is Israel Responded by 'Initiating a Genocide' That 'Has Continued to This Day,' JNS (Oct. 8, 2026), https://www.jns.org/news/u-s-news/mamdani-tells-interviewer-a-lesson-of-oct-7-is-israel-responded-by-initiating-a-genocide-that-has-continued-to-this-day.

[55] Office of the Mayor, City of New York, Transcript (Oct. 8, 2026), supra note 52 ("And also for others, it is a day that is continuing in the Israeli government's use of it as a justification for a genocide."); Anders Hagstrom, Mamdani Doubles Down on Anti-Israel Oct 7 Statement After Backlash, Fox News (Oct. 8, 2026), https://www.foxnews.com/politics/mamdani-doubles-down-anti-israel-oct-7-statement-backlash.

189. The Mayor's statements bracket DOHMH's decisions: the Mayor's Office released the Nakba video on May 15, 2026; on June 18, the Mayor told an audience that the "monsters" his movement faced "take many different forms" and then denounced AIPAC; DOHMH closed its investigation of HINENU's leaders without findings on June 24; on June 28, the Mayor stated on national television that he could not say he supports Israel as a Jewish state; DOHMH denied HINENU's application on July 10; and on or about July 21, the Mayor's Office released the video accusing the Prime Minister of Israel of genocide.

190. Jewish DOHMH employees who identify with Israel, including Plaintiffs, reasonably understood these statements and decisions by their employer's chief executive — made in the weeks surrounding DOHMH's July 10, 2026 denial of HINENU's application, and after DOHMH closed its investigation of the HINENU Plaintiffs on June 24, 2026 without exonerating them — as confirmation that the hostility toward Israel, and toward Jews who identify with it, expressed by DOHMH's leadership and equity infrastructure is the policy of the City itself, and that Jewish employees who object to that hostility do so without recourse.

191. The Mayor's public statements and policy decisions show that the discriminatory purpose and effect of the official conduct alleged herein are consistent with and endorsed by City policy and practice.

***8. The Repeated Official Accusation That Israel Is Committing "Genocide"***

192. Genocide is a crime with a precise legal definition. Article II of the Convention on the Prevention and Punishment of the Crime of Genocide, adopted by the United Nations General Assembly on December 9, 1948, defines it as enumerated acts "committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such." Under United States law, it requires "the specific intent to destroy, in whole or in substantial part, a national, ethnic,

racial, or religious group as such," carried out through one of six enumerated acts, such as killing members of the group or imposing measures intended to prevent births within the group; a "substantial part" is "a part of a group of such numerical significance that the destruction or loss of that part would cause the destruction of the group as a viable entity within the nation of which such group is a part."[56] No court or tribunal has adjudicated the accusation. The war in Gaza began on October 7, 2023, when Hamas and Palestinian Islamic Jihad terrorists invaded Israel, murdered approximately 1,200 people, most of them civilians, and took 251 people hostage into Gaza.

193. South Africa's December 29, 2023 application against Israel in the International Court of Justice remains pending, with written pleadings scheduled to continue until May 2029. The Court has made no finding on the merits; its January 26, 2024 order stated that it was not called upon at that stage "to establish the existence of breaches of obligations under the Genocide Convention." The order acknowledged that "figures relating to the Gaza Strip cannot be independently verified."

194. The Government of the United Kingdom stated on September 1, 2025: "To date, the ICJ has neither found that Israel has breached its obligations under the Genocide Convention, nor ruled on the plausibility of Israel committing genocide."[57]

---

[56] 18 U.S.C. § 1091(a) ("Whoever, whether in time of peace or in time of war and with the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group as such— (1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group; shall be punished as provided in subsection (b)."), https://www.law.cornell.edu/uscode/text/18/1091; 18 U.S.C. § 1093(8), https://www.law.cornell.edu/uscode/text/18/1093.

[57] Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel), Order of 26 January 2024, ¶ 46 (I.C.J.), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf, *transmitted in* Letter dated 26 January 2024 from the Secretary-General addressed to the President of the Security Council, annex, U.N. Doc. S/2024/116 (Jan. 31, 2024), at 18, https://digitallibrary.un.org/record/4036496/files/S_2024_116-EN.pdf; Letter from the Rt Hon David Lammy MP, Secretary of State for Foreign, Commonwealth and Development Affairs, to Sarah Champion MP, Chair, International

195. The International Criminal Court warrant that the Mayor invoked does not charge genocide. The accusation was launched within days of the October 7 massacre, before any substantial Israeli ground operations in Gaza had begun: on October 13, 2023, an essay published in Jewish Currents described the assault on Gaza as "a textbook case of genocide unfolding in front of our eyes," two weeks before the IDF announced, on October 27, 2023, that its ground forces were expanding their activity in Gaza.[58][59]

196. When 88% of American Jews believe that Israel has the right to exist as a Jewish, democratic state,[60] 77% say caring about Israel is important to what being Jewish means to them,[61]

---

Development Committee (Sept. 1, 2025), https://committees.parliament.uk/publications/49215/documents/262248/default/.

[58] Raz Segal, *A Textbook Case of Genocide*, Jewish Currents (Oct. 13, 2023), https://jewishcurrents.org/a-textbook-case-of-genocide; Becky Sullivan & Daniel Estrin, *Israel says it's 'expanding' ground activities in Gaza as internet blackout takes hold*, NPR (Oct. 27, 2023), https://www.npr.org/2023/10/27/1209084199/israel-military-expanding-operations-gaza-hamas-communications-internet.

[59] South Africa v. Israel, supra note 57, Application Instituting Proceedings (I.C.J. Dec. 29, 2023), https://www.icj-cij.org/case/192; Order of 26 January 2024, supra note 57, ¶¶ 30, 62, 84 (quoted); Orders of 28 March 2024, ¶¶ 25, 49, and 24 May 2024, ¶¶ 32, 55 (incorporating the January findings by reference and "without prejudice" to compliance findings); Order of 21 May 2026 (fixing Nov. 22, 2027 for South Africa's Reply and May 22, 2029 for Israel's Rejoinder, as reported by the Presidency of South Africa, https://www.gov.za/news/media-statements/presidency-notes-icj-order-south-africa-and-israel-case-02-jun-2026; reciting that Israel's Counter-Memorial, filed within the time-limit extended to Mar. 12, 2026, contained objections to jurisdiction and admissibility), https://www.icj-cij.org/sites/default/files/case-related/192/192-20260521-ord-01-00-en.pdf. The January 26, 2024 order also found "plausible" the right of Palestinians in Gaza "to be protected from acts of genocide" (¶ 54); the Court's then-President stated publicly that the Court "didn't decide that the claim of genocide was plausible" (Judge Joan Donoghue, BBC HARDtalk, Apr. 2024); the May 24, 2024 order directed Israel to halt its Rafah offensive. ICC warrant: International Criminal Court, "Situation in the State of Palestine: ICC Pre-Trial Chamber I rejects the State of Israel's challenges to jurisdiction and issues warrants of arrest for Benjamin Netanyahu and Yoav Gallant" (Nov. 21, 2024), https://www.icc-cpi.int/news/situation-state-palestine-icc-pre-trial-chamber-i-rejects-state-israels-challenges (charges as summarized in the Court's press release and in UN News, Nov. 21, 2024, https://news.un.org/en/story/2024/11/1157286).

[60] Jewish Federations of North America, Survey of Jewish Life since October 7 – Zionism Findings: Findings from a poll of Jewish Americans (fielded Mar. 2025) (88% of Jewish respondents (n=1,499) answered "Yes" to the question "Do you believe Israel has the right to exist as a Jewish, democratic state?"), https://www.jewishdatabank.org/api/download/?studyId=1277&mediaId=bjdb%5cJFNA_Survey_4_IsraelZionismInsights.pdf; see also Burson, #6682 | JFNA National Survey, at 5 (Apr. 25, 2025) (toplines; field dates Mar. 5–24, 2025).

[61] American Jewish Committee, AJC's State of Antisemitism in America 2025 Report: Insights and Analysis ("Over three in four American Jews (77%) say caring about Israel is important to what being Jewish mean [sic] to them."), https://www.ajc.org/AntisemitismReport2025/InsightsandAnalysis; see SSRS, The State of Antisemitism in America 2025 Surveys Methodology Report, at 2 (nationally representative sample of 1,222 Jewish adults; survey conducted Sept. 26–Oct. 29, 2025), https://www.ajc.org/media/methodology/AntisemitismReport2025.

and 71% agree that they feel emotionally attached to Israel,[62] an official accusation that Israel is committing genocide is reasonably understood by Jewish employees as an accusation against the people with whom they identify, and marks them, in the eyes of co-workers whom their employer has so instructed, as complicit in the gravest crime known to law.

197. The IHRA definition's contemporary examples of antisemitism, quoted above, include applying double standards to Israel and using classic antisemitic imagery, such as blood libel, to characterize Israel or Israelis. Since 2021, the United States government has formally determined that China committed genocide against the Uyghurs, that Myanmar's military committed genocide against the Rohingya, and that Sudan's Rapid Support Forces committed genocide; the parliaments of Ukraine, Canada, Estonia, Latvia, Lithuania, Poland, the Czech Republic, and Ireland have recognized Russia's conduct in Ukraine as genocide; and independent investigators have found a reasonable basis to believe that genocide was committed in Ethiopia's Tigray region.[63] By contrast, on December 5, 2024, in response to a question about an Amnesty

---

[62] Jewish Federations of North America, Survey of Jewish Life since October 7 – Zionism Findings, supra note 60 (71% of Jewish respondents (n=1,877) agreed with the statement "I feel emotionally attached to Israel"); see also Burson, #6682 | JFNA National Survey, supra note 60, at 3.

[63] U.S. Secretary of State, Determination of the Secretary of State on Atrocities in Xinjiang (Jan. 19, 2021) ("the PRC … has committed genocide against the predominantly Muslim Uyghurs"), https://2017-2021.state.gov/determination-of-the-secretary-of-state-on-atrocities-in-xinjiang/; Secretary Blinken, remarks at the U.S. Holocaust Memorial Museum (Mar. 21, 2022) ("members of the Burmese military committed genocide and crimes against humanity against Rohingya"), https://2021-2025.state.gov/secretary-antony-j-blinken-at-the-united-states-holocaust-memorial-museum/; Secretary Blinken, Genocide Determination in Sudan and Imposing Accountability Measures (Jan. 7, 2025) ("members of the RSF and allied militias have committed genocide in Sudan"), https://2021-2025.state.gov/genocide-determination-in-sudan-and-imposing-accountability-measures/; The Gambia v. Myanmar (I.C.J.) (merits hearings concluded Jan. 29, 2026; judgment pending), https://www.icj-cij.org/case/178; parliamentary resolutions on Ukraine: Verkhovna Rada of Ukraine, Resolution No. 2188-IX (Apr. 14, 2022), https://zakon.rada.gov.ua/laws/show/2188-20; Riigikogu (Estonia), Statement on the War Crimes and Genocide committed by the Russian Federation in Ukraine (Apr. 21, 2022), https://www.riigikogu.ee/wpcms/wp-content/uploads/2023/02/21.04.2022-Ukraina-avaldus-eng.pdf; Saeima (Latvia), statement of Apr. 21, 2022, https://www.saeima.lv/en/news/saeima-news/30934-saeima-adopts-statement-on-russia-s-aggression-and-war-crimes-in-ukraine-recognising-it-as-genocide-against-the-ukrainian-people; House of Commons of Canada, Journals, No. 59, 44th Parl., 1st Sess., at 649–50 (Apr. 27, 2022), https://www.ourcommons.ca/Content/House/441/Journals/059/Journal059.PDF; Seimas (Lithuania), Resolution No. XIV-1070 (May 10, 2022), https://e-seimas.lrs.lt/portal/legalAct/lt/TAD/4152dc40d03b11ecb1b39d276e924a5d; Sejm (Poland), Resolutions of Mar. 23, 2022 and Apr. 8, 2022 (M.P. 2022, items 367, 407) (condemning acts of genocide), https://eli.gov.pl/eli/MP/2022/367/ogl/pol/pdf,

International report accusing Israel of genocide in Gaza, the United States Department of State stated: "We have said previously and continue to find that the allegations of genocide are unfounded."[64]

198. Upon information and belief, no other alleged genocide was the repeated and principal focus of DOHMH messages and programs, nor has the Mayor addressed those alleged genocides in any official communication. DOHMH and the City have made one state, the Jewish state, the subject of sustained and dedicated official programming on a charge of genocide.

199. The genocide accusation has been invoked by perpetrators of violence against Jews in the United States, as alleged in federal charging documents.[65]

---

https://eli.gov.pl/api/acts/MP/2022/407/text/I/M20220407.pdf; Czech Senate, Resolution on Support for Ukraine (May 11, 2022), as reported by the Verkhovna Rada, https://www.rada.gov.ua/en/news/News/top_news/223599.html; Seanad Éireann (Ireland), Situation in Ukraine: Motion (June 1, 2022), https://www.oireachtas.ie/en/debates/debate/seanad/2022-06-01/; New Lines Institute, Genocide in Tigray: Serious Breaches of International Law in the Tigray Conflict, Ethiopia, and Paths to Accountability (June 2024) ("reasonable basis to believe"), https://newlinesinstitute.org/intl-law-peace/genocide-in-tigray-serious-breaches-of-international-law-in-the-tigray-conflict-ethiopia-and-paths-to-accountability-2/.

[64] U.S. Dep't of State, Department Press Briefing (Dec. 5, 2024) (Principal Deputy Spokesperson Vedant Patel), https://2021-2025.state.gov/briefings/department-press-briefing-december-5-2024/.

[65] IHRA Non-Legally Binding Working Definition of Antisemitism, supra note 33 (items 8, 9, 10); see also International Holocaust Remembrance Alliance, Working Definition of Antisemitism, https://holocaustremembrance.com/resources/working-definition-antisemitism (listing the United States among adopting countries (Dec. 11, 2019)). City adoption and revocation: see Part IV.G.6 above. Violence: United States v. Rodriguez, No. 1:25-mj-00091 (D.D.C.), Criminal Complaint and Affidavit of FBI Special Agent Christina Hagenbaugh (May 22, 2025), ¶ 12 ("RODRIGUEZ spontaneously stated on scene to MPD, 'I did it for Palestine, I did it for Gaza, I am unarmed.' … he shouted 'Free Palestine.'"), https://www.justice.gov/usao-dc/media/1401421/dl; U.S. Attorney's Office for D.C., press release (Aug. 7, 2025) (indictment; the "Explication" document: "argued for the 'morality of armed demonstration' and wrote that '[t]hose of us against the genocide take satisfaction in arguing that the perpetrators and abettors have forfeited their humanity'"), https://www.justice.gov/usao-dc/pr/federal-hate-crime-and-first-degree-murder-charges-filed-against-alleged-killer-israeli; superseding indictment (Feb. 4, 2026) adding terrorism counts, https://www.justice.gov/usao-dc/pr/new-terrorism-related-charges-filed-against-alleged-killer-israeli-embassy-employees; Notice of Intent to Seek the Death Penalty, ECF No. 49, *United States v. Rodriguez*, No. 1:25-cr-00224 (D.D.C. filed May 15, 2026); U.S. Attorney's Office press releases of June 2, 2025 ("When he threw the Molotov cocktails, Soliman yelled 'Free Palestine!'"; "He stated that he wanted to kill all Zionist people and wished they were all dead"), https://www.justice.gov/usao-co/pr/egyptian-national-charged-hate-crime-attack-boulder-gathering, and June 25, 2025 (twelve-count hate-crime indictment), https://www.justice.gov/usao-co/pr/alleged-perpetrator-terror-attack-colorado-charged-hate-crimes; Colorado state court guilty plea (May 7, 2026) to first-degree murder of Karen Diamond, 82, and attempted-murder counts, life without parole (Allison Sherry, Boulder Firebomber Pleads Guilty to State Charges in Death, Injuries, Gets Life in Prison, Colo. Pub. Radio (May 7, 2026), https://www.cpr.org/2026/05/07/boulder-firebomb-suspect-pleads-guilty/); see also supra note 6.

200. As a matter of official policy, the City repeatedly tells its employees, through official channels, that the Jewish state is committing the gravest crime known to law, and, upon information and belief, it has made no other state the subject of sustained official programming on that charge. That is the environment in which Plaintiffs work.

## H. DOHMH INVESTIGATES HINENU FOR "RACIAL AND RELIGIOUS DISCRIMINATION"

201. On March 30, 2026, DOHMH's EEO Office served eight HINENU leaders (six of whom were represented by Plaintiffs' counsel during the investigation (Represented Respondents); three of whom are HINENU Plaintiffs) with a "Notice of Complaint to Respondent" in EEO Case No. 161370. The Notice stated that "[o]n February 27, 2026, [EEO] received a complaint" brought by eleven named DOHMH employees and three anonymous complainants against HINENU, and that EEO would investigate two allegations:

> 1) In their email dated December 16, 2025, Respondents, as leaders of HINENU (a Jewish affinity group), engaged in racial and religious discrimination by conflating the Bondi Beach shooting with pro-Palestinian advocacy and/or anti-Zionism. 2) Respondents, as leaders of HINENU, engaged in racial and religious discrimination when they made and/or engaged in discriminatory remarks at the support space they hosted on December 18, 2025.

202. The Notice warned that "failure to cooperate with an EEO investigation may result in disciplinary action," directed respondents not to "discuss this matter with any individuals," requested a written response, and required each to appear for an interview. The Notice stated that Defendant Ahn "has been assigned to this matter" — the same EEO Director who had received HINENU's December 17 "Urgent Requests" containing the very quotation now alleged to be discriminatory, who had responded that day only by ordering HINENU off its agency e-mail account.

203. The fourteen complainants included an organizer of the April 2025 DJFJ event and the canceled June 2025 "[DJFJ] Bagel Lunch" (Ms. McKenney); three leads of DJFJ (Ms. McKenney, Sara Atlas, Rachel Suss); two organizers of the February 3 event (Ms. McKenney, Zanab Jafry Shah); five DC37 Local 3005 officers (Ms. McKenney, Ms. Atlas, Ms. Suss, Cristina Rodriguez-Hart, Grace "Gray" Mackson); three DELs (Ms. Shah, Tala Mansi, Paola Villegas); and three members of DDC Bureau Action Teams, which are the equity teams DOHMH lists among its Race to Justice "equity stakeholders" (Ms. McKenney, Abigail Crampton, Musarrat Rahman).

204. Upon information and belief, most of the complainants had neither received HINENU's e-mail nor attended its support space; DOHMH's investigators acknowledged that "we are unsure if anyone actually attended," and took the position that a co-worker who merely "heard about the message" or "f[ound] out about the words being used at some point" had standing to bring an EEO complaint.

205. DOHMH's EEO intake procedure, as stated in the Notice, provides that the EEO Team will first determine whether a reported incident falls within EEO's purview, and refers non-EEO matters elsewhere. The EEO Office exercised that discretion in opposite directions depending on who complained. When Plaintiff Stein reported DJFJ's events on agency premises to Defendant Ahn in 2025, and when, on January 30, 2026, she complained to the EEO Office "[a]s a Jewish employee" that her workplace "allows hostile and partisan discussions," the EEO Office, upon information and belief, opened no investigation. When fourteen co-workers complained that a Jewish group's message and support space constituted "racial and religious discrimination" because they "conflat[ed] the Bondi Beach shooting with pro-Palestinian advocacy and/or anti-Zionism," the same office accepted the complaint and investigated for nearly four months. The

Deputy EEO Director later wrote that "once allegations are brought to our office, we must investigate them as we are tasked with doing so."

206. DOHMH has since confirmed that its own policy required the opposite result. On August 31, 2026, DOHMH's Chief Equity Office sent all staff a message titled "Reporting Bias and Discrimination," which stated that "all allegations of discrimination and harassment based on a protected category, no matter where they are initially reported (i.e., OCR), must be referred to EEO," and that DOHMH's Race to Justice office "does not receive or act upon individual incidents of harm, harassment, discrimination or retaliation." Under that policy, Plaintiffs' complaints of anti-Jewish harassment were for the EEO Office to address.

207. The EEO Office refused to state what statements Represented Respondents were accused of making. On April 15, 2026, Plaintiffs' counsel asked EEO to identify the specific statements or actions alleged to constitute racial or religious discrimination, which the Notice did not specify. The EEO Director refused: "The previously provided Notice gives the Respondents sufficient information … we will not be providing additional detail beyond what has already been shared." She also ruled that counsel's "presence at these meetings will be for support only" and counsel "will not be able to interject or speak on behalf of the Respondents." Deputy EEO Director Bridgemohan described the complaint as alleging "discrimination based on religion and national origin" — inconsistent with the Notice's "racial and religious" and the investigators' "Anti-Muslim, anti-Palestinian" formulations.

208. The EEO Office served its Notice on March 30, 2026, immediately before Passover (April 1–9, 2026). That was also the date that DOHMH chose to announce the Non-ERG Guidelines described above. The EEO Office also violated its own confidentiality policies by placing an EEO meeting on a Represented Respondent's public office calendar, visible to her

colleagues. Her supervisor saw the entry, asked her what it was and whether she "had a problem," and raised it with the division's human-resources lead. When the respondent objected, the EEO Office responded that it had done nothing wrong, and refused counsel's April 15, 2026 request that the calendar entries be marked private.

209. On April 16 and 17, 2026, Defendant Ahn, Deputy EEO Director Bridgemohan, and EEO investigators Brodska and Poubouridis, in varying combinations, interrogated the Represented Respondents. The investigators disclosed during the interviews that the "racial and religious discrimination" alleged consisted of (1) HINENU's quotation of Rabbi Steinmetz's statement that "globalizing the intifada is a call to murder" and "anti-Zionism kills Jews," and (2) an alleged remark by a participant at the support space that "at least in Israel, we know who our enemies are," which the investigators indicated was reported as offensive by someone not present.

210. The investigators' questions appeared designed to extract admissions of wrongdoing and of anti-Arab or anti-Muslim animus, and to press Represented Respondents to disavow the view that antizionism is a form of antisemitism. Among other things:

(a) EEO investigator Poubouridis repeatedly asked whether Represented Respondents saw "issues" with quoting "a pretty overtly political figure" whom "some people have seen as … potentially inflammatory," and whether the rabbi's words were "something that could be potentially inflammatory and something that strays a little different from creating a safe space."

(b) Investigators asked Represented Respondents to distinguish antisemitism from antizionism and whether the Bondi Beach massacre was "an anti-Semitic attack or an anti-zionist attack," and EEO investigator Brodska acknowledged, "I know it's a loaded question."

(c) EEO investigator Poubouridis theorized that "Intifada is an Arabic word, so it inherently attaches itself to, you know, Muslim people, Arabic people," so that criticizing the slogan "globalize the intifada" "could align to somebody believing that it is like anti Arabic statement, anti Muslim statement, anti pro Palestine statement," and asked a Represented Respondent whether she could "see how … somebody else at the DOHMH could hear this type of language, this type of quote, and themselves fear that HINENU or members of HINENU are threats to their safety."

(d) The EEO Director told a Represented Respondent: "despite what you say, Intifada that globalizing the Intifada is there is a historical significance. It's not just words, they have meaning and they tend to be very pro Palestine. And I don't think we can dispute that right here … Do you think that this quote was should not have been triggering?"

(e) EEO investigator Brodska asked Plaintiff Stein "why from an agency e-mail HINENU chose to make a political statement saying that it's time to say that anti Zionism kills Jews." When Stein explained that the slogan "Globalize the Intifada" is a call for violence against Jews, Brodska responded: "Based on our understanding, it is an uprising and the way that it is used in certain political contexts is relevant."

(f) The EEO Director told Plaintiff Pacht that "the use of the phrase globalizing the Intifada … was seen as Anti-Muslim, anti-Palestinian," that the complainants were "saying you're taking this shooting tragedy? And making it a political statement about it. And that is the thrust of the allegation," and, when counsel asked whether EEO was investigating his client for political statements, answered: "Well, no, we're not [investigating] for political statements. We're wondering her thoughts about it."

(g) EEO investigator Brodska told Plaintiff Pacht that "[t]o use the phrase saying that globalized the Intifada is a call to murder as a factual statement was a trigger to people because there are people who do not interpret it that way," and that the intent "may have been to express solidarity, but it was interpreted as identifying… Arab or Muslim or Palestinian colleagues as dangers."

(h) EEO investigator Brodska asked Plaintiff Stein "why you don't believe Jewish is religious."

(i) Investigators also asked Represented Respondents about HINENU's formation, leadership, objectives, and e-mail account, which were outside the scope of the statements purportedly under investigation. When a Represented Respondent asked whether those matters were relevant to an interview about Bondi Beach, EEO investigator Brodska answered, "That's not necessarily how groups work, right?"

211. These questions and statements showed that EEO prejudged the matter and concluded without investigation that the statements at issue reflected improper bias and were offensive, and they refused to accept the Respondents' statements as accurate, despite the investigators' apparent ignorance of the history of the Israel-Palestine conflict and of the Jewish people.

212. Represented Respondents rejected the premise that Jews who fear those who chant "globalize the intifada" are thereby hostile to Arabs or Muslims, explaining that they associate "intifada" not with Arabs or Muslims generally but only with those who commit and promote violence against Jews. The investigators nonetheless repeatedly attempted to extract incriminating statements.

213. When counsel objected that the questioning exceeded the scope of the complaint and sought to punish Represented Respondents for their beliefs, the EEO Director responded:

"There is no due process at this time. This is an EEO investigation. You are here as a support," and the respondent's "full cooperation is required as a code of conduct under the agency's policies. … Please abstain from speaking further."

214. The EEO Director then threatened to "reconvene and ask another person to be her representative," and EEO investigator Brodska later told counsel: "we're gonna cut this call off." But when counsel asked whether Plaintiff Pacht was free to leave "without consequence," Brodska answered: "It will be noted. It will be noted in our report that she refused to cooperate, which is part of the Code of Conduct with DOHMH."

215. Throughout, no investigator acknowledged the Bondi Beach massacre that had prompted HINENU's messages, or the fear and anxiety it could be expected to cause Jewish employees.

216. On April 16, 2026, Plaintiffs' counsel demanded in writing that the investigation be "concluded immediately as unfounded." On April 17, counsel renewed that demand and insisted that, if the investigation continued, the EEO Director "be removed from the matter due to her prior involvement, which presents a conflict of interest"; on April 20, counsel re-sent that demand to DOHMH's General Counsel; and on April 23, in an e-mail also sent to the COH, counsel asked whether DOHMH would "dismiss this case or reassign it to a disinterested investigator."

217. The removal demand rested principally on the EEO Director's advance notice of the planned session and of the quotation: on December 17, 2025, she had received, as a direct addressee, HINENU's "Urgent Requests" e-mail, which quoted Rabbi Steinmetz — the same quotation later alleged to be discriminatory — and announced the December 18 support session. Upon information and belief, she raised no objection to either; her only response that day, within hours of receiving the "Urgent Requests," was an e-mail to HINENU asking who had authorized

HINENU's agency e-mail account and directing HINENU to "desist from the use of this agency account."

218. Counsel pointed out that the investigators' own statements showed the complaint was investigated because complainants disagreed that "globalize the intifada" is a call to violence against Jews, and that the investigation was retaliatory.

219. The investigation was then unreasonably extended, creating further anxiety and distress for Plaintiffs, who had to work under the threat of possible discipline. On May 26, 2026, the EEO Office notified Represented Respondents that "the EEO Office will need additional time (approximately 60 calendar days) to complete the investigation," without explanation.

220. The City's EEO Policy provides that "[a]bsent extraordinary circumstances, the EEO Office shall conclude its investigation within 90 days from the date on which the complaint was accepted for investigation."[66] On June 18, 2026, counsel objected that no extraordinary circumstances existed, that "the pendency of the investigation causes continuing harm and prejudice to our clients," and again demanded dismissal. The only response was the June 24 closing letter.

221. On June 24, 2026 — 117 days after the February 27, 2026 receipt date stated in the Notice — the EEO Office closed the case by a one-page letter "To Whom it may concern," signed by EEO Investigator/Trainer Jay Brodska. The letter stated that "the EEO Office is unable to make findings regarding the allegations of racial and religious discrimination against the Respondents," because "[t]o determine whether the use of certain language constituted discriminatory conduct under the EEO Policy, the EEO Office would be required to adopt a definitive interpretation of

---

[66] N.Y.C. Dep't of Citywide Admin. Servs., City of New York Equal Employment Opportunity Policy § VII.E, at 43 (June 2024), https://www.nyc.gov/assets/dcas/downloads/pdf/agencies/nyc_eeo_policy.pdf.

terms and slogans such as 'anti-Zionism' and 'globalize the intifada.' These terms are the subject of significant political, historical, and public debate and may be understood differently depending on the speaker, audience, and context in which they are used." The letter used a disposition ("unable to make findings") that appears nowhere in the City's EEO Policy or DOHMH's own Notice; stated no determination expressly attributed to the agency head, as the Policy requires; offered no apology for an unfounded investigation; and made no provision for expunging the matter from Represented Respondents' records.

222. Upon information and belief, DOHMH maintains in its EEO Office files a record of EEO Case No. 161370 and of each Represented Respondent's status in it, in which the allegations against them remain unresolved.

223. DOHMH thus subjected Jewish employees to a nearly four-month investigation for purported "racial and religious discrimination," on a complaint whose factual predicate DOHMH conceded was inadequate to support any finding. Upon information and belief, DOHMH has never investigated its own officials for stating, in official messages, that Israel is a "settler colonial" or "apartheid" state, or its equity liaisons for convening an official workshop premised on allegations of Israeli "genocide," or its employees for displaying posters and symbols reasonably experienced as expressions of hostility to the Jewish people.

## I. DEFENDANTS' KNOWLEDGE, FAILURE TO ACT, AND THE HARM TO PLAINTIFFS

224. Defendants had actual knowledge of each of the matters alleged above. The "Urgent Requests" e-mail of December 17, 2025 went to ACOH, Chief of Staff Mandel-Ricci, Chief Equity Officer, ER Director, and Defendant Ahn. Plaintiff Stein's 2025 reports and Plaintiff Pacht's January 2026 e-mails went to the EEO Office. On January 30, 2026, Plaintiff Stein wrote to the EEO Office objecting to the February 3 event. Counsel's e-mails regarding the baseless EEO

investigation of April 15, 16, and 17, 2026 went to Defendant Ahn and Deputy EEO Director Bridgemohan; counsel's e-mail of April 20, 2026 also went to General Counsel Mendez; and counsel's e-mails of April 23 and June 18, 2026 went to General Counsel Mendez and the Commissioner of DOHMH.

225. Chief of Staff Mandel-Ricci, then-ACOH, and Chief Equity Officer personally authored or approved the anti-Israel messages described above. The February 3 event was promoted agency-wide, attended by more than 100 people, and reported in the press; the Council's Health Committee Chair stated that she was "very glad to learn an investigation is underway," and the Council Speaker called for "[a] thorough investigation into the use of taxpayer resources." Upon information and belief, DOHMH took no corrective action on any of it.

226. As a direct and proximate result of Defendants' conduct, each Plaintiff has been denied the terms, conditions, and privileges of employment — official recognition, an agency e-mail account, a SharePoint page, calendar access, agency funding, agency-wide announcement, and institutional standing — that DOHMH extends to employees who share any other recognized identity; has been deprived of the workplace communications resource HINENU had been granted; has, in the case of the HINENU Plaintiffs, been subjected to a compulsory, months-long investigation into their beliefs about Jewish identity, Israel, and Zionism under threat of discipline, with a gag on discussing it and with no exoneration at its end; and has been made to work in an environment in which their employer's official voice condemns the Jewish state as a perpetrator of "genocide," their co-workers' anti-Israel displays are tolerated while their group's Hanukkah message is policed, and their grief at the murder of Jews is treated as evidence of bigotry.

227. Plaintiffs have suffered, and continue to suffer, fear, anxiety, depression, humiliation, emotional distress, damage to their professional reputations and relationships, and loss of the enjoyment of their employment.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d — Intentional Discrimination — Against Defendants City of New York and DOHMH)

228. The foregoing paragraphs are incorporated by reference.

229. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI is enforceable through an implied private right of action for intentional discrimination.

230. Title VI reaches the employment practices of a recipient of federal financial assistance where "a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3; 45 C.F.R. § 80.3(c)(1).

231. The Jewish Plaintiffs are members of a protected class under Title VI on the basis of race, shared ancestry, ethnic characteristics, and national origin. Plaintiff Micius is protected against discrimination because of her association with Jewish employees and with HINENU.

232. The City and DOHMH are recipients of federal financial assistance within the meaning of Title VI. DOHMH receives grants from the United States Department of Health and Human Services and its Centers for Disease Control and Prevention, and has executed assurances of compliance with Title VI as a condition of that assistance. By applying for or accepting federal funds from HHS, DOHMH certifies "compliance with all federal antidiscrimination laws and these

requirements and that complying with those laws is a material condition of receiving federal funding streams."[67]

233. Among the federal financial assistance DOHMH receives are awards a primary objective of which is to provide employment at DOHMH by funding the recruitment, hiring, training, and retention of public-health personnel, including, upon information and belief, the following, of which the first is the principal award on which this Claim rests:

(a) CDC award No. NE11OE000057 under CDC-RFA-OE22-2203, "Strengthening U.S. Public Health Infrastructure, Workforce, and Data Systems" (the Public Health Infrastructure Grant), a five-year award of more than $128 million (December 1, 2022 – November 30, 2027) made for DOHMH and received on DOHMH's behalf by its fiscal agent, Public Health Solutions, which states that DOHMH will use it for "hiring, retaining, sustaining, and training the public health workforce," with expected outcomes of "increased hiring of diverse staff" and an "increased size and capabilities of the public health workforce with improved wages and protections";[68]

---

[67] Ctrs. for Disease Control & Prevention, General Terms and Conditions for Non-research Awards, at 9 (eff. Aug. 13, 2026), https://www.cdc.gov/grants/documents/General-Terms-and-Conditions-Non-Research-Awards_Eff-2026-08-13.pdf; U.S. Dep't of Health & Human Servs., Grants Policy Statement § 2.5.4.3 (eff. Oct. 1, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-oct-2025.pdf.

[68] USAspending.gov, Award NE11OE000057 (recipient Public Health Solutions, UEI GSAHEHG8MNL7; Assistance Listings 93.967, 93.317, 93.283, 93.354; period of performance Dec. 1, 2022–Nov. 30, 2027; total obligation $128,573,508.00), https://www.usaspending.gov/award/ASST_NON_NE11OE000057_075. The award description states: "DOHMH PLANS TO STRENGTHEN ITS PARTNERSHIPS AND ITS INVESTMENTS IN COMMUNITIES BY HIRING, RETAINING, SUSTAINING, AND TRAINING THE PUBLIC HEALTH WORKFORCE …"; "DOHMH EXPECTS TO ACHIEVE THE FOLLOWING OUTCOMES: … INCREASED HIRING OF DIVERSE STAFF; INCREASED SIZE AND CAPABILITIES OF THE PUBLIC HEALTH WORKFORCE WITH IMPROVED WAGES AND PROTECTIONS"; and that "DOHMH WILL UTILIZE A FISCAL AGENT, PUBLIC HEALTH SOLUTIONS, TO RECEIVE, OBLIGATE AND LIQUIDATE GRANT FUNDS ON DOHMH'S BEHALF." See also id. (subaward No. 22-DOHMH-01 to City of New York, UEI XKJ3F8WKV2L3, June 3, 2024, $9,700,319); City of New York, Single Audit Report for FY ended June 30, 2024, Consolidated Schedule of Expenditures of Federal Awards, at 188 (PDF p. 189) (AL 93.967, pass-through "22-DOHMH-01"), https://app.fac.gov/dissemination/report/pdf/2024-06-GSAFAC-0000363727. CDC, OE22-2203 Strengthening U.S. Public Health Infrastructure, Workforce, and Data Systems (2022) (Component "A1. Workforce," "$3 billion": "Recruit, retain, support, and train the Public Health Workforce"), https://www.cdc.gov/workforce/resources/infrastructuregrant/pdfs/phi_grant_one_pager.pdf. CDC, OE22-2203

(b) CDC award No. NU90TP922148, the COVID-19 Workforce Supplement to the Crisis Response Cooperative Agreement (CDC-RFA-TP18-1802), approximately $49.6 million (July 1, 2021 – June 30, 2025), received on DOHMH's behalf by Public Health Solutions, the award text of which states that DOHMH "will establish, expand, train, and sustain its public health workforce to support jurisdictional COVID-19 prevention, preparedness, response, and recovery initiatives, including school-based health programs," and that "[t]his includes recruit, hire, and train personnel";[69]

(c) CDC award No. NU50CK000517, Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases (ELC), a direct award to the City (August 1, 2019 –

---

Appendix 1: Sample Activities for Component A ("Strategy A1: Workforce": "A1.1. Recruit and hire new public health staff."; "A1.2. Retain public health staff."; "A1.4. Train new and existing public health staff."), https://www.cdc.gov/infrastructure/phig/docs/appendix-1-sample-activities-component-a.pdf. Press Release, CDC, CDC Awards More Than $3 Billion to Improve U.S. Public Health Workforce and Infrastructure (Nov. 29, 2022) ("$3 billion from the American Rescue Plan Act for jurisdictions to recruit, retain, and train their workforce …"), https://archive.cdc.gov/www_cdc_gov/media/releases/2022/p1129-cdc-infrastructure.html. Assistance Listing 93.967 (objective to "build workforce capacity"), https://sam.gov/fal/e342a6aa67f349aabacb832242e56cad/view. Josh Michaud, Jennifer Kates & Anna Rouw, New Federal Support for the Public Health Workforce: Analysis of Funding by Jurisdiction, KFF (Dec. 11, 2023) ("Among cities, New York City received the largest amount ($84.6 million) …"), https://www.kff.org/covid-19/new-federal-support-for-the-public-health-workforce-analysis-of-funding-by-jurisdiction/.

[69] USAspending.gov, Award NU90TP922148 ("COOPERATIVE AGREEMENT FOR EMERGENCY RESPONSE: PUBLIC HEALTH CRISIS RESPONSE - 2018COVID 19 WORKFORCE SUPPLEMENT"; recipient Public Health Solutions; Assistance Listing 93.354; July 1, 2021–June 30, 2025; total obligation $49,567,191.83), https://www.usaspending.gov/award/ASST_NON_NU90TP922148_075. Transaction description (Mod. 04, closeout, Feb. 13, 2026): "THE NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (NYC DOHMH) WILL ESTABLISH, EXPAND, TRAIN, AND SUSTAIN ITS PUBLIC HEALTH WORKFORCE … THIS INCLUDES RECRUIT, HIRE, AND TRAIN PERSONNEL …". See also id. (subaward No. 21-DOHMH-01 to City of New York, Apr. 14, 2022, $3,160,523.40, "COVID-19 PUBLIC HEALTH WORKFORCE"). CDC, COVID-19 Funding (last reviewed Apr. 23, 2024) ("$2 billion from the American Rescue Plan … to establish, expand, and sustain a public health workforce"; "This supplemental funding is intended to establish, expand, train, and sustain the … public health workforce …"), https://www.cdc.gov/readiness/php/funding/covid-19-funding.html. CDC, Crisis Response Cooperative Agreement: COVID-19 Public Health Workforce Supplemental Funding Guidance (May 2021) ("Funding can be used to hire personnel …"; "Recipients must report on all staff hired …"), https://stacks.cdc.gov/view/cdc/138565. CDC, New York City Funding (last reviewed Mar. 11, 2024) (listing under "Public Health Crisis Response Funding" COVID-19 (2021) funding of $49,758,827), https://www.cdc.gov/readiness/php/data-research/new-york-city-funding.html; see also CDC, Crisis Response Cooperative Agreement: COVID-19 Public Health Workforce Supplemental Funding Guidance, app. 1 (May 14, 2021) (New York City: $49,758,827), reproduced at https://www.hhs.nd.gov/sites/www/files/documents/DOH%20Legacy/CDC%20Crisis%20Response%20COVID-19%20Funding%20PH%20Workforce%20Guidance%20May%202021.pdf.

July 31, 2027) under which more than $795 million has been obligated since January 1, 2021, in which the award text states that DOHMH "recognizes the primary importance of maintaining a well trained workforce, with sufficient depth and expertise on a wide range of communicable disease issues" and "continues to value the ability to use these funds to strengthen and sustain its epidemiologic, laboratory and public health informatics workforce capacity";[70] and

(d) CDC award No. NU47OE000106, "Enhancing US Clinical Laboratory Workforce Capacity" (CDC-RFA-OE22-2202) (September 1, 2022 – August 31, 2025), the award text of which states that the Public Health Laboratory "is comprised of approximately 250 staff" and that "[t]he purpose of this project would be to 1) develop a PHL wide training program for licensed and unlicensed staff … and 2) produce and identify resources to provide continuing education and enable laboratorians to develop the skills needed for career progression."[71]

---

[70] USAspending.gov, Award NU50CK000517 (recipient City of New York, UEI XKJ3F8WKV2L3; Assistance Listing 93.323 and others; Aug. 1, 2019–July 31, 2027; total obligation $1,643,859,159.59), https://www.usaspending.gov/award/ASST_NON_NU50CK000517_075. Transaction description (e.g., Mod. 18, Mar. 20, 2026; same text in transaction descriptions since Oct. 28, 2020): DOHMH "RECOGNIZES THE PRIMARY IMPORTANCE OF MAINTAINING A WELL TRAINED WORKFORCE …" and "CONTINUES TO VALUE THE ABILITY TO USE THESE FUNDS TO STRENGTHEN AND SUSTAIN ITS EPIDEMIOLOGIC, LABORATORY AND PUBLIC HEALTH INFORMATICS WORKFORCE CAPACITY." CDC, CDC's Epidemiology and Laboratory Capacity (ELC) Program ("30,000+ of highly trained epidemiologists and laboratorians supported"; "When a New York City restaurant worker tested positive for hepatitis A, ELC-funded staff quickly identified exposed individuals …"), https://cdc.gov/epidemiology-laboratory-capacity/media/pdfs/2026/01/ELC-Program-Overview.pdf. Assistance Listing 93.323, https://sam.gov/fal/85695e3f52044825a862627d4b3f2339/view. See USAspending.gov, Recipient Profile, UEI XKJ3F8WKV2L3 (alternate names include "NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE"), https://www.usaspending.gov/recipient/8a4a5698-e56e-f2ea-e551-884e4de0b514-C/latest.

[71] USAspending.gov, Award NU47OE000106 (recipient City of New York, UEI XKJ3F8WKV2L3; funding opportunity CDC-RFA-OE22-2202; Assistance Listings 93.322, 93.354, 93.283; Sept. 1, 2022–Aug. 31, 2025; total obligation $685,148.00), https://www.usaspending.gov/award/ASST_NON_NU47OE000106_075. Award description: "ENHANCING US CLINICAL LABORATORY WORKFORCE CAPACITY - THE NEW YORK CITY PUBLIC HEALTH LABORATORY (PHL) IS COMPRISED OF APPROXIMATELY 250 STAFF …"; "THE PURPOSE OF THIS PROJECT WOULD BE TO 1) DEVELOP A PHL WIDE TRAINING PROGRAM FOR LICENSED AND UNLICENSED STAFF … AND 2) PRODUCE AND IDENTIFY RESOURCES TO PROVIDE CONTINUING EDUCATION AND ENABLE LABORATORIANS TO DEVELOP THE SKILLS NEEDED FOR CAREER PROGRESSION …". CDC, Notice of Recipients: NOFO OE22-2202 (Nov. 5, 2024) ("The four recipients of this CoAg aim to enhance the U.S. clinical laboratory workforce capacity."; listing "New York City Department of

234. Upon information and belief, DOHMH employs personnel on lines funded in whole or in part by those awards, recruits and trains personnel with those funds, and must report to CDC the staff hired. In addition, DOHMH's ERG program is open to, and its ERG Guidelines expressly extend ERG leadership eligibility to, "NYC employees paid through grant-funded lines"; and the EEO Office administers DOHMH's equal-employment obligations, including those imposed as conditions of that federal assistance, for all DOHMH personnel, including grant-funded personnel.

235. DOHMH also receives federal financial assistance under awards whose award texts describe DOHMH staff, staff training, or workforce for emergency preparedness and response, including the following, each of which was in effect on December 17, 2025, on each day of the investigation described in Part IV.H, and on July 10, 2026:

(a) CDC award No. NU90TU000059, the Public Health Emergency Preparedness (PHEP) Cooperative Agreement (July 1, 2024 – June 30, 2029), awarded to Public Health Solutions, which DOHMH uses as a fiscal agent "to receive, obligate and liquidate preparedness and response grant funds on DOHMH's behalf," under which CDC has obligated $59,986,891, including $15,950,520 on June 30, 2025 and $19,803,961 on June 18, 2026, and the award text of which lists among its expected outcomes a "prepared public health workforce ready to sustain public health investigations, response, and recovery." CDC's published funding profile for New York City lists "256 PHEP-funded staff (rounded)," which it states "[i]ncludes epidemiologists, laboratorians, nurses, planners, IT specialists, administrative staff, statisticians, and other positions";[72] and

Health & Mental Hygiene (Public Health Lab)"), https://cdc.gov/laboratory-systems/php/funding-opportunity/recipients-oe22-2202.html.

[72] USAspending.gov, Award NU90TU000059 (recipient Public Health Solutions, UEI GSAHEHG8MNL7; Assistance Listing 93.421; July 1, 2024–June 30, 2029; total obligation $59,986,891.00), https://www.usaspending.gov/award/ASST_NON_NU90TU000059_075. Transaction description (e.g., Mod. 00,

(b) CDC award No. NU90TP922310, a Public Health Crisis Response Cooperative Agreement award (January 17, 2025 – January 16, 2027; $1,339,555), received on DOHMH's behalf by Public Health Solutions, the award text of which states that DOHMH has "a robust incident command system (ICS) structure, including an on-call roster with pre-identified staff to fill leadership and general ICS roles in support of emergency preparedness and response activities," that "[s]everal real-world responses, regular trainings, exercises and drills ensure staff can perform emergency response roles," and that this "assures a steady state of readiness for notification, situational awareness, staff deployment and other response operations."[73]

236. Awards NE11OE000057 and NU50CK000517 were in effect on December 17, 2025, on each day of the investigation described in Part IV.H, and on July 10, 2026. Awards NU90TP922148 and NU47OE000106 expired on June 30, 2025 and August 31, 2025,

---

continuation, June 18, 2026, $19,803,961.00): "PUBLIC HEALTH EMERGENCY PREPAREDNESS (PHEP) COOPERATIVE AGREEMENT … DOHMH HAS IDENTIFIED KEY ACTIVITIES FOR THE UPCOMING FIVE-YEAR PROJECT PERIOD … EXPECTED OUTCOMES OVER THE PROJECT PERIOD INCLUDE: … PREPARED PUBLIC HEALTH WORKFORCE READY TO SUSTAIN PUBLIC HEALTH INVESTIGATIONS, RESPONSE, AND RECOVERY." CDC, New York City Funding (last reviewed Mar. 11, 2024) ("PHEP-Funded Staff (rounded)"; "256 PHEP-funded staff (rounded)"; "Includes epidemiologists, laboratorians, nurses, planners, IT specialists, administrative staff, statisticians, and other positions."; listing CDC PHEP funding for FY 2021–FY 2023), https://www.cdc.gov/readiness/php/data-research/new-york-city-funding.html. On Public Health Solutions as DOHMH's fiscal agent for preparedness and response funds, see USAspending.gov, Award NU90TP922310, award description ("DOHMH WILL UTILIZE A FISCAL AGENT, PUBLIC HEALTH SOLUTIONS, TO RECEIVE, OBLIGATE AND LIQUIDATE PREPAREDNESS AND RESPONSE GRANT FUNDS ON DOHMH'S BEHALF."), https://www.usaspending.gov/award/ASST_NON_NU90TP922310_075.

[73]USAspending.gov, Award NU90TP922310 ("NYC DOHMH PUBLIC HEALTH CRISIS RESPONSE COOPERATIVE AGREEMENT ABU APPLICATION"; recipient Public Health Solutions; Assistance Listing 93.354; Jan. 17, 2025–Jan. 16, 2027; total obligation $1,339,555.00), https://www.usaspending.gov/award/ASST_NON_NU90TP922310_075. Award description: "DOHMH HAS A ROBUST INCIDENT COMMAND SYSTEM (ICS) STRUCTURE, INCLUDING AN ON-CALL ROSTER WITH PRE-IDENTIFIED STAFF TO FILL LEADERSHIP AND GENERAL ICS ROLES IN SUPPORT OF EMERGENCY PREPAREDNESS AND RESPONSE ACTIVITIES. SEVERAL REAL-WORLD RESPONSES, REGULAR TRAININGS, EXERCISES AND DRILLS ENSURE STAFF CAN PERFORM EMERGENCY RESPONSE ROLES. THIS ASSURES A STEADY STATE OF READINESS FOR NOTIFICATION, SITUATIONAL AWARENESS, STAFF DEPLOYMENT AND OTHER RESPONSE OPERATIONS."; "DOHMH WILL UTILIZE A FISCAL AGENT, PUBLIC HEALTH SOLUTIONS, TO RECEIVE, OBLIGATE AND LIQUIDATE PREPAREDNESS AND RESPONSE GRANT FUNDS ON DOHMH'S BEHALF."

respectively, and are pleaded as federal financial assistance received during the hostile work environment alleged in Part IV.G.

237. Defendants intentionally discriminated against Plaintiffs on the basis of their race, shared ancestry, ethnic characteristics, and national origin as Jews by, among other things: refusing to recognize a Jewish ERG in July 2025 and on July 10, 2026, on the pretextual ground that Jewish identity is "religious," while recognizing ERGs for six other identity groups, including an ERG defined by the ancestry and heritage of the "indigenous peoples" of Southwest Asia and North Africa; revoking HINENU's agency e-mail account the day after its use to mourn murdered Jews, while permitting recognized ERGs to use their agency accounts to circulate messages about a foreign conflict and a foreign disaster; and exercising the EEO Office's intake discretion to accept and pursue, for nearly four months, a "racial and religious discrimination" complaint against the HINENU Plaintiffs premised on a Jewish group's Hanukkah message, while declining to investigate Plaintiffs' own complaints about anti-Israel events on agency premises.

238. Defendants' stated reason for refusing to recognize a Jewish ERG — that "ERG identity cannot be based on religious groups" — was pretextual. Defendants knew, from HINENU's application and from their own recognition of ASWATNA, data classifications, Haredi Health Coalition, and antisemitism training, that Jews are an ethnic and ancestral people as well as a religious community. Defendants' selective invocation of the "religious groups" rule, and selective enforcement of the agency e-mail rule, against Jews alone demonstrate that the true reason for Defendants' conduct was Plaintiffs' Jewish identity.

239. Defendants' classification of HINENU as a "religious group" was itself a classification on the basis of race, shared ancestry, ethnic characteristics, and national origin: HINENU defined itself by the peoplehood, ancestry, ethnic heritage, culture, and history of the

Jewish people, and Defendants excluded it because the identity around which it was organized is Jewish. HINENU disclaimed religious worship, prayer, services, and religious instruction, and Defendants identified no religious activity that HINENU proposed to conduct on agency time or with agency resources. No interest in religious neutrality justified the exclusion.

240. As a direct and proximate result of Defendants' intentional discrimination, Plaintiffs have been excluded from participation in, denied the benefits of, and subjected to discrimination under Defendants' programs and activities, and have suffered the injuries described above.

## SECOND CLAIM FOR RELIEF

(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d — Hostile Environment — Against Defendants City of New York and DOHMH)

241. The foregoing paragraphs are incorporated by reference.

242. Defendants, through their officials with authority to address the conduct described above and to institute corrective measures, had actual knowledge of harassment of Jewish employees on the basis of race, shared ancestry, ethnic characteristics, and national origin, including the official programming and messaging condemning the Jewish state as a "settler colonial," "apartheid" state committing "genocide"; the "Global Oppression" workshop; the anti-Israel displays throughout the workplace; and the treatment of Jewish employees' mourning as "racial and religious discrimination." That harassment was severe, pervasive, and objectively offensive, and deprived Plaintiffs of the benefits of their employment and of Defendants' programs and activities.

243. Defendants were deliberately indifferent to that harassment. Defendants' response — no response to Plaintiffs' complaints, a "desist" order and a discrimination investigation directed at the Jewish complainants themselves, and an antisemitism training that omitted from

Jewish identity the very elements under attack — was clearly unreasonable in light of the known circumstances, and Defendants' own officials authored much of the offending conduct.

244. As a direct and proximate result, Plaintiffs have suffered the injuries described above.

**THIRD CLAIM FOR RELIEF**

(New York State Human Rights Law, N.Y. Exec. Law § 296(1)(a), (h) — Discrimination in the Terms, Conditions, and Privileges of Employment — Against Defendants City of New York and DOHMH)

245. The foregoing paragraphs are incorporated by reference.

246. The NYSHRL makes it an unlawful discriminatory practice for an employer, because of an individual's race, creed, or national origin, among other protected characteristics, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment," N.Y. Exec. Law § 296(1)(a), or to subject any individual to harassment because of such characteristics, "regardless of whether such harassment would be considered severe or pervasive," where the harassment subjects the individual "to inferior terms, conditions or privileges of employment," N.Y. Exec. Law § 296(1)(h). The NYSHRL "shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws … have been so construed." N.Y. Exec. Law § 300. Under the NYSHRL, "national origin" includes "ancestry." N.Y. Exec. Law § 292(8).

247. The City is Plaintiffs' employer within the meaning of N.Y. Exec. Law § 292(5), and DOHMH is the agency through which the City employs Plaintiffs. The Jewish Plaintiffs are members of protected classes under the NYSHRL on the basis of creed (religion), race, and national origin as Jews. Plaintiff Micius is protected against discrimination because of her association with Jewish employees and with HINENU.

248. Defendants discriminated against Plaintiffs in the terms, conditions, and privileges of their employment because of their creed, race, ethnicity, and national origin by, among other things: (a) refusing to recognize a Jewish ERG in July 2025 and on July 10, 2026, and thereby denying Plaintiffs the official recognition, agency e-mail account, SharePoint page, calendar access, $5,000 annual budget, agency-wide announcement, and institutional standing that Defendants extend to employees who share any of six other recognized identities; (b) revoking HINENU's agency e-mail account on December 17, 2025, while permitting recognized ERGs, including ASWATNA and SALUD, to use theirs for comparable messages; (c) refusing Plaintiffs' requests for an agency acknowledgment of antisemitism and for professional support after the Bondi Beach massacre, while providing such acknowledgment and support to employees affected by other events; and (d) subjecting the HINENU Plaintiffs to a compulsory, nearly four-month EEO investigation for "racial and religious discrimination," under threat of discipline and a gag order, on account of their Jewish grief and their statements about antizionism, while declining to investigate Plaintiffs' own complaints.

249. In the alternative, taking Defendants' stated reason at face value, Defendants denied Plaintiffs the privileges of ERG recognition because the identity Plaintiffs share is religious, while extending those privileges to employees who share racial, ethnic, national-origin, sexual-orientation, and disability-status identities, which is discrimination because of creed and religion within the meaning of N.Y. Exec. Law § 296(1)(a).

250. Defendants' stated reason for refusing to recognize a Jewish ERG was pretextual, and Defendants' conduct was motivated, at least in part, by Plaintiffs' creed, race, ethnicity, and national origin, as demonstrated by: the same "Jews are a religion" rationale given orally in July 2025 and in one sentence in July 2026, by an official present on both occasions; Defendants'

recognition of ASWATNA on identical ethnic-and-ancestral framing; Defendants' selective enforcement of the agency e-mail rule against HINENU alone; the EEO Office's acceptance of a complaint against Jewish employees for mourning Jews; and an EEO investigator's statement to Plaintiff Pacht that "[t]o use the phrase saying that globalized the Intifada is a call to murder as a factual statement was a trigger to people because there are people who do not interpret it that way."

251. Defendants' conduct constituted far more than petty slights or trivial inconveniences.

252. As a direct and proximate result, Plaintiffs have suffered the injuries described above, and are entitled to compensatory damages, injunctive relief, and attorneys' fees under N.Y. Exec. Law § 297(9)–(10).

## FOURTH CLAIM FOR RELIEF

(New York State Human Rights Law, N.Y. Exec. Law § 296(1)(a), (h) — Hostile Work Environment — Against Defendants City of New York and DOHMH)

253. The foregoing paragraphs are incorporated by reference.

254. Defendants subjected Plaintiffs to harassment because of their creed, race, ethnicity, and national origin as Jews who identify, as Jews, with the Jewish people's connection to the Land and State of Israel, which subjected Plaintiffs to inferior terms, conditions, and privileges of employment, by, among other things: official agency messages and programming, authored or sponsored by Defendants' senior leadership and equity infrastructure, condemning the Jewish state as a "settler colonial" and "apartheid" state committing "genocide," including the February 3 event, the January 27, 2026 IHRD message accusing Israel of present-day "genocide" in Gaza, the "Decolonizing Public Health" series, and the DOHMH messages and events described in Parts IV.G.1 through IV.G.5; the toleration of numerous anti-Israel displays in the workplace, including maps erasing Israel and flyers accusing Israel of "genocide," in violation of Defendants'

written rules; the enforcement of the agency e-mail rule against HINENU alone; the refusal to respond to Jewish employees' complaints; the investigation of the HINENU Plaintiffs for "racial and religious discrimination" for mourning murdered Jews and condemning "globalize the intifada"; and the delivery of an antisemitism training that omitted Israel and Zionism from Jewish identity. The statements and decisions of the City's chief executive described in paragraphs 151–164 and 168–191 are pleaded as evidence of the purpose behind that conduct and of the City's endorsement of it.

255. Defendants knew of the harassment, much of which they authored, and failed to take any corrective action. Defendants' conduct constituted far more than petty slights or trivial inconveniences, and a reasonable Jewish employee in Plaintiffs' position would find, and Plaintiffs did find, the environment hostile and abusive.

256. As a direct and proximate result, Plaintiffs have suffered the injuries described above.

## FIFTH CLAIM FOR RELIEF

(New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a) — Discrimination in the Terms, Conditions, and Privileges of Employment — Against All Defendants)

257. The foregoing paragraphs are incorporated by reference.

258. The NYCHRL makes it an unlawful discriminatory practice for an employer or an employee or agent thereof, because of the actual or perceived race, creed, or national origin of any person, among other protected characteristics, "to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). The NYCHRL must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this

title, have been so construed." N.Y.C. Admin. Code § 8-130(a). Under the NYCHRL, a plaintiff need show only that she was treated "less well" than other employees, at least in part because of a protected characteristic; no materially adverse employment action is required.

259. Plaintiffs Cohen, Kellner, Pacht, Ritterman-McAndrew, Sheiber, and Stein are Jewish and are members of protected classes under the NYCHRL on the basis of creed, race, and national origin as Jews. Plaintiff Micius, who is not Jewish, associates with Jewish employees and was injured by Defendants' discriminatory actions against Jews and persons seeking to associate with Jews, because she was denied the opportunity to attend a Jewish ERG. N.Y.C. Admin. Code § 8-107(20). The City is Plaintiffs' employer within the meaning of the NYCHRL, and the officials whose conduct is described above exercised managerial or supervisory responsibility on the City's behalf, such that their conduct is imputed to the City under N.Y.C. Admin. Code § 8-107(13)(b).

260. Defendants treated Plaintiffs less well than other employees because of their creed, race, and national origin, by each of the acts described in the Third Claim for Relief.

261. In the alternative, taking Defendants' stated reason at face value, Defendants denied Plaintiffs the privileges of ERG recognition because the identity Plaintiffs share is religious, while extending those privileges to employees who share other identities listed in the Third Claim for Relief, which is discrimination because of creed within the meaning of N.Y.C. Admin. Code § 8-107(1)(a).

262. Defendants' conduct was motivated at least in part by Plaintiffs' protected characteristics, for the reasons stated in the Third Claim for Relief, and constituted far more than petty slights or trivial inconveniences.

263. Defendant Ahn is liable under N.Y.C. Admin. Code § 8-107(1)(a) for her own discriminatory conduct, in which she actually participated, including ordering HINENU to "desist"

from using its agency e-mail account, issuing the July 10, 2026 denial of approval of the Jewish ERG, and accepting and conducting EEO Case No. 161370 against the HINENU Plaintiffs.

264. As a direct and proximate result, Plaintiffs have suffered the injuries described above, and are entitled to compensatory damages, injunctive relief, and attorneys' fees under N.Y.C. Admin. Code § 8-502.

**SIXTH CLAIM FOR RELIEF**

(New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a) — Hostile Work Environment — Against All Defendants)

265. The foregoing paragraphs are incorporated by reference.

266. By the conduct described in the Fourth Claim for Relief, Defendants subjected Plaintiffs to a hostile work environment because of their creed, race, and national origin as Jews who identify with the Land and State of Israel, in which Plaintiffs were treated less well than other employees, and which no reasonable employee would regard as consisting of nothing more than petty slights or trivial inconveniences.

267. Defendant Ahn is liable under N.Y.C. Admin. Code § 8-107(1)(a) for her own conduct contributing to that hostile work environment, in which she actually participated, including ordering HINENU to "desist" from using its agency e-mail account the day after its use to mourn murdered Jews, and subjecting the HINENU Plaintiffs to a compulsory investigation of their beliefs about Jewish identity, Israel, and Zionism.

268. Defendants knew of the hostile environment, authored much of it, and failed to take corrective action; the offending conduct was committed or sanctioned by employees exercising managerial or supervisory responsibility, and is imputed to the City.

269. As a direct and proximate result, Plaintiffs have suffered the injuries described above.

## SEVENTH CLAIM FOR RELIEF

(Retaliation — N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8-107(7) — By the HINENU Plaintiffs Against All Defendants)

270. The foregoing paragraphs are incorporated by reference.

271. The HINENU Plaintiffs engaged in protected activity by opposing discriminatory practices, including: HINENU's December 17, 2025 "Urgent Requests," which complained that DOHMH had not acknowledged antisemitism or supported its Jewish employees as it acknowledges bias against, and supports, other groups; Plaintiff Pacht's January 22, 2026 inquiry to the EEO Office asking why the Working Group could operate as an employee group when a Jewish affinity group could not; Plaintiff Stein's 2025 reports to the EEO Director complaining of hostility toward Jewish employees on agency premises; Plaintiff Stein's January 30, 2026 e-mail to the EEO Office objecting to the February 3 event "[a]s a Jewish employee" and stating that "[a]ntisemitism in New York is at the historic high levels"; and Plaintiffs' written objections, through counsel, to the EEO investigation on April 15, 16, 17, 20, and 23 and June 18, 2026, including those of April 16, 17, and 20 that the investigation was "politically retaliatory," "motivated by bias," and part of the agency's "persecution of Jews for their statements, EEO complaints and associational activities."

272. Defendants retaliated against the HINENU Plaintiffs by, among other things: ordering HINENU off its agency e-mail account within hours of receiving the "Urgent Requests"; receiving, on February 27, 2026, thirty-six days after Plaintiff Pacht's January 22, 2026 complaint and twenty-eight days after Plaintiff Stein's January 30, 2026 complaint, and pursuing for nearly four months an EEO complaint against the HINENU Plaintiffs brought by, among others, the organizers of the events Plaintiffs had opposed; conducting that investigation in a manner designed to punish and intimidate the HINENU Plaintiffs for their beliefs, under an express threat of

discipline for non-cooperation and a gag on discussing the matter; refusing, after counsel's objections, to state findings that would have exonerated the HINENU Plaintiffs; and, 16 days after closing the investigation and 22 days after counsel's June 18, 2026 demand, denying HINENU's ERG application in a single sentence.

273. Defendants' retaliatory conduct was reasonably likely to deter a person from engaging in protected activity, and would have dissuaded a reasonable employee from opposing discrimination.

274. Defendant Ahn is liable under N.Y. Exec. Law § 296(7) and N.Y.C. Admin. Code § 8-107(7), each of which applies to any person who retaliates, because she knew of the HINENU Plaintiffs' protected activity — including HINENU's December 17, 2025 "Urgent Requests" and counsel's written objections, each sent to her — and actually participated in the retaliatory conduct described above.

275. As a direct and proximate result, the HINENU Plaintiffs have suffered the injuries described above.

## EIGHTH CLAIM FOR RELIEF

(42 U.S.C. § 1983 — Denial of Equal Protection of the Laws, Fourteenth Amendment; Freedom of Speech, Association, and Petition, First and Fourteenth Amendments — Against Defendant Ahn)

276. The foregoing paragraphs are incorporated by reference.

277. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of state law, deprives another of rights secured by the Constitution. At all relevant times, Defendant Ahn was DOHMH's EEO Director and acted under color of state law.

278. Defendant Ahn intentionally treated the Jewish Plaintiffs differently from similarly situated non-Jewish employees because they are Jewish, in violation of the Equal Protection

Clause of the Fourteenth Amendment, by: (a) issuing the July 10, 2026 denial of approval of the Jewish ERG on the stated ground that Jews are a "religious group," after attending the July 16, 2025 meeting at which DOHMH first refused a Jewish ERG, while DOHMH recognizes ERGs for six other identity groups, including ASWATNA; (b) ordering HINENU, on December 17, 2025, within hours of receiving HINENU's "Urgent Requests" and the day after HINENU used its agency e-mail account to mourn murdered Jews, to "desist" from using that account, while DOHMH permitted ASWATNA and SALUD to use their agency accounts to address a foreign conflict and a foreign disaster; (c) accepting and, as the EEO Director assigned to it, conducting for nearly four months EEO Case No. 161370, a "racial and religious discrimination" complaint against the HINENU Plaintiffs premised on a Jewish group's Hanukkah message, while declining to investigate Plaintiffs' own complaints about anti-Israel events on agency premises; and (d) declining to limit or close that investigation, or to step aside from it, after Plaintiffs' counsel objected that it was discriminatory and retaliatory. Plaintiff Micius, who is not Jewish, associates with Jewish employees and with HINENU and was injured by Defendant Ahn's denial of approval of the Jewish ERG, because she was denied the opportunity to attend a Jewish ERG.

279. In addition, and in the alternative, by construing and applying the "religious groups" identity restriction on July 10, 2026 to deny recognition to HINENU because of the religious dimension of Jewish identity, Defendant Ahn classified and discriminated against Plaintiffs on the basis of religion, in violation of the Equal Protection Clause.

280. Defendant Ahn also abridged Plaintiffs' freedom of speech, freedom of association, and right to petition, in violation of the First and Fourteenth Amendments, by: (a) on July 10, 2026, excluding HINENU, whose planned activities were cultural and educational, from the ERG program — through which DOHMH provides recognized employee groups an agency e-mail

account, a SharePoint page, access to the joint ERG calendar, agency funds, the use of "Agency equipment, resources, and facilities for meetings and approved activities," and "a platform for Agency personnel to advocate for internal work environment improvements" — on the ground that "ERG identity cannot be based on religious groups," and, upon information and belief, because of the Jewish identity of HINENU's members, which prevented Jews from enjoying the same fora and platforms for workplace expression as are enjoyed by other employees; and (b) on December 17, 2025, within hours of HINENU's "Urgent Requests" to senior leadership, and the day after HINENU used its agency e-mail account to send a Hanukkah message mourning Jews murdered at Bondi Beach, ordering HINENU to "desist" from using that account, upon information and belief because of the content and viewpoint of HINENU's messages, while DOHMH permitted ASWATNA and SALUD to use their agency accounts to address a foreign conflict and a foreign disaster, permitted the Global Oppression Working Group to use agency e-mail, and permitted other unrecognized employee groups to use agency Teams channels, bulletin boards, and conference rooms.

281. Defendant Ahn also violated the HINENU Plaintiffs' rights under the Equal Protection Clause and the First Amendment by retaliating against them for objecting to the violation of those rights, including by denying ERG status to HINENU, ordering HINENU to "desist" from using its agency e-mail account, and conducting a spurious EEO investigation against them.

282. Defendant Ahn personally committed each of the acts described above. She acted intentionally, with knowledge of Plaintiffs' Jewish identity and of their complaints of discrimination, and with the intent to discriminate against Plaintiffs on the basis of their religion, race, ethnicity, and ancestry as Jews, including Plaintiffs' identification, as Jews, with the Jewish

people's connection to the Land and State of Israel, and to punish Plaintiffs for complaining of that discrimination. Her conduct was undertaken with reckless or callous indifference to Plaintiffs' federally protected rights. Plaintiff Micius was subjected to the same conduct because of her association with Jewish employees and with HINENU.

283. As a direct and proximate result, Plaintiffs have been deprived of the equal protection of the laws and of their freedom of speech, freedom of association, and right to petition and have suffered the injuries described above, and are entitled to compensatory and punitive damages against Defendant Ahn and to relief under 42 U.S.C. §§ 1983 and 1988.

## NINTH CLAIM FOR RELIEF

(42 U.S.C. § 1983 — Denial of Equal Protection of the Laws, Fourteenth Amendment; Freedom of Speech, Association, and Petition, First and Fourteenth Amendments — Municipal Liability (Monell) — Against Defendants City of New York and DOHMH)

284. The foregoing paragraphs are incorporated by reference.

285. The Equal Protection Clause of the Fourteenth Amendment prohibits a public employer from discriminating against its employees in the terms, conditions, and privileges of employment, from subjecting them to a hostile work environment, and from retaliating against them for complaining of such discrimination, on the basis of religion, race, ethnicity, or ancestry. The First Amendment, applicable to the City and DOHMH through the Fourteenth Amendment, secures to public employees the freedom of speech, the freedom of association, and the right to petition the government for a redress of grievances. 42 U.S.C. § 1983 provides a cause of action against a municipality whose official policy or custom, or whose officials with final policymaking authority, cause such a deprivation.

286. Acting under color of state law, the City and DOHMH intentionally treated the Jewish Plaintiffs differently from similarly situated non-Jewish employees because they are

Jewish, by: (a) refusing to recognize a Jewish ERG in July 2025 and on July 10, 2026, on the stated ground that Jews are a "religious group," while recognizing ERGs for six other identity groups, including ASWATNA; (b) ordering the Jewish affinity group to cease using an agency e-mail account the day after its use to mourn murdered Jews, while permitting ASWATNA and SALUD to use their agency accounts to address a foreign conflict and a foreign disaster; (c) exercising the EEO Office's intake discretion to accept and investigate for nearly four months a "racial and religious discrimination" complaint against the HINENU Plaintiffs premised on a Jewish group's Hanukkah message, while declining to investigate Plaintiffs' own complaints about anti-Israel events on agency premises; and (d) enforcing DOHMH's written rule on the use of agency e-mail accounts against the Jewish group alone. Plaintiff Micius, who is not Jewish, associates with Jewish employees and with HINENU and was injured by the refusal of the City and DOHMH to recognize a Jewish ERG, because she was denied the opportunity to attend a Jewish ERG.

287. In addition, and in the alternative, the "religious groups" identity restriction, as Defendants construed it on July 10, 2026, classifies employees on the basis of religion: under that construction, a group of employees whose shared identity has a religious dimension is denied the privileges of ERG recognition that DOHMH extends to groups of employees who share a race, ethnicity, ancestry, sexual orientation, or other characteristic. Defendants applied that construction to deny recognition to HINENU because of the religious dimension of Jewish identity. That classification discriminates against religious groups generally, and against Plaintiffs, in violation of the Equal Protection Clause. HINENU disclaimed religious worship, prayer, services, and religious instruction, and proposed no religious activity on agency time or with agency resources, and no legitimate governmental interest supports applying the restriction to such a group.

288. The City and DOHMH also abridged Plaintiffs' freedom of speech, freedom of association, and right to petition, in violation of the First and Fourteenth Amendments, by: (a) on July 10, 2026, excluding HINENU, whose planned activities were cultural and educational, from the ERG program — through which DOHMH provides recognized employee groups an agency e-mail account, a SharePoint page, access to the joint ERG calendar, agency funds, the use of "Agency equipment, resources, and facilities for meetings and approved activities," and "a platform for Agency personnel to advocate for internal work environment improvements" — on the ground that "ERG identity cannot be based on religious groups," and, upon information and belief, because of the Jewish identity of HINENU's members, which prevented Jews from enjoying the same fora and platforms for workplace expression as are enjoyed by other employees; and (b) on December 17, 2025, within hours of HINENU's "Urgent Requests" to senior leadership, and the day after HINENU used its agency e-mail account to send a Hanukkah message mourning Jews murdered at Bondi Beach, ordering HINENU to "desist" from using that account, upon information and belief because of the content and viewpoint of HINENU's messages, while permitting ASWATNA and SALUD to use their agency accounts to address a foreign conflict and a foreign disaster, permitting the Global Oppression Working Group to use agency e-mail, and permitting other unrecognized employee groups to use agency Teams channels, bulletin boards, and conference rooms.

289. The foregoing conduct was not the isolated act of any single employee. It was caused by the official policy and custom of the City and DOHMH, and by the decisions of officials exercising final policymaking authority, in that:

(a) DOHMH's ERG Guidelines are an official written policy of the City, promulgated by DOHMH. They provide that "[t]he Director of Employee Relations and the EEO Director

oversee the ERGs on behalf of the Agency" and are responsible for, among other things, "[p]roviding overarching guidance and support to established ERGs and to individuals who are interested in forming new ERGs" and "[a]pproving ERG communications, events and activities, including the vetting of all speakers." DOHMH's ERG Application Instructions direct that "[a]ll communications and materials should be emailed to" the Director of EEO and the Director of Employee Relations, and state the criteria on which "ERG approval will be based," without identifying any official who decides an application or any procedure for review of a denial. The July 10, 2026 denial was issued by Defendant Ahn, copying the ER Director. The policy provides no procedure for an appeal to any other official. The denial was final when issued.

(b) The agency-wide messages described above concerning Israel and "genocide" were authored or approved by DOHMH's then-ACOH, Dr. Morse (including the Monday Message of September 8, 2025), Chief of Staff Mandel-Ricci, and Chief Equity Officer — the officials with final authority over DOHMH's official communications to its workforce — and the January 27, 2026 message was issued following the December 2025 "discussions with several leaders including [ACOH and Chief Equity Officer]" reported in Chief of Staff Mandel-Ricci's December 29, 2025 e-mail and in deliberate substitution for the acknowledgment of antisemitism Plaintiffs had requested.

(c) The City's EEO Policy requires the agency head to review and adopt or reject the findings of every EEO investigation; the June 24, 2026 disposition of EEO Case No. 161370 was issued on COH's letterhead and, upon information and belief, was adopted by or on behalf of COH, who had received Plaintiffs' counsel's April 23, 2026 e-mail (forwarding counsel's April 17

and 20 e-mails) and June 18, 2026 e-mail describing the discriminatory and retaliatory basis of the investigation and who took no corrective action.

(d) The City, through DOHMH's COH, General Counsel, Chief of Staff, and Chief Equity Officer, had actual notice of each of the acts described above through Plaintiffs' December 17, 2025 e-mail, Plaintiffs' January 2026 complaints, counsel's April and June 2026 e-mails, and public reporting and City Council statements in February 2026, and, with that notice, acquiesced in and ratified the conduct and its discriminatory basis by declining to act.

(e) The Mayor exercises final policymaking authority over the adoption or revocation of any City definition of antisemitism and over the City's official posture toward Israel and Jews who identify with it. On his first day in office, by Executive Order No. 1, the Mayor revoked Executive Order No. 52 (the City's adoption of the IHRA definition) and Executive Order No. 60. In April 2026, his administration confirmed that the City would use no codified definition of antisemitism or of any other form of hate. Upon information and belief, that policy was applied by DOHMH's EEO Office when, on June 24, 2026, it declined to make findings in EEO Case No. 161370 on the ground that it could not adopt "a definitive interpretation of terms and slogans such as 'anti-Zionism' and 'globalize the intifada.'" The Mayor's public statements described in paragraphs 151–164 and 168–191 are pleaded as evidence of the purpose behind that policy and of the posture that DOHMH's COH, Chief Equity Officer, and EEO Director understood the City to endorse.

290. The conduct of the City and DOHMH was motivated by an intent to discriminate against Plaintiffs on the basis of their religion, race, ethnicity, and ancestry as Jews, including Plaintiffs' identification, as Jews, with the Jewish people's connection to the Land and State of Israel, and to punish Plaintiffs for complaining of that discrimination. That intent is further

evidenced by the official policy and public statements of the City's chief executive described in paragraphs 151–164 and 168–191. Plaintiff Micius was subjected to the same conduct because of her association with Jewish employees and with HINENU.

291. The conduct alleged above also reflects a persistent and widespread practice and custom of DOHMH and the City, in that:

(a) Since October 2023, multiple DOHMH officials and employees — including its former ACOH and CMO, Dr. Morse, its former Chief Equity Officer, a Director-level manager, and its Division Equity Liaisons — have used official agency channels to describe the State of Israel as a "settler colonial" and "apartheid" state and to assert that it is committing "genocide," in messages and programming unrelated to DOHMH's public-health mission, as described in Part IV.G;

(b) DOHMH has twice refused to recognize a Jewish ERG, in July 2025 and, citing its ERG Guidelines, on July 10, 2026, as described in Parts IV.C and IV.E;

(c) DOHMH has enforced its rule on the use of agency e-mail accounts against the Jewish group alone, as described in Part IV.F; and

(d) DOHMH's EEO Office, under Defendant Ahn as EEO Director, has treated Jewish employees differently from other employees in EEO matters, leaving their complaints unaddressed while accepting and pursuing for nearly four months a complaint against them, as described in Part IV.H.

292. The number of officials and employees involved, the duration of that conduct, and the absence, upon information and belief, of any effective corrective action after repeated written notice demonstrate an official policy and custom of hostility toward Jewish employees, expressed through unreasonable and excessive condemnation of Israel and disparate treatment of Jewish

employees in EEO matters, rather than isolated misconduct. In the alternative, and upon information and belief, the City and DOHMH, through their policymakers, failed adequately to train and supervise DOHMH's EEO and equity staff concerning their obligation not to discriminate against Jewish employees, including on the basis of their identification with Israel, a subject that the antisemitism training DOHMH hosted omitted altogether, as described in Part IV.G.5; the need for such training and supervision was obvious in light of the complaints described above; and that failure amounted to deliberate indifference to Plaintiffs' rights. That policy and custom, and that deliberate indifference, were the moving force behind the denial of Plaintiffs' right to the equal protection of the laws and the abridgment of their freedom of speech, freedom of association, and right to petition.

293. As a direct and proximate result, Plaintiffs have been deprived of the equal protection of the laws and of their freedom of speech, freedom of association, and right to petition and have suffered the injuries described above, and are entitled to relief under 42 U.S.C. §§ 1983 and 1988.

## TENTH CLAIM FOR RELIEF

(Aiding and Abetting Discrimination and Retaliation — N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6) — Against Defendant Ahn)

294. The foregoing paragraphs are incorporated by reference.

295. N.Y. Exec. Law § 296(6) and N.Y.C. Admin. Code § 8-107(6) each make it an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden by the NYSHRL and the NYCHRL, respectively, or to attempt to do so. Defendant Ahn is a "person" within the meaning of each provision.

296. Defendants City of New York and DOHMH committed unlawful discriminatory practices against Plaintiffs in violation of N.Y. Exec. Law § 296(1) and (7) and N.Y.C. Admin. Code § 8-107(1) and (7), as alleged in the Third through Seventh Claims for Relief.

297. Defendant Ahn actually participated in the conduct giving rise to those violations, including by: (a) ordering HINENU, on December 17, 2025, within hours of receiving HINENU's "Urgent Requests," to "desist" from using its agency e-mail account; (b) issuing the July 10, 2026 denial of approval of the Jewish ERG; (c) accepting, and, as the EEO Director assigned to it, conducting, EEO Case No. 161370 against the HINENU Plaintiffs, including the interviews described in Part IV.H; and (d) declining to limit or close that investigation, or to step aside from it, after Plaintiffs' counsel objected that it was discriminatory and retaliatory and demanded her removal for conflict of interest.

298. Defendant Ahn acted knowingly and intentionally, with knowledge of Plaintiffs' protected characteristics and of the HINENU Plaintiffs' protected activity, and shared the discriminatory and retaliatory intent of the City, DOHMH, and the other officials and employees whose unlawful practices she aided.

299. Defendant Ahn aided and abetted the unlawful discriminatory practices of Defendants City of New York and DOHMH, and those of other City and DOHMH officials and employees described above — including the officials who participated with her in the refusal to recognize the Jewish ERG, and the EEO investigators who conducted the interviews in EEO Case No. 161370 — and, as EEO Director, also did so by declining to investigate or remedy Plaintiffs' complaints about the conduct described in Part IV.G.

300. Defendant Ahn thereby aided, abetted, incited, compelled, and coerced the unlawful discriminatory practices of Defendants City of New York and DOHMH and of their other

officials and employees, and attempted to do so, in violation of N.Y. Exec. Law § 296(6) and N.Y.C. Admin. Code § 8-107(6).

301. As a direct and proximate result, Plaintiffs have suffered the injuries described above, and are entitled to compensatory damages, injunctive relief, and attorneys' fees under N.Y. Exec. Law § 297(9)–(10) and N.Y.C. Admin. Code § 8-502.

**JURY DEMAND**

302. Plaintiffs respectfully demand a jury trial on all issues of fact that may arise from the pleadings.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs Samuel Cohen, Tabata Kellner, Joanna Micius, Tamar Pacht, Lana Ritterman-McAndrew, Faith Sheiber, and Yuliya Stein pray that the Court award relief on all causes of action against Defendants the City of New York, the Department of Health and Mental Hygiene of the City of New York, and Sye-Eun Ahn, as follows:

A. A declaration that Defendants City of New York and DOHMH discriminated against Plaintiffs on the basis of race, shared ancestry, ethnic characteristics, and national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

B. A declaration that Defendants discriminated against Plaintiffs in the terms, conditions, and privileges of their employment, subjected them to a hostile work environment, and retaliated against the HINENU Plaintiffs, because of their creed, religion, race, ethnicity, and national origin, in violation of N.Y. Exec. Law § 296 and N.Y.C. Admin. Code § 8-107, and that Defendant Ahn aided and abetted those

violations in violation of N.Y. Exec. Law § 296(6) and N.Y.C. Admin. Code § 8-107(6);

C. A declaration that Defendants City of New York, DOHMH, and Ahn denied Plaintiffs the equal protection of the laws in violation of the Fourteenth Amendment, and abridged their freedom of speech, freedom of association, and right to petition in violation of the First and Fourteenth Amendments;

D. A permanent injunction directing Defendants to recognize HINENU: The Jewish ERG as an ERG of the Department on the same terms, and with the same resources and privileges, as every other recognized ERG, and enjoining Defendants from denying recognition or resources to any employee group on the ground that Jewish identity is "religious";

E. A permanent injunction directing Defendants to expunge EEO Case No. 161370 and all records of it from the HINENU Plaintiffs' personnel and EEO files, to issue to each of the HINENU Plaintiffs a written statement that no finding of wrongdoing was or could be made against her, and enjoining Defendants from relying on that matter in any employment decision;

F. A permanent injunction directing Defendants to apply and enforce their written policies governing the use of agency e-mail, agency communications channels, workplace signage, and employee groups on a basis that does not discriminate on the ground of religion, creed, race, ethnicity, ancestry, or national origin; and directing Defendants to adopt and implement policies, procedures, and training reasonably designed to prevent and remedy harassment of and discrimination against Jewish employees, including harassment directed at Jewish employees'

identification with the Land and State of Israel, on the same terms as Defendants' policies addressing bias against other protected groups;

G. Compensatory damages for the injuries suffered by each Plaintiff and, on Plaintiffs' claims under N.Y. Exec. Law § 296, N.Y.C. Admin. Code § 8-107, and 42 U.S.C. § 1983, for the emotional distress, humiliation, and reputational harm suffered by each Plaintiff, in an amount to be determined at trial, punitive damages against Defendant Ahn, and nominal damages;

H. Attorneys' fees, expert fees, and costs, as permitted by 42 U.S.C. § 1988, N.Y. Exec. Law § 297(10), N.Y.C. Admin. Code § 8-502(g), and other applicable law;

I. Pre-judgment and post-judgment interest to the extent permitted by law; and

J. Such other, further, and additional relief as this Court deems just, necessary, and appropriate.

Dated: New York, New York
November 10, 2026

Respectfully submitted,

NATIONAL JEWISH ADVOCACY CENTER

By: /s/ Alan H. Scheiner
Alan H. Scheiner
3 Times Square, Suite 512
New York, NY 10036
(332) 278-1100 x 754
alan@njaclaw.org
*Attorneys for Plaintiffs*